# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IRMA B. SANCHEZ,<br><br>Plaintiff,<br><br>v.<br><br>STATE OF CALIFORNIA, et al.,<br><br>Defendants. | Case No.  1:12-cv-01835-SAB<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT<br><br>(ECF Nos. 59-70, 75-80, 82-87) |

Currently before the Court is Defendants California Department of Corrections and Rehabilitation[1] ("CDCR") and Sidney Smyth's motion for partial summary judgment.[2]

## I.

## PROCEDURAL HISTORY

Plaintiff Irma B. Sanchez ("Sanchez" or "Plaintiff") filed this action on November 8, 2012.  On May 15, 2013, Plaintiff filed a first amended complaint.  Plaintiff alleges seven causes of action for sexual harassment and retaliation in violation of 42 U.S.C. § 1983; 42 U.S.C. §§ 2000e et seq. ("Title VII"); and the California Employment and Housing Act ("FEHA"), California Government Code sections 12940 et seq.

---

[1] Plaintiff brought this action against the State of California.  The CDCR is the state agency which employed Plaintiff and Defendant Smyth and at which the incidents alleged occurred.

[2] The parties have consented to the jurisdiction of a magistrate judge.  (ECF Nos. 7, 12.)

1    On January 16, 2015, Defendants CDCR and Smyth filed a motion for partial summary

2  judgment on the second, fourth, sixth, and seventh causes of action.  Plaintiff filed an opposition

3  on February 11, 2015.   On February 12, 2015, Plaintiff filed a corrected opposition and

4  declaration.  On February 18, 2015, Defendants CDCR and Smyth filed a reply and objections to

5  Plaintiff's opposition.

6                                              **II.**

7                                      **LEGAL STANDARD**

8    Under Federal Rule of Civil Procedure 56, "[s]ummary judgment is appropriate only if,

9  taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to

10  the non-moving party, there are no genuine issues of material fact and the moving party is

11  entitled to judgment as a matter of law."  Smith v. Clark Cnty. Sch. Dist., 727 F.3d 950, 954 (9th

12  Cir. 2013) (citations omitted).  A fact is material if, under the substantive law governing the

13  action, resolution of the fact might affect the outcome of the suit.  Anderson v. Liberty Lobby,

14  Inc., 477 U.S. 242, 248 (1986).  Summary judgment must be entered "against a party who fails to

15  make a showing sufficient to establish the existence of an element essential to that party's case. .

16  . ."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "[A] party seeking summary judgment

17  always bears the initial responsibility of informing the district court of the basis for its motion,

18  and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and

19  admissions on file, together with the affidavits, if any,' which it believes demonstrate the

20  absence of a genuine issue of material fact."  Id.

21    If the moving party meets its initial responsibility, the burden then shifts to the opposing

22  party to establish that a genuine issue as to any material fact actually does exist.  Matsushita

23  Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the

24  existence of this factual dispute, the opposing party may not rely upon the denials of its

25  pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or

26  admissible discovery material, in support of its contention that the dispute exists.  Fed. R. Civ. P.

27  56(e); Matsushita, 475 U.S. at 586 n.11.  This requires the party opposing summary judgment to

28  respond with more than mere hearsay and legal conclusions, Kaiser Cement Corp. v. Fischbach

and Moore, Inc., 793 F.2d 1100, 1104 (9th Cir. 1986), or "simply show that there is some metaphysical doubt as to the material facts[,]" Matsushita, 475 U.S. at 586.

The Ninth Circuit has cautioned that in evaluating motions for summary judgment in employment discrimination cases, we must zealously guard an employee's right to a full and fair trial because "discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses." McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1112 (9th Cir. 2004). This sets a high standard for granting summary judgment in employment discrimination cases. Schnidrig v. Columbia Mach., Inc., 80 F.3d 1406, 1410 (9th Cir. 1996) (citations omitted). Very little evidence is required to survive summary judgment in an employment discrimination case because "because the ultimate question is one that can only be resolved through a 'searching inquiry'-one that is most appropriately conducted by the factfinder, upon a full record." Schnidrig, 80 F.3d at 1410 (citations omitted). Nevertheless, summary judgment is appropriate where there is a "[f]ailure to allege 'specific facts' that establish the existence of a prima facie case" or "when evidence to refute the defendant's legitimate explanation is totally lacking'. . . even though plaintiff may have established a minimum prima facie case." Hunt v. City of Portland, 726 F.Supp.2d 1244, 1255 (D. Or. 2010) (citations omitted).

**III.**

**UNDISPUTED FACTS**

1.    Sanchez has been employed by the CDCR as a correctional officer at California State Prison-Corcoran ("Corcoran") since 1994.

2.    Smyth has been employed as a correctional officer with CDCR since 1995, and worked at Corcoran from 1997 through December 2014.

3.    CDCR operates Corcoran. The inmate population at Corcoran is organized into facilities which typically include housing units for inmates, a yard, gym, dining facility, and other buildings.

4.    Correctional officers are assigned to positions known as posts. Each post has certain duties and responsibilities, a certain shift (known as a watch), and set days off.

5.      Correctional officers bid for posts, and bids are won based on seniority.

6.      In 2010, Sanchez's post was on the 3C facility in building 02 where she worked the second watch (6:00 a.m. to 2:00 p.m.) five days per week.

7.      In 2010, Smyth's post was on the 3C facility as a relief officer.

8.      On Sundays, Smyth worked with Sanchez on the second watch in building 02.

9.      During the other days of the week, Smyth worked in other buildings.

10.     On September 28, 2010, Sanchez filed her first internal sexual harassment equal opportunity ("E.O.") complaint against Smyth.

11.     Sanchez's September 28, 2010, complaint alleged that "sexual harassment by C/O S. Smyth over the last 7-8 months continues."  Sanchez claimed that Smyth would stare at her, make comments of a sexual nature, she was uncomfortable doing cell searches with him, onetime he walked into the unisex staff restroom while she was inside, and he would hang-up the phone when male officers called for her.

12.     Sanchez's complaint was referred to the CDCR Internal Affairs Office of Civil Rights for investigation in Bakersfield, California.

13.     On January 3, 2011, Eric Lawton became the new program sergeant for facility 3C and thus became Sanchez's and Smyth's direct supervisor.

14.     Within days of Lawton becoming the new program sergeant, Sanchez told him that she had filed a sexual harassment complaint against Smyth, and that she did not want to work with him alone.

15.     On or about January 20, 2011, CDCR Office of Internal Affairs closed the investigation into Sanchez's complaint and concluded that no violation of CDCR's EEO policy was found.

16.     Lieutenant Weaver met with Smyth and Sanchez and informed them that the investigation had been unsubstantiated, and that the two of them were expected to remain on the 3C facility, be professional, and carry out their duties.[3]

---

[3] Plaintiff disputes this fact stating that she was not told that she was expected to remain on Facility C and as soon as she could she bid for a new position.  (Decl. of Irma B. Sanchez ¶ 9, ECF No. 78.)  Defendant objects to this and Plaintiff's other disputes with the statement of undisputed facts on the ground that Plaintiff's dispute with the stated

17.     On or about February 14, 2011, Sanchez had bid into a new post on the 3C facility, and began working in building 04.

18.     With Sanchez's new post, she no longer worked with Smyth in the same building one day per week.

19.     Smyth remained working on the 3C facility as a relief officer in the new bid.

20.     Correctional officers are expected and required to perform duties which include search and escort duties, pat downs, helping with the morning meal release, working the steam line in the cafeteria, and filling other posts when needed by the institution, among other duties.[4]

21.     At Sanchez's request, Lawton gave Sanchez permission to switch (swap) with other officers in the event she was expected to perform collateral duties with Smyth.

22.     Lawton never told Sanchez she could not switch with other officers so that she would not have to work with Smyth.

23.     Switching, or swapping as Sanchez calls it, is a voluntary decision among correctional officers to trade places at work, subject to supervisory approval.

24.     When Lawton became the 3C facility program sergeant, he restructured the process for releasing inmates from their cells for morning meal.

25.     Lawton would serve on the meal release team along with two other correctional officers. They would move from one building to the next until all of the inmates had been released for morning meal. When Lawton could not serve on the meal release team, he ensured that at least two officers were providing meal release coverage. Some days, he had to redirect officers from other duties to meet the two officer meal release team minimum.[5]

---

fact is not material. The Court sustains Defendants' objections on the ground that the disputes raised by Plaintiff are not material except as otherwise noted in this order. The fact does not indicate that Plaintiff was expected to remain on Facility C indefinitely or that she was not to bid for other positions.

[4] Although Defendants identified these duties as collateral, Plaintiff states that they are a regular part of her assignment as a correctional officer. (Id. at ¶ 10.)

[5] Lawton states that he served on the meal team most days (Decl. of Eric Lawton ¶ 8, ECF No. 66), Plaintiff contends that his presence was limited and sporadic, (ECF No. 78 at ¶ 4). Defendants object on the ground that Plaintiff has not laid a foundation that she is aware of Sgt. Lawton's participation on the meal release team. For purposes of this motion, the frequency of Sgt. Lawton's participation on the meal release team is irrelevant and shall not be considered.

1    26.    On October 19, 2011, Lawton called building 02 and talked to Smyth.

2    27.    On October 19, 2011, Lawton told Smyth that either Smyth or his partner were

3    needed to go to building 04 for the meal release.

4    28.    On October 19, 2011, Smyth went to perform the meal release.

5    29.    At approximately 6:30 a.m. on October 19, 2011, Sanchez called Lawton

6    regarding working with Smyth.[6]

7    30.    On October 19, 2011, Sanchez called officers on the 3C facility and asked if

8    anyone wanted to swap with her.  No one wanted to swap.

9    31.    On October 19, 2011, Sanchez stayed in her office while Smyth released the

10   inmates from building 04.

11   32.    On October 19, 2011, when Smyth finished releasing the inmates from building

12   04, he went to building 03.

13   33.    On October 19, 2011, Sanchez stayed in building 04 during the meal release.

14   34.    On October 19, 2011, Sanchez's meal release duties required her to go to building

15   03.

16   35.    On October 19, 2011, without having a partner present, Smyth released the

17   inmates from building 03.

18   36.    On October 19, 2011, Smyth called Lawton and told him that he had released the

19   inmates from building 03 without a partner, and that Sanchez had stayed in building 04.

20   37.    On October 19, 2011, Lawton instructed Smyth to standby on releasing building

21   02 pending the arrival of a second officer.

22   38.    On October 19, 2011, it was unsafe for Smyth to perform he meal release without

23   a partner.

24   39.    Lawton went to 3C04 and found Sanchez not assisting with meal release.

25

26   _____

27   [6] The parties dispute whether Plaintiff informed Sgt. Lawton that she would not work with Smyth on this date.
     Plaintiff called and stated that she could not work with Smyth alone.  (ECF No. 83 at ¶ 19.)  There is a dispute as to
     whether this information informed Sgt. Lawton that Defendant Smyth had responded to assist with the meal release
28   on October 19, 2011.

1  40.    Sanchez admitted to staying in her office while Smyth released the inmates from

2  building 04, and she admitted to remaining in building 04 instead of going to building 03 with

3  Smyth.

4  41.    On October 20, 2011, Lawton and Sanchez met in his office to discuss the previous

5  day's meal release incident.

6  42.    On October 20, 2011, Lawton verbally counseled Sanchez about how she had

7  jeopardized staff safety by not participating in the meal release.[7]

8  43.    In response to Sanchez's refusal to perform her duties on October 19, 2011, Sanchez

9  was issued a cease and desist memorandum on October 23, 2011.[8]

10  44.    During her deposition on August 14, 2014, Sanchez initially testified that she did not

11  believe the cease and desist memorandum was disciplinary and that she did not know whether she

12  was given this memorandum in retaliation for complaining about Smyth.

13  45.    Sanchez stated in her November 9, 2011, EEO complaint that Counselor Ortega

14  ("Ortega") received a "Hurt Feelings Report" in her mailbox on October 25, 2011.  Ortega showed

15  this document to Sanchez and Correctional Officer Cody.

16  46.    On October 27, 2011, Sanchez found three copies of the same document on the desk

17  she shared with another officer.

18  47.    Sanchez does not know who put the document on her desk.

19  48.    Sanchez believes the document was put on her desk in retaliation because several

20  staff members had seen her crying a few days earlier.

21  49.    Sanchez does not know if the staff members knew what she was crying about.[9]

22

23  [7] The parties dispute whether Plaintiff contacted a supervisor prior to refusing to assist with the meal release.
24  Plaintiff testifies that she attempted to contact Sgt. Lawton multiple times but he did not answer his phone or the
    phone was busy.  (ECF No. 83 at ¶ 19.)

25  [8] Plaintiff disputes this fact based upon her understanding of the conduct the cease and desist memorandum covered.
    However, Plaintiff states that it was clear to her that the memorandum was issued "because she refused to work
26  alone with Defendant Smyth to perform the morning release on October 19, 2011."  (ECF No. 78 at ¶ 24.)  Further,
    Plaintiff disputes many of the facts set forth by Defendants stating that she did not refuse to perform her duties, but
27  refused to work with Defendant Smyth.  However, Plaintiff's reason for refusing to work with Defendant Smyth
    does not refute the fact that she did not assist in releasing inmates for the morning meal although it was her duty on
28  October 19, 2011.

50.     Sanchez believed the document was put on her desk because she had complained about working with Smyth.

51.     On November 9, 2011, Sanchez filed a second internal EEO complaint.

52.     Sanchez's November 9, 2011 complaint accused Smyth of stalking her, and calling her names.

53.     Sanchez's November 9, 2011 complaint stated that on October 20, 2011, Lawton told her that she would be getting a letter of instruction, but on October 23, 2011, Lawton gave her a cease and desist order instead.

54.     After having been investigated by CDCR Internal Affairs, Sanchez's November 9, 2011 complaint closed on July 31, 2012.  No violation of CDCR's EEO policy was found.

55.     The cease and desist memorandum that was issued to Sanchez on October 23, 2011, made no reference to the October 19, 2011 incident, including Sanchez's refusal to perform meal release duties on October 19, 2011.[10]

56.     To create a written record of the performance issue, Lawton issued Sanchez a written counseling on November 17, 2011.

57.     CDCR's Department Operations Manual ("DOM") defines an employee counseling record as "[a] written record of counseling, documented on a CDC Form 1123, between a supervisor and subordinate which provides formal instruction about laws, rules, policies and employer expectations."

58.     An employee counseling record is a form of corrective of action.  CDCR's DOM provides that the purpose of corrective action is to help an employee change problem behavior or performance before discipline is necessary and may be imposed for any employee conduct or performance that is correctable by means of counseling and/or training (up to and including a Letter of Instruction).

---

[9] In her deposition testimony, Plaintiff stated that she did not know if other people knew what she was crying about. (Depo. of Irma Sanchez 305:5-7.)  In her declaration, Plaintiff states that officers saw her leaving in tears, (id. at ¶ 22), but this does not contradict the statement that she did not know if other staff members knew why she was crying.

[10] Plaintiff states that Lawton made it clear to her that the cease and desist letter was issued due to her refusal to work alone with Defendant Smyth on October 19, 2011.  (ECF No. 78 at ¶ 24.)

59.     The counseling record that was given to Sanchez on November 17, 2011, documented her refusal to perform meal release duties, and the safety issue that resulted from that refusal.

60.     Sanchez admitted her duties on October 19, 2011, including going to other buildings to help with the meal release and she did not do that.

61.     CDCR propounded interrogatories upon Sanchez.  Interrogatory number six asked Sanchez to: Describe every act of retaliation for which YOU are seeking damages in this action, including:  a.  The name of the PERSON who retaliated against YOU; b.  The approximate month and year the retaliation occurred; and c.  A description of the retaliation.

62.     Sanchez responded to interrogatory number six without objection stating: 1. Sgt. E. Lawton, October 23, 2011.  Issued Officer Sanchez a cease and desist order; 2. Sgt. Lawton, November 17, 2011. Issued Officer Sanchez a disciplinary 1123 write up; 3. Sgt. Lawton assigned Officer Sanchez extra duties out of her building, including, but not limited to, additional cell searches in other buildings or inventory of property in other buildings.  Despite being assigned as "release team," charged with releasing inmates for breakfast, Sgt. Lawton would take Officer Sanchez off the "release team," and place her on the "steam line," charged with monitoring inmate activity in the dining commons.  Officer Sanchez had not been previously regularly assigned as "steam line." Meanwhile, Sgt. Lawton would have another officer replace Officer Sanchez on the "release team."

63.     Sanchez did not supplement her interrogatory response.

64.     During her deposition, Sanchez testified that she thought she was also retaliated against by being forced to work with Officer Smyth, because she received a hurt feelings report, and because Lieutenant Fresquez told her that he would find her a good job off the yard if she wanted to move.

65.     Sanchez was issued a cease and desist memorandum on October 23, 2011, and a written counseling (CDCR Form 1123) on November 9, 2011, in response to her refusal to perform her duties on October 19, 2011.[11]

---

[11] See footnote 5, supra.

9

1  66.    Although the memorandum stated it would be placed in her supervisory file, Sanchez
2  has no evidence that the cease and desist memorandum was ever placed into her supervisory file.

3  67.    Because the cease and desist order made no reference to Sanchez's refusal to perform
4  her duties on October 19, 2011, the counseling dated November 17, 2011, was issued to create a
5  written record of what had transpired that day to be used to correct performance deficiencies.[12]

6  68.    Sanchez testified that the cease and desist memorandum did not impact her ability to
7  promote, transfer, or enter into work programs.

8  69.    The written counseling was issued within 30 days of the performance incident, in
9  accordance with CDCR DOM section 33030.8.

10  70.    Safety and security is a top priority in a prison.

11  71.    For operational, safety and security reasons, correctional officers may be diverted
12  from their posts to perform other duties which include search and escort duties, yard duties, and
13  filling other posts in the prison, to name a few.

14  72.    Sanchez's work schedule did not change (she continued to work the same days and
15  hours each week), she was not demoted, and she did not receive any reduction in pay when
16  performing the alleged duties outside of her assigned post.

17  73.    During her EEO interview on April 19, 2012, Sanchez admitted that part of her job
18  description was doing jobs as needed other than in the housing unit.

19  74.    During her EEO interview on April 19, 2012, Sanchez admitted that in 2011, Lawton
20  would redivert other staff from their posts to do other duties.

21  75.    During Sanchez's deposition, when asked if she had ever inventoried property before
22  she had filed her complaint, Sanchez testified "I'm sure I have, but I don't remember.  I'm sure I
23  have."

24  76.    During her deposition, Sanchez admitted that she had been assigned cell search duties
25  outside of her yard as extra duties before she filed her complaint.

26  _____
[12] Plaintiff contends that she was not provided with any type or corrective action plan.  (ECF No. 78 at ¶ 27.)
27  However, the employee counseling record does include an action plan and Plaintiff's argument does not contradict
the statement that the employee counseling record was issued to create a written record of what transpired on
October 29, 2011 or that what occurred that day was to correct performance deficiencies.  (Employee Counseling
28  Record, ECF No. 62-2 at 85.)

77.   During her deposition, Sanchez admitted that she had been assigned cell search duties that did not follow a schedule before she made her complaint.

78.   During her deposition, Sanchez testified that she had worked outside in the yard as part of an "extra duty" before she had filed her complaint against Smyth.

79.   Sanchez believes Lawton purposefully assigned her to the steam line so that she would be near Smyth who was assigned to the cafeteria.

80.   Sanchez never reported being assigned to the steam line in her November 9, 2011 EEO complaint.

81.   Sanchez never reported being assigned to the steam line to the EEO investigator on April 12, 2012

82.   During her deposition, Sanchez could not provide any specific dates or times of when the alleged extra duties began, and how long they lasted, other than that they started after 2010 and lasted "a while."

83.   During her EEO interview on April 12, 2012, however, Sanchez stated that Lawton redirected her to perform other duties "at least a good three and a half weeks." Sanchez told the investigator that this occurred about nine or ten times.

84.   In regards to being redirected, Sanchez told the investigator that "I didn't mind, I really don't.  I'm a worker."

85.   At her deposition Sanchez testified that being "forced" to work with Smyth occurred when "Sergeant Lawton would send him to go and release chow knowing that I did not want to work with him."

86.   Smyth was directed off the 3C facility effective November 21, 2011, which meant that he would no longer be working anywhere near Sanchez.[13]

87.   On October 25, 2011, Correctional Counselor Ortega found a "Hurt Feelings Report" in her mailbox.

---

[13] Plaintiff states that Smyth continued to come into her work unit to make contact with her.  (ECF No. 78 at ¶¶ 11-13.)

88. Sanchez's January 10, 2012, EEOC charge alleges that "[o]n or about December 2011, Lt. Fresquiz [sic] informed me to look for another job."

89. Sanchez told the investigator that Fresquez stated he did not like to see her cry, and that he wanted to see if he could place her "in another yard, or another job."

90. Sanchez told Fresquez that "well, if I don't have to go, I would just want to stay here."

91. Fresquez never moved Sanchez.

92. Sanchez explained that she had this conversation with Fresquez during "his second day on the yard as a lieutenant" and that she did not think he was retaliating against her.

93. Sanchez stated that Fresquez "was probably just trying to get me another job and, you know, that way I wouldn't have to -- um -- be sexually harassed by -- by Smyth."

94. Sanchez told the investigator that she was dropping her complaint against Fresquez.

95. At her deposition, however, Sanchez testified that she thought Fresquez retaliated against her when he asked if she wanted to be moved off the yard.

96. Sanchez testified that Fresquez "said he'd give me a good job somewhere else."

97. She believed Fresquez's conversation was retaliation because she had not bid to be moved off the yard.

98. When Smyth entered Sanchez's building to assist with the meal release on October 19, 2011, she stayed in her office while he released 200 inmates from her building.

99. When the inmates from Sanchez's building had been released, Sanchez was required to leave her building and go to the next building (03) to release inmates for morning meal.

100. Sanchez did not go building 03.

101. Sanchez filed her first internal EEO complaint on September 28, 2010. It was closed as unfounded on or around January 20, 2011.

102. The cease and desist memorandum was issued more than one year after Sanchez's September 28, 2010, EEO complaint.

1    103.    While Sanchez had filed an EEOC charge on March 8, 2011, Lawton was unaware of

2  the status or substance of the charge when he issued the cease and desist memorandum.[14]

3    104.    On November 17, 2011, Lawton memorialized his verbal counseling with Sanchez

4  from October 20, 2011.

5    105.    During her deposition, Sanchez could not provide specific dates of when the alleged

6  "extra duties" began other than they started after 2010.

7    106.    Sanchez did not complain about performing "extra duties" in her March 8, 2011

8  EEOC charge.

9    107.    Sanchez did not complain about "extra duties" when she filed her internal EEO

10  complaint on November 9, 2011.

11    108.    Sanchez's first complaint about "extra duties" was in her January 10, 2012 EEOC

12  charge, where she alleged that she had been subject to "increased work assignments including, but

13  not limited to, more escorts and searches."

14    109.    Sanchez attributes Lawton for the "extra duties," which must have started sometime

15  after she filed her internal EEO complaint on November 9, 2011.

16    110.    Sanchez testified at her deposition that she did not know why her supervisors would

17  be forcing her to work with Smyth, but it could have been because she filed complaints against him.

18    111.    Lawton gave Sanchez permission to switch (swap) with other officers to avoid

19  contact with Smyth.

20    112.    Sanchez statements to the EEO investigator on April 10, 2012, indicate that Sanchez

21  was aware of the extent to which Lawton was trying to keep her and Smyth apart.

22    113.    In the context of the extra duties, Sanchez went so far as to state that "Sergeant

23  Lawton was probably trying to do his job.  I -- I kind of feel bad because he was caught in the middle

24  of it."

25    114.    During her deposition, Sanchez admitted that Lawton never personally told her that

26  she could not swap with other officers on October 19, 2011.

27

28

[14] Plaintiff sets forth that she filed two complaints, however, the fact that the complaints were filed and being investigated does not show that Lawton was aware of the status or substance of the charge when he issued the cease and desist memorandum.  (Id. at ¶15.)

115.    Sanchez has no idea who put the hurt feelings report on her desk.

116.    When asked why she believed it was put on her desk in retaliation for complaining about Smyth, Sanchez testified that it was because staff had seen her crying a few days earlier.

117.    Sanchez does not know if the staff knew what she was crying about.

118.    Sanchez thought she had received the report because she had complained about working with Smyth.

119.    Sanchez's co-workers had received the same report in her mailbox on October 25, 2011.

120.    The cease and desist memorandum set forth the expectation that Sanchez would conduct herself in a professional manner during any contact with Smyth, and with other staff, and inmates.

121.    Sanchez testified that during meal release 200 inmates line-up out of their cells and then file out of the building to the dining hall.

122.    During Sanchez's 20 year career with CDCR, there was only one time she completed the meal release without a partner. That incident upset Sanchez, and she testified that her safety was in jeopardy.

123.    Sanchez testified that being female and doing the meal release alone was unsafe, and that it is "probably" safer when two officers perform the meal release together.

124.    From time to time correctional officers are diverted from their posts to perform duties to meet institutional needs.

125.    To the extent that Sanchez was diverted from her post to perform different duties, it was done to meet the operational, safety and security needs of the prison.

126.    Smyth and Sanchez were co-workers.  Smyth did not have supervisory authority over Sanchez, such as the authority to fire or promote her, or to schedule her work assignments and which shifts she worked on.

127.    Sanchez admitted that any alleged harassment or retaliation by Smyth would have violated CDCR policy, and that sexually harassing her and retaliating against her was not one of his job responsibilities.

128.    Sanchez testified that if Smyth was sexually harassing her or retaliating against her, his conduct would have been outside the scope of his duties.

129.    On September 23, 2011, Smyth reported to building 04 as instructed for meal release coverage.  When he arrived, Sanchez swapped with an officer from building 05.  Smyth and that officer conducted the meal release together.

130.    Sanchez does not know whether the cease and desist memorandum was ever placed in her supervisory file.

131.    The written counseling that Lawton issued Sanchez on November 9, 2011, was given within 30 days of her refusal to perform her duties on October 19, 2011, in accordance with the CDCR DOM.

132.    Sanchez admitted that being assigned to the steam line was not an extra duty.

133.    After Warden Gipson learned that Sanchez had filed an internal discrimination complaint against Smyth, she redirected Smyth off of his post on the 3C facility and assigned him to work in a different area of the prison.

134.    The purpose of redirecting Smyth was to minimize, if not eliminate, contact between Sanchez and Smyth while Sanchez's November 2011 EEO complaint was being investigated.

135.    Sanchez told the EEO investigator on April 19, 2012 that: "I was making it difficult I guess as a supervisor for him to have to – uh – continuously, you know, break us apart, or listen – hear me out, you know, to where I would have to call Lawton and let him know that Smyth is in my unit again, I need to switch with somebody."

136.    Mass movements, like releasing inmates from their cells for morning meal, create certain risks for staff and inmates.

137.    Given the low ratio of correctional officers to inmates during mass movements, there is a heightened risk that inmates could attack correctional officers or other inmates, or otherwise become disruptive.

138.    When Sanchez refused to assist with meal duties on October 19, 2011, this risk was elevated and handicapped the prison's ability to address any violent incidents.

1      139.    When Sanchez refused to assist with the morning release Smyth did not have a

2 partner on the floor to assist him or be available to provide immediate assistance in the event that

3 inmates attacked him or became disruptive.

**IV.**

**OBJECTIONS TO PLAINTIFF'S STATEMENT OF DISPUTED FACTS**

6      Plaintiff filed a statement of disputed facts and, in response, Defendants filed objections to

7 the facts contained therein.  Defendants object to the majority of Plaintiff's statement of disputed

8 facts on the ground that they are immaterial to the present motion, irrelevant or both.  Having

9 reviewed the statement of disputed facts, the Court will sustain the objections with the following

10 exceptions.

11     **A.**    **Objections Based on Materiality and Relevance**

12      Defendants object to specific conduct of Defendant Smyth that was directed at Plaintiff and

13 she found to be sexual harassment on the grounds that it is immaterial and irrelevant to whether she

14 has been subjected to an adverse employment action.  "Evidence is relevant if: (a) it has a tendency

15 to make a fact more or less probable than it would be without the evidence; and (b) the fact is of

16 consequence in determining the action.  Fed. R. Evid. 401.

17      Defendants contend that this motion is not about whether Defendant Smyth sexually harassed

18 Plaintiff.  However, as discussed in more detail below, the Ninth Circuit held in Ray v. Henderson,

19 217 F.3d 1234 (9th Cir. 2000), that harassment as retaliation for engaging in protected activity is

20 actionable where the harassment is "sufficiently severe or pervasive to alter the conditions of the

21 victim's employment and create an abusive working environment."  Ray, 217 F.3d at 1245

22 (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)).  Therefore, Plaintiff's

23 statements regarding the treatment that she was subjected to after complaining of the sexual

24 harassment are relevant to determine the severity and pervasiveness of the alleged sexual

25 harassment.

26      While Defendants argue that this motion is about what they did to help her avoid working

27 with Defendant Smyth, the basis of Plaintiff's complaint is that her supervisors continued to

28 allow Defendant Smyth to sexually harass her and made her work alone with him knowing that

he was sexually harassing her.  Plaintiff's position is that the hostile work environment itself was the adverse employment action and Defendant CDCR created the hostile work environment by allowing Defendant Smyth to sexually harass her in retaliation for her complaints.  Accordingly, Defendants' objections on the grounds of materiality and relevance are overruled as to Plaintiff's statement of disputed facts numbers 5, 6, 8, 9, 10, 24, and 25.

Defendants argue that it is immaterial and irrelevant whether Lt. Baer knew that Plaintiff intended to file an EEO complaint against Defendant Smyth when he directed Sgt. Lawton to issue the cease and desist order to Plaintiff.  However, knowledge of the intent to file a complaint is relevant and material to the issue of whether there was a causal link between the protected activity and the adverse employment decision which is an element of the retaliation claim.  Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1064 (9th Cir. 2002).  Defendants' objections on the grounds of materiality and relevance are overruled as to Plaintiff's statement of disputed facts numbers 14, 15.

### B.      Objections Based on Lack of Foundation and Hearsay

Defendants object to several statements on the grounds of lack of foundation and hearsay. "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."  Fed. R. Evid. 602.  Hearsay is "a statement that:  (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).  A statement made by the opposing party or by the party's agent or employee on a matter within the scope of the relationship is not hearsay when offered into evidence against the opposing party.  Fed. R. Evid. 801(d)(1)(d).

### 1.      Plaintiff's Disputed Statement Number 16

Plaintiff's disputed statement number 16 states that Sgt. Lawton told Plaintiff's partners that they could no longer change positions with Plaintiff to allow her to avoid Defendant Smyth. (ECF No. 86 at 9.)  In support of this fact, Plaintiff offers the testimony of Officer Gaulden that he was told by Officer Benevides that they could no longer swap with Plaintiff and Plaintiff's

own declaration.   Defendants object on the grounds of lack of foundation and hearsay.[15]

Defendants' objection to the statement allegedly made by Sgt. Lawton is sustained on the

---

[15]     Officer Gaulden testified:

> Q.       . . . at some point did you understand from Lawton that you were – no longer had his authority to change the slots for the breakfast?
>
> A.       He actually called Officer Benevides and told Benevides that change-out is no longer approved.

(Depo. of Rodney Anthony Gaulden, Sr. 44:15-20, ECF No. 77-1 at 9.)  Officer Gaulden was questioned about a memorandum, and he testified:

> A.       I haven't seen this before.
> Q.       Okay. That's the day he stopped us - - after we even got permission for that to happen.
> Q.       So is it your - - what does this memorandum tell you or remind you of?
> A.       That's the day that he took away the permission to change spots out with her.
> Q.       Okay.
> A.       These - - this spot, this morning feeding spot –
> Q.       Yes, sir.
> A.       -- was not an assigned spot.
> Q.       Un-huh.
> A.       They just wanted them covered.  They didn't care up until that day, apparently, if I went to the dining hall or if she went to the dining hall or if the guy up top went – well, the guy on the top had to get permission for that because that would be leaving his post completely.
>          As far as the bottom two officers on the floor –
> Q.       Yes.
> A.       Which is Sanchez and myself, there was no real big deal who went where.  They just wanted those positions covered.
> Q.       Yes, sir.
> A.       That's why we made it a point Benevides and myself, to call Sergeant Lawton and ask permission to make the swap-outs because that would mean Benevides would have to leave his post.  Excuse me on that.
>          And so it was – and I remember that.
> Q.       Okay.
> A.       All of a sudden – because prior to that, we got permission to swap out.
> Q.       Yes, sir.
> A.       And the only one we really needed permission for was Benevides because she – he had to completely leave his control booth, which was an assigned post for him, to come down to the floor area so she could go up there.
> Q.       Uh-huh.
> A.       It was something that we had worked out with Lawton to avoid complications of Sanchez not being able to complete her task the rest of the day because she had these interactions with Smyth.
> Q.       Uh-huh.
> A.       And that's probably the day that it was no longer okay anymore.  But we had received permission before that –
> Q.       Okay.
> A.       -- to make this change-out.

(Id. at 101:20-:103:22.)

1   grounds of lack of foundation.  Plaintiff has not submitted any evidence to show that Officer

2   Gaulden had knowledge of where the directive that they could no longer swap with Plaintiff

3   originated.

4          However, Officer Gaulden testified that it was Officer Benevides who needed to get

5   permission to swap out because he would have to leave his post to switch with Plaintiff.  Officer

6   Benevides conveyed to Officer Gaulden that he had been informed he could no longer swap out

7   with Plaintiff.  This is information which was conveyed by an employee of the CDCR in the

8   course and scope of employment and related to the duties that the officers were performing.

9   Officer Gaulden's statement that Officer Benevides told him that he could no longer swap with

10  Plaintiff is not hearsay and the objection is overruled as to this statement.   Fed. R. Evid.

11  801(d)(1)(d).

12         2.     Plaintiff's Disputed Statement of Facts Number 18

13         Defendants object to Plaintiff's disputed statement of fact number 18, that Sgt. Lawton

14  admitted to staff that he put the "hurt feelings" memo into circulation in the yard on the ground

15  that Plaintiff did not submit any admissible evidence to support the fact.

16         Officer Gaulden testified that during a general meeting after the memo was distributed,

17  Sgt. Lawton "made a general apology.  He said, 'Some people don't know what's funny.  Some

18  people don't know what's not funny.  I just found out I can't give this stuff out.  I can't put this

19  stuff around.  So accept my apologies if I hurt anybody's feelings.' "  (Depo. of Gaulden 99:4-

20  18.)  Defendants cite to sections of the deposition where Officer Gaulden states that Sgt. Lawton

21

22         Officer Gaulden testified that Sgt. Lawton allowed them to swap out as long as the posts are covered.  (Id.
       at 131:16-132: 8.)  Officer Gaulden stated that Officer Benevides told him Sgt. Lawton said they could no longer
23     swap out.  (Id. at 132:9-11.)
       Q.     And did he tell you that he talked to Lawton.
24     A.     I don't remember how it got conveyed to him.  I was just told by Benevides that we couldn't swap out
       anymore.
25     Q.     So Benevides is the one that told you that Sanchez couldn't swap out anymore?
       A.     That we couldn't swap out with Sanchez anymore.
26     Q.     Okay.  And you don't know how Benevides got that information, correct?
       A.     I don't know who told Benevides.  All I know is I was conveyed – conveyed to me through Benevides that
27     we couldn't swap out with Sanchez anymore.
       (Id. at 132:12-133:1.)
28

1   never directly told him that he was the person who distributed the memorandum, but the

2   statements at the general meeting are admissible as statements of the opposing party and the

3   inference could be drawn that Sgt. Lawton distributed the memo.   Defendants' objection to

4   disputed statement of fact number 18 is overruled.

5                                                     **V.**

6                                               **ANALYSIS**

7           Defendant CDCR moves for summary judgment on the second and fourth cause of action,

8   retaliation in violation of Title VII and the FEHA.  (Defendants' Memorandum in Support of Motion

9   for Partial Summary Judgment 14, ECF No. 60.)

10          **A.        Retaliation**

11          Defendants argue that they are entitled to summary judgment on Plaintiff's retaliation claims

12  under Title VII and FEHA because Plaintiff has not suffered an adverse employment action; there is

13  no evidence that her protected activity was the cause of any adverse employment action; and there

14  was a legitimate business reason for any allegedly adverse employment action.  (ECF No. 60 at 14-

15  28.)

16          Plaintiff's retaliation claim is subject to the burden shifting analysis of McDonnell

17  Douglas Corp. v. Green, 411 U.S. 792 (1973).  Davis v. Team Elec. Co., 520 F.3d 1080, 1089

18  (9th Cir. 2008) (Title VII); Yanowitz v. L'Oreal USA, Inc., 36 Cal.4th 1028, 1042 (2005)

19  (FEHA).  First, the employee must establish a prima facie case of discrimination.  Id.  If the

20  employee does, then the employer must articulate a legitimate, nondiscriminatory reason for the

21  challenged action.  Id.  If the employer meets this burden, "the employee must show that the

22  reason is pretextual either directly by persuading the court that a discriminatory reason more

23  likely motivated the employer or indirectly by showing that the employer's proffered explanation

24  is unworthy of credence."  Id. (internal punctuation and citations omitted).

25          Section 2000e-2 provides that it is "an unlawful employment practice for an employer . . .

26  to discriminate against any individual with respect to his compensation, terms, conditions, or

27  privileges of employment, because of such individual's race, color, religion, sex, or national

28  origin. . . ."  42 U.S.C. § 2000e-2(a)(1).  The FEHA prohibits employers from harassing an

employee on the basis of race, sex, or other specified grounds.  Etter v. Veriflo Corp., 67 Cal.App.4th 457, 464 (1998).  Under both Title VII and the FEHA an adverse employment action is one that materially affects the compensation, terms, conditions or privileges of employment.  Chuang v. University of California Davis, Bd. of Trustees, 225 F.3d 1115, 1126 (9th Cir. 2000).  Title VII does not set a "general civility code for the American workplace." Burlington Northern and Santa Fe Fy. Co. v. White (Burlington), 548 U.S. 53, 68 (2006). (quoting Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80 (1998)).  Normally petty slights, minor annoyances, and simple lack of good manners are not the type of behavior rising to the level of deterring an individual from making or supporting a discrimination charge. Burlington, 548 U.S. at 68.

As relevant here, the anti-retaliation provision of Title VII provides that it is "an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice" under Title VII.  42 U.S.C. § 2000e-3(a).  To establish a prima facie case for a claim of retaliation under Title VII and the FEHA, Plaintiff must establish that 1) she engaged in activity to protect her rights under the statute; 2) an adverse employment decision was taken against her; and 3) there was a causal link between the protected activity and the adverse employment decision.  McGinest, 360 F.3d at 1125 (Title VII); Villiarimo, 281 F.3d at 1064 (same); Yanowitz, 36 Cal.4th at 1042 (2005) (FEHA).

1.    Prima Facie Case of Retaliation

**a.    Protected activity**

Plaintiff filed two complaints based on the alleged sexual harassment by Defendant Smyth.  Plaintiff filed the first internal sexual harassment equal opportunity complaint against Smyth on September 28, 2010.  (Undisputed Fact ("U.F.") 10.)  On November 9, 2011, Plaintiff filed a second internal EEO complaint.  (U.F. 51.)  Defendants agree that this conduct is protected activity within Title VII.

Section 2000e-3(a) makes it illegal for the employer to retaliate against an employee for opposing any practice made unlawful under Title VII.  This protection is afforded an employee who

opposes a practice that is reasonably believed to be an unlawful employment practice.  E.E.O.C. v. Crown Zellerbach Corp., 720 F.2d 1008, 1014 (9th Cir. 1983).  Plaintiff's complaints to CDCR and her supervisors that Defendant Smyth was sexually harassing her were sufficiently specific to constitute opposition to an unlawful employment practice.  Id.  Plaintiff's complaints to her supervisors and the CDCR that Defendant Smyth was sexually harassing her were also protected activity under both Title VII and the FEHA.  Brooks v. City of San Mateo, 229 F.3d 917, 928 (9th Cir. 2000).  The first element of the retaliation claim is met.

### b.      Adverse employment action

The parties dispute whether adverse employment action was taken against Plaintiff. Defendants' argue that Plaintiff stated she was subjected to 1) a cease and desist order; 2) written counseling; 3) assignment of extra duties out of her building; 4) forcing her to work with Defendant Smyth; 5) receiving the "hurt feelings report"; and 6) being offered help to find a job off the yard; and none of these action are adverse employment action.  Plaintiff counters that requiring Plaintiff to work in the hostile work environment itself was adverse employment action.

The Ninth Circuit has taken an expansive view on what constitutes adverse employment action.  Ray, 217 F.3d at 1241.  Recently, the Supreme Court held that the protection afforded by Title VII's anti-retaliation provision extends beyond workplace or employment related acts and harm.  Burlington, 548 U.S. at 67.  This does not extend to all retaliation, but that which is materially adverse to a reasonable employee.  Id. at 67-68.  This means that the action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Id. at 68 (internal punctuation and citations omitted.)

The FEHA requires that the adverse employment action must materially affect the terms, conditions, or privileges of employment to be actionable.  Yanowitz, 36 Cal.4th at 1052. Although, broadly viewed this includes not only "so-called 'ultimate employment actions' such as termination or demotion, but also the entire spectrum of employment actions that are reasonably likely to adversely and materially affect an employee's job performance or opportunity for advancement in his or her career."  Id. at 1054.

///

      i.    <u>Cease and desist order and written counseling</u>

Defendants argue that the cease and desist order and written counseling were not adverse employment actions because, as Plaintiff testified, they did not impact her ability to promote, transfer, or enter into work programs.  Plaintiff provides no case law, but argues that the cease and desist letter were clearly intended to be a punitive measure against her arguing "Sgt. Lawton's angry, abusive and disrespectful response to [Plaintiff's] complaints form the backdrop and context for each of the written documents issued to her.  The express purpose of the various 'corrective' actions was to compel her to submit to Defendant Smyth's sexual harassment in silence."  (Plaintiff's Memorandum of Points and Authorities in Opposition to Defendants' Motion for Partial Summary Judgment 23, ECF No. 82.)

Plaintiff was issued a cease and desist order after she refused to release the inmates for their morning meal with Defendant Smyth on October 19, 2011.  (U.F. 40, 43.)  While Plaintiff argues she did not refuse to perform her duties, she just refused to work with Defendant Smyth, it is undisputed that it was Plaintiff's duty on this date to assist with the inmate release and she did not do so.  (U.F. 31-34.)  When Plaintiff refused to assist with the meal release, Defendant Smyth released the inmates without having a partner present.  (U.F. 35.)  Plaintiff's failure to assist with the meal release jeopardized staff safety.  (U.F. 38, 60, 136-138.)

Due to her refusal to assist Defendant Smyth, he did not have a partner on the floor to assist him or be available to provide immediate assistance in the event that inmates attacked him or became disruptive.  (U.F. 139.)  The cease and desist memorandum set forth the expectation that Plaintiff was to conduct herself in a professional manner during any contact with Defendant Smyth, other staff and inmates.  (U.F. 120.)  The cease and desist memorandum did not address what had transpired on October 19, 2011.  (U.F. 55.)  The written counseling issued on November 17, 2011, addressed Plaintiff's refusal to perform the meal release duties and the safety issue that resulted from that refusal.  (U.F. 59, 67, 99.)

A cease and desist order begins the disciplinary process and was issued to Plaintiff to stop her refusal to work around Defendant Smyth and to report to her assigned post.  (Depo. of Anthony Baer

1   67:7-68:7, ECF No. 77-3.)  The written counseling document is a corrective action and the cease and

2   desist order is to tell the employee to stop the behavior immediately.  (Id. at 68:18-69:3.)

3          Written warnings and performance improvement plans are not adverse employment actions

4   where they do not materially affect the terms and conditions of employment.  Cozzi v. County of

5   Marin, 787 F.Supp.2d 1047, 1061 (N.D. Cal. 2011) (citations omitted).  There is no dispute that

6   Plaintiff did not assist in releasing inmates on the date in question and that it is a safety issue for a

7   single officer to release inmates without assistance.  The cease and desist order informed Plaintiff

8   that she was to conduct herself in a professional manner during any contact that she may have with

9   Defendant Smyth and or other staff members or the inmate population.  (Cease and Desist Order,

10  ECF No. 62-2 at 81.)

11         Although Plaintiff argues that the order inferred that she had engaged in irresponsible or

12  unethical conduct, the order merely states that Plaintiff should adhere "to California Code of

13  Regulations, Section 3391 which states in part irresponsible or unethical conduct or conduct

14  reflecting discredit on themselves or the department, either on or off duty, shall be avoided by all

15  employees."  (Id.)  Due to Plaintiff's refusal to assist with the inmate release, Defendant Smyth

16  released the inmates without assistance, which jeopardized institutional security.  This could

17  reasonably be seen as irresponsible behavior on the part of Plaintiff.  See Kortan v. California Youth

18  Authority, 127 F.3d 1104, 1113 (9th Cir. 2000) (evaluation that was not sub-average or undeserved

19  was not adverse employment action).

20         While Plaintiff argues that the memorandum stated that it would be placed in her supervisory

21  file, Sgt. Lawton states that he did not place the cease and desist order in her supervisory file.  (Decl.

22  of Eric Lawton ¶ 18, ECF No. 66).  Further, Plaintiff testified that the cease and desist memorandum

23  did not impact her ability to promote, transfer, or enter into work programs.  (U.F. 68.)

24         The cease and desist memorandum made no reference to the October 19, 2011 incident.

25  (U.F. 55.)  The employee counseling record issued November 17, 2011 stated:

26         On October 19, 2011, at approximately 0710 hours, while conducting my duties as
           the Facility 3C Program Sergeant, I discovered that you were not at your designated
27         post during the inmate morning meal release on Facility 3C.  Your primary area of
           responsibility during the morning release is designated as a release team officer.
28         Instead of assisting with the morning meal, you remained in Housing Unit 3C04 and

24

conducted other non-scheduled duties without approval from your supervisor. As a result of your failure to assist with the feeding of the morning meal, staff safety was compromised by having only one officer present to conduct the release of inmates from their housing units. You were not receptive to my attempts to counsel you regarding this area of your job performance, therefore, it is necessary to document your actions to ensure a clear understanding of my expectations.

(Employee Counseling Record, ECF No. 62-2 at 85.) The action plan stated:

- You are being directed to request approval from your immediate supervisor prior to deviating from your designated duties.

- During all major recalls and releases you shall work cooperatively with all custody staff and walk the tiers to ensure all cell doors are closed.

(Id.)

Plaintiff states that she was not provided with any type of action plan to prevent the situation from reoccurring, however, the action plan clearly informs Plaintiff that she is expected to receive approval prior to deviating from her assigned duties and to work cooperatively with all staff. The written counseling was a corrective action to help Plaintiff change problem behavior or performance before discipline was necessary. (U.F. 58.)

The cease and desist memorandum/order and written counseling were issued based upon Plaintiff's admitted failure to assist with the release of inmates. Neither document implemented any material change in Plaintiff's terms and conditions of employment. See Hoang v. Wells Fargo Bank, N.A., 724 F.Supp.2d 1094, 1104 (D. Or. 2010) (letter that did not implement material change in terms and conditions of employment is not by itself adverse employment action). The Court finds that the cease and desist memorandum and written counseling were not adverse employment actions as they did not affect the terms, conditions and privileges of Plaintiff's employment.[16]

ii.   Extra duties

Defendant argues that the extra duties that Plaintiff alleges she was required to perform are collateral duties that are routinely performed by correctional officers. (ECF No. 60 at 17.) Plaintiff did not include any allegations regarding being required to work extra duties in her first amended

---

[16] Further to the extent that these documents were adverse employment actions, Defendants have offered a legitimate nondiscriminatory reason for them to be issued based upon the safety issue caused due to Plaintiff's refusal to assist Defendant Smyth with the inmate release.

1  complaint, nor did she address the extra duty assignments in her opposition to the motion for

2  summary judgment.

3       Reassignment of job duties can be an adverse employment action and whether an assignment

4  is materially adverse depends upon the circumstances of the particular case and is to be judged from

5  the perspective of a reasonable person in Plaintiff's position considering all the circumstances.

6  Burlington, 548 U.S. at 71.  The Ninth Circuit has held that assigning more or more burdensome

7  work responsibilities is an adverse employment action.  Davis, 520 F.3d at 1089.

8       In her declaration, Plaintiff states that she has been assigned increased work assignments.

9  (ECF No. 83 at 17.)   However, Plaintiff has not submitted any evidence that she was assigned

10 increased work assignments or that her work assignment was more burdensome after she complained

11 of sexual harassment.   After she filed her complaints against Defendant Smyth, Plaintiff's work

12 scheduled (days and hours) did not change.  (U.F. 72.)  Plaintiff was not demoted nor did she receive

13 any reduction in pay.  (Id.)  Due to safety and security concerns, correctional officers may be

14 diverted from their posts to perform other duties as needed.  (U.F. 71.)  It is undisputed that it is

15 part of Plaintiff's job to perform other jobs as needed outside of the housing unit; and Sgt. Lawton

16 rediverted other staff from their posts to do other duties.  (U.F. 74.)

17       Plaintiff did not identify any duties that she was required to perform after she filed her

18 complaints that she had not been assigned prior to making the complaints.  (U.F. 75-78.)  As to the

19 specific duties which Plaintiff alleged she was required to perform in her deposition, Plaintiff states

20 that these duties, including being assigned to the steam line, are not collateral duties, but duties that

21 all correctional officers perform.  (ECF No. 83 at ¶ 10.)  Plaintiff was unable to identify any specific

22 dates or times period of when she had been assigned extra duties or how long they lasted.  (U.F. 82.)

23       While Plaintiff did tell the EEO investigator that she had been redirected to perform other

24 duties about nine or ten times and that the assignments were at least a good three and one-half weeks

25 (U.F. 83), Plaintiff has presented no evidence that her work assignment was more burdensome or that

26 she was assigned additional duties that were more burdensome.  Plaintiff has not produced any

27 evidence to create a triable issue of fact that adverse employment action was taken against her due to

28

1    being assigned extra work assignments.  The Court finds that Plaintiff was not subjected to an

2    adverse employment action by being assigned extra duties.

3           iii.    Hurt feelings report

4           Defendants argue that the hurt feelings report is a petty slight that does not constitute adverse

5    employment action.  (ECF No. 60 at 20.)  Plaintiff does not address the hurt feelings report in her

6    opposition to the motion for summary judgment.

7           Plaintiff and other employees received a "hurt feelings report" between October 25 and 27,

8    2011.  (U.F. 45, 46.)  The hurt feelings report is a single page blank form.  (Attached as Exhibit 9 at

9    ECF No. 62-2 at 83.)  The report states, "Is there permanent feeling damage", and "Did you require a

10   tissue for your tears".  It has a section to check off the reasons for filing the report, such as "I am

11   thin-skinned", "I am a pussy", I have woman-like hormones", "I am a queer", etc.  (Id.)  Next to

12   name the report has "(little sissy filing report)" and requests the "Girly-man signature".  While the

13   report is juvenile, and is clearly inappropriate in any situation, it is not an adverse employment

14   action.  See Roberts v. Office of the Sheriff for Charles County, No. DKC 10-3359, 2012 WL 12762,

15   at *9 (D. Md. January 3, 2012) ("The 'Hurt Feelings Report' would seem to be a prime example of a

16   'petty slight' that Burlington held does not constitute retaliation.").

17          iv.     Lt. Fresquez's offer to assist Plaintiff

18          During her interview with the Office of Internal Affairs, Plaintiff testified that on Lt.

19   Fresquez's second day as lieutenant on the yard in December 2011, he pulled her into his office and

20   told her that he did not like to see her stressed out and crying on the yard.  He offered to see if he

21   could place Plaintiff on another yard or another job.  (ECF No. 62-1 at 8, 9.)  Plaintiff asked him why

22   and he told her because she had issues there and he did not like to see her upset.  (Id.)  Lt. Fresquez

23   told Plaintiff that it was not good for her or the inmates to see her like this.  (Id.)  Lt. Fresquez told

24   Plaintiff that he could find her a job at the hospital.  (Id. at 9.)  Plaintiff stated that she did not think

25   he was trying to discriminate against her, but he was trying to find her another job so that she did not

26   have to be sexually harassed by Defendant Smyth.  (Id. at 10.)  Plaintiff told Lt. Fresquez that she did

27   not want to go.  (Id. at 14.)  Plaintiff told the hearing officer that Lt. Fresquez did not retaliate against

28   her.  (Id.)

1    Lt. Fresquez's offer to assist Plaintiff to find a different position because he had noticed that

2    she was having issues at the facility and he did not like to see her upset would not dissuade a

3    reasonable worker from making or supporting a charge of discrimination.   Plaintiff does not

4    allege that he pressured her to transfer after she stated that she did not want to go somewhere

5    else.   Additionally, Plaintiff testified that Lt. Fresquez did not retaliate against her by his offer,

6    but was trying to find her another job so she did not have to be sexually harassed by Defendant

7    Smyth.   "[A] party cannot create an issue of fact by an affidavit contradicting his prior deposition

8    testimony.   Nelson v. City of Davis, 571 F.3d 924, 927 (9th Cir. 2009) (quoting Kennedy v.

9    Allied Mutual Insurance Co., 952 F.2d 262 (9th Cir.1991)).   The offer of assistance in finding a

10   job was not an adverse employment action.

11        v.      Forcing Plaintiff to work with Defendant Smyth

12        Regardless that these individual actions did not constitute adverse employment action,

13   Plaintiff has presented sufficient evidence that she was subjected to a hostile work environment

14   in retaliation for making complaints against the sexual harassment by Defendant Smyth to

15   survive summary judgment.

16        The Ninth Circuit held in Ray that harassment as retaliation for engaging in protected

17   activity is actionable where the harassment is "sufficiently severe or pervasive to alter the

18   conditions of the victim's employment and create an abusive working environment."   Ray, 217

19   F.3d at 1245 (quoting Harris, 510 U.S. at 21).   Determining whether an environment is

20   sufficiently hostile requires looking "to the totality of the circumstances, including the

21   'frequency of the discriminatory conduct; its severity; whether it is physically threatening or

22   humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an

23   employee's work performance.' "   Ray, 217 F.3d at 1245 (citations omitted).   The plaintiff must

24   "prove that the conduct at issue was not merely tinged with offensive sexual connotations, but

25   actually constituted 'discrimina[tion] ... because of ... sex.' "   Oncale, 523 U.S. at 81 (emphasis

26   in original).

27        "Conduct that is not severe or pervasive enough to create an objectively hostile or

28   abusive work environment—an environment that a reasonable person would find hostile or

abusive—is beyond Title VII's purview." <u>Oncale</u>, 523 U.S. at 81  (citations omitted).  To be actionable under Title VII, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." <u>Kortan</u>, 217 F.3d at 1110 (citations omitted).

Plaintiff states that Defendant Smyth began harassing her in October 2009 by overtly making unwelcome sexual advances and offensive sexual comments and innuendo.  (Decl. of Irma B. Sanchez ¶ 4, ECF No 83.)  Even on days when he was not assigned to work in her building he would come into her unit and make contact with her.  (<u>Id.</u>)  He would stare at her breasts and crotch area. (<u>Id.</u>)  He would look her up and down and fasten his eyes on either her crotch or breasts.  (<u>Id.</u>) Defendant Smyth made explicit comments about having sex with his wife, reminded Plaintiff to perform breast cancer checks at work and by calling her at home.  (<u>Id.</u> at ¶ 5.)  On more than one occasion, Defendant Smyth touched Plaintiff with his hands or pelvis in a sexual manner.  (<u>Id.</u>) When Plaintiff sat on the bottom bunk during cell searches, Defendant Smyth would put his crotch in her face.  (<u>Id.</u>)  He would "slip" and rub up against her buttocks in the cell.  (<u>Id.</u>)  Defendant Smyth would stand in front of Plaintiff's desk and flick his tongue in and out as if simulating oral sex.  (<u>Id.</u> at ¶ 12.)  He told her that he wanted to have sex with her.  (<u>Id.</u> at ¶ 21.)  This conduct continued through 2013.  (<u>Id.</u> at ¶ 12.)  Defendant Smyth has walked in on her in the unisex bathroom after she told him she was going to use the restroom.  (U.F. 11; ECF No. 62-2 at 78.)

Defendants point to the actions that were taken, such as encouraging Plaintiff to file a complaint against Defendant Smyth, changing his work station to avoid contact, and that Sgt. Lawton never told Plaintiff that she could not swap with other officers to avoid working with Defendant Smyth to show that steps were taken to protect Plaintiff from Defendant Smyth.  However, Plaintiff has submitted evidence that despite the reassignment, Defendant Smyth made up excuses to come to where Plaintiff was working to seek her out to sexually harass her and Defendant CDCR was aware of this and did not take action to prevent this contact.  The mere presence of an employee who has engaged in particularly severe or pervasive harassment can create a hostile work environment. <u>Ellison v. Brady</u>, 924 F.2d 872, 883 (9th Cir. 1991).

1    In determining whether there was a hostile work environment, it is the conduct of the

2    harasser that must be severe and pervasive.  Ellison, 924 F.2d at 877.  Officer Gaulden testified that

3    Defendant Smyth was initially spacing his appearances in their building.  (Gaulden Decl. at 92:23-

4    25.)  But after nothing was done about Plaintiff's complaints, Defendant Smyth came around once or

5    twice a week and toward the end of 2011, Defendant Smyth was showing up every chance he got and

6    was chasing Plaintiff down.  (Id. at 93:1-4; 156:13-16; 19-21.)

7    On November 9, 2011, Defendant Smyth came into the housing unit.  (Id. at 21:12-23:14.)

8    Plaintiff was supposed to be working that day and had called in sick so Officer Gaulden was in the

9    office.  (Id. at 26:4-25.)  Defendant Smyth appeared at the window of the office and his eyes were

10   rolled back, he was stroking his chin with his hand and he was flicking his tongue in and out as if

11   suggesting oral sex.  (Id. at 24:3-25:25.)  When Defendant Smyth saw that it was Officer Gaulden at

12   the desk he appeared surprised.  (Id. at 26:4-25.)  Officer Gaulden directly asked Defendant Smyth if

13   he was stalking Plaintiff.  (Id. at 23:11-17.)

14   Plaintiff testified that on the date that she refused to work with Defendant Smyth, he came to

15   the window of her office, made eye contact, and mouthed something of which Plaintiff only

16   understood "Bitch".  (ECF No. 62-1 at 3-4.)  Defendant Smyth came to the window with a Styrofoam

17   cup with a straw in his hand.  (Id. at 5.)  He looked in the window and made eye contact with

18   Plaintiff and began simulating oral sex on the straw and laughed.  (Id.)  Plaintiff's allegations that she

19   was subjected to offensive comments, leering, unwelcome physical contact, and Defendant Smyth's

20   actions simulating oral sex and the frequency and duration of the alleged conduct, if proven, are

21   sufficient for a trier of fact to find that the conduct was objectively offensive.

22   Further, Officer Gaulden testified that when Defendant Smyth came around Plaintiff would

23   be totally useless for the rest of the day.  (ECF No 83 at 43:20-24.)  She would get very emotional

24   and sit in the office with the lights off crying.  (Id. at 44:1-4.)  She would not be of any assistance to

25   Officer Gaulden putting him in a very precarious position.  (Id. at 44:1-8.)  Plaintiff has submitted

26   evidence to show that she found the conduct to be offensive.

27   Plaintiff's allegations and the cease and desist memo suggest that although Sgt. Lawton

28   was aware of Plaintiff's complaints that she was being sexually harassed by Defendant Smyth,

1  she was expected to continue to work with him alone.  See Brooks, 229 F.3d at 924 n.4 (when an

2  employer knows about a series of incidents and does nothing to correct the conduct, the non-

3  action by the employer can be characterized as having changed the conditions of employment to

4  include putting up with the harassment from other employees).  Plaintiff has met her burden to

5  present sufficient evidence to create a triable issue of material fact as to whether the CDCR

6  allowed the conditions that she was subjected to continue and that the conditions were

7  sufficiently severe and pervasive to create a hostile work environment.

8         **c.     Causation**

9         Defendants also contend that Plaintiff cannot establish a causal connection between

10  Plaintiff's protected activity and any adverse employment action.  "Causation sufficient to

11  establish the third element of the prima facie case may be inferred from circumstantial evidence,

12  such as the employer's knowledge that the plaintiff engaged in protected activities and the

13  proximity in time between the protected action and the allegedly retaliatory employment

14  decision." Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987).

15        Plaintiff filed a charge of discrimination with the DFEH and EEOC on March 8, 2011,

16  after her complaints within the CDCR did not stop the alleged harassment by Defendant Smyth.

17  (ECF NO. 83 at ¶ 4.)  While Defendants argue that the time between Plaintiff filing complaints

18  and their alleged lack of knowledge is sufficient to show lack of causation, Plaintiff's complaints

19  to Sgt. Lawton on October 19, 2011 of the sexual harassment by Defendant Smyth were

20  protected action covered by Title VII and the FEHA.  Brooks, 229 F.3d at 928; see E.E.O.C. v.

21  California Psychiatric Transitions, Inc., 644 F.Supp.2d 1249, 1278 (E.D. Cal. 2009) (making

22  complaints to officer of company about discriminatory practices is protected activity).

23        It is undisputed that within days of Lawton becoming the new program sergeant, Plaintiff

24  informed him that she had filed a sexual harassment complaint against Defendant Smyth, and

25  that she did not want to work with him alone.  (U.F. 14.)  At Plaintiff's request, Sgt. Lawton

26  gave her permission to switch with other officers in the event she was expected to perform

27  collateral duties with Defendant Smyth. (U.F. 21.) After  Plaintiff  refused  to  work  with

28  Defendant Smyth on October 19, 2011, Plaintiff alleges that Sgt. Lawton cut her off when she

1   attempted to complain about the sexual harassment she was being subjected.  (ECF No. 83 at ¶

2   20.)  Sgt. Lawton told Plaintiff to keep her mouth shut and that he did not have time to "babysit"

3   to keep her away from Defendant Smyth.  (Id. at ¶ 21.)

4          Less than a month after the incident, the action plan was developed which stated, "During

5   all major recalls and releases you shall work cooperatively with all custody staff and walk the tiers to

6   ensure all cell doors are closed."   Within a short time of the incident, her co-workers were

7   informed that they were no longer allowed to swap with her.  Plaintiff alleges that she was placed

8   on the steam line so that she had to work in the vicinity of Defendant Smyth who was in the

9   kitchen.  Sgt. Lawton's statement that he did not have time to "babysit" and the proximity in

10  time of the action plan and Plaintiff's co-workers being informed they could no longer swap

11  duties with Plaintiff to the October 19, 2011 incident are sufficient for a trier of fact to infer that

12  Plaintiff was subjected to a hostile work environment because she complained about Defendant

13  Smyth's sexual harassment.  See Yartzoff, 809 F.2d at 1376 (transferring job duties within three

14  months of filing first administrative complaint sufficient to infer causation for retaliation claim).

15         Viewing the evidence in the light most favorable to Plaintiff, Ellison, 924 F.2d at 873,

16  prior to Plaintiff's refusal to work with Defendant Smyth due to the sexual harassment, Plaintiff

17  was allowed to swap with her co-workers to avoid working with him.  Shortly, after Plaintiff

18  refused to be subjected to more sexual harassment, her coworkers were informed they could not

19  swap with her, Defendant Smyth's presence in her housing unit became more frequent, and she

20  was assigned duties that made her work in proximity to Defendant Smyth.  Plaintiff has met her

21  burden of establishing a prima facie case of retaliation.

22         **d.      Legitimate nondiscriminatory reason**

23         The burden now shifts to the Defendants to show that there was a legitimate,

24  nondiscriminatory reason for the challenged action.  Davis, 520 F.3d at 1089.  Defendants argue

25  that there were legitimate business decisions for issuing the cease and desist order and the

26  written counseling letter.  However, the issue is whether there was a legitimate business decision

27  for allowing Plaintiff to be subjected to a hostile work environment.  Defendants have presented

28  no argument or evidence on this issue.  Defendants' have not met their burden to show that there

1  was a legitimate nondiscriminatory reason for subjecting Plaintiff to a hostile work environment.

2  Accordingly, Defendants' motion for summary adjudication on Plaintiff's retaliation claims is

3  denied.

4      **B.    Section 1983 Claims**

5      Defendant Smyth moves for summary judgment on the sixth and seventh causes of action

6  on the ground that he was not acting under color of state law.  (ECF No. 60 at 28-30.)  Plaintiff

7  counters that Defendant Smyth's harassing conduct toward her took place while he was

8  performing his duties as a correctional officer and Plaintiff would not have been required to

9  submit to his sexual harassment but for the pretense of his authority under state law.  (ECF No.

10  82 at 24-25.)

11      Section 1983 provides a cause of action for the violation of a plaintiff's constitutional or

12  other federal rights by persons acting under color of state law.  Nurre v. Whitehead, 580 F.3d

13  1087, 1092 (9th Cir 2009); Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006);

14  Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002).  The issue to be addressed on this motion

15  for summary judgment is whether Defendant Smyth was acting under color of law when he is

16  alleged to have sexually harassed Plaintiff.

17      "The purpose of § 1983 is to deter state actors from using the badge of their authority to

18  deprive individuals of their federally guaranteed rights."  McDade v. West, 223 F.3d 1135, 1139

19  (9th Cir.2000).  Generally, a public employee is acting under color of state law when acting in

20  his official capacity or while exercising his responsibilities pursuant to state law.  McDade, 233

21  F.3d at 1170.  All actions that a government official takes are not state action simply by virtue of

22  government employment.  Johnson v. Knowles, 113 F.3d 1114, 1117 (9th Cir. 1997).[17]  The acts

23  therefore must be performed when the public employee "is acting, purporting, or pretending to

24  act in the performance of his or her official duties."  McDade, 233 F.3d at 1140.

25   

26  [17] Plaintiff cites to Johnson, to support her argument that Defendant Smyth acted under color of state law.  Johnson
considered whether the alleged actions of a state senator, by virtue of his position on the Republican Party Central

27  Committee, amounted to state action.  113 F.3d at 1115-16.  Under Ninth Circuit law, actions by the central
committee of political parties are private actions.  Id. at 1118.  In Johnson, the court was determining if the actions

28  of a private individual amounted to state action.  Id.   The tests applied in Johnson are not relevant to the issue before
this Court.

1    There is no "rigid formula" to determine whether a public employee is acting under color

2    of state law.  Anderson v. Warner, 451 F.3d 1063, 1067 (9th Cir. 2006).  While employment with

3    the state is sufficient to render the defendant a state actor, whether he "is acting under color of

4    state law turns on the nature and circumstances of the officer's conduct and the relationship of

5    that conduct to the performance of his official duties."  Anderson, 451 F.3d at 1068 (quoting

6    Martinez v. Colon, 54 F.3d 980, 986 (1st Cir.1995)).  Where the misuse of power that is

7    possessed by virtue of state law and only possible because the actor is clothed with the authority

8    of state law, the action is taken "under color of state law."  United States v. Classic, 313 U.S.

9    299, 326 (1941).  "It is firmly established that a defendant in a § 1983 suit acts under color of

10   state law when he abuses the position given to him by the State."  Anderson, 451 F.3d at 1068

11   (quoting West v. Atkins, 487 U.S. 42, 49-50 (1988)).  However, action that is not in any way

12   related to the duties of the official is not under color of state law.  Johnson, 113 F.3d at 1118.

13   Plaintiff does not cite any case finding that a co-worker acts under color of law when

14   harassing another employee, but merely argues that the primary case relied on by Defendants,

15   Dang Vang v. Vang Xiong X. Toyed, 944 F.2d 476 (9th Cir. 1991), rejected that very argument.

16   In Dang Vang, the Ninth Circuit considered whether a public employee, whose job was to

17   interview and find refuges suitable employment, was acting under color of state law when he

18   allegedly raped several women.  Id. at 478.  The plaintiffs in Dang Vang alleged that the official

19   raped them when they appeared for their interview, when he was supposed to be driving them to

20   an interview, when assisting them to obtain a driver's license.  (Id.)  One plaintiff claimed that

21   she was raped on sixteen occasions and each time it was on the pretext of a potential job

22   opportunity.  (Id.)  The Dang Vang court looked to Murphy v. Chicago Transit Authority, 638

23   F.Supp. 464 (N.D. Ill. 1986), a case in which a transit worker sued fellow employees under

24   section 1983 for sexual harassment in the workplace.  The issue in Murphy was whether the

25   workers acted under color of law.  944 F.2d at 479.

26   The Murphy court stated that the defendants were only capable of harassing the plaintiff

27   because their jobs enabled them to have frequent encounters and it could be said that their

28   conduct was only made possible because of the authority given them by their state jobs and the

1 exercise of that authority.  Id. at 480.  However, the Murphy court found that does not mean the

2 employees acted under color of state law.  Id.  Action taken under color of state law must relate

3 to the duties and powers incidental to the employees job.  Id.  To be related to state authority, the

4 conduct must bear some similarity to the nature of the powers and duties assigned to the

5 employees.  Id.  Because the defendants conduct in Murphy had nothing to do with, and bore no

6 similarity to the nature of their jobs, they did not act under color of state law.  Id.

7 Applying these principles, the Dang Vang court found that there was sufficient evidence

8 that the defendant used his government position to exert influence and control over the women to

9 sexually assault them.  Id.  As the defendant acted in abuse of his state authority in raping the

10 plaintiff's his conduct was taken under color of state law.  Id.  The employee was not liable

11 simply because he was a state employee, but because he used his position to assert influence and

12 control over the women.  In determining this issue, the Court looks to other cases where courts

13 have considered if an employee was acting under color of state law when engaging in tortuous

14 conduct.

15 This action is distinguishable from Dang Vang.  The official in Dang Vang used his

16 position to assert authority over the plaintiffs.  He was purporting to act in the performance of his

17 duties to get the plaintiffs in a position where he was able to rape them.  Plaintiff has not

18 included any evidence that Defendant Smyth was purporting to act in the performance of his

19 duties when he sexually harassing her or that he used his position to influence her behavior.

20 The Ninth Circuit considered a case similar to Dang Vang, in Anderson.  In Anderson an

21 off duty correctional officer was involved in an automobile accident and invoked his law

22 enforcement status to keep bystanders from interfering with his assault on the driver of the other

23 vehicle.  451 F.3d at 1065-66.  The Ninth Circuit found that three elements must be satisfied to

24 find that the officer was acting under the color of state law.

25 First, the defendant's action must have been "performed while the officer is
acting, purporting, or pretending to act in the performance of his or her official

26 duties."  McDade, 223 F.3d at 1140. Second, the officer's pretense of acting in the
performance of his duties must have had the purpose and effect of influencing the

27 behavior of others.  See Van Ort v. Estate of Stanewich, 92 F.3d 831, 839-40 (9th
Cir.1996) (finding no color of state law because the victim had not opened the

28 door based on defendant's status as a police officer).  Third, the challenged

conduct must be "related in some meaningful way either to the officer's governmental status or to the performance of his duties." Martinez, 54 F.3d at 987.

Anderson, 451 F.3d at 1068-69. The Ninth Circuit found that the first two elements were met because the officer stated that he was a law enforcement officer which caused the bystanders to not interfere. Id. at 1169.

In considering the third factor, whether the challenged conduct is related in some meaningful way to the officer's governmental status or performance of his duties, the Anderson court found it does not mean that the officer must be acting within the scope of his authority. Anderson, 451 F.3d at 1069. Related in some meaningful way just means "that the challenged conduct must have a sufficiently close relationship to the officer's "governmental status" or to "the performance of his duties." Id. A key aspect of this factor is that the official must have invoked his actual status. Id. When the officer in Anderson told the bystanders that he was a law enforcement officer, he was invoking his governmental status, and hence, acting under the color of state law. Id.

Similarly, in McDade, an employee of the District Attorney's Office accessed a private database to obtain the address of her husband's ex-wife to serve her with a subpoena. 233 F.3d at 1138. The Ninth Circuit found that the defendant "acted under the pretense of state employment by asserting her state-authorized passcode to enter into the database." Id. at 1141. Because the act that she committed was related to her official duties, the defendant was acting under the color of state law. Id.

Several other circuits have also considered the issue. In deciding whether a police officer violated federal rights while hazing another officer, Martinez, 54 F.3d at 982, the First Circuit considered whether the officer was acting under color of state law when he shot the victim, id. at 986. The Martinez court found that a person acts under color of state law when he abuses the position given to him by the state. Id. "The key determinant is whether the actor, at the time in question, purposes to act in an official capacity or to exercise official responsibilities pursuant to state law." Id. Although under color of state law means under pretense of state law, the acts of a state official that are in the ambit of their personal pursuits are not state action. Id. Therefore, "a

1  policeman's private conduct, outside the line of duty and unaided by any indicia of actual or
2  ostensible state authority, is not conduct occurring under color of state law." Id. at 986-87.  The
3  Martinez court held that an official is not acting under color of state law "if the challenged
4  conduct is not related in some meaningful way either to the officer's governmental status or to
5  the performance of his duties." Id. at 987.

6      The court assessed the nature of the officer's conduct in light of the totality of the
7  surrounding circumstances.  Martinez, 54 F.3d at 987.  The Martinez court found that the officer
8  was not purporting to exercise under any power possessed by virtue of law, but was solely intent
9  on a personal frolic, tormenting an acquaintance.  Id.  Martinez held that such conduct is not
10  action under color of law.  Id.  The court stated that even if an argument was made that the
11  conduct was possible solely because of the officer's status as a police officer, that would not be
12  sufficient to find action under the color of state law. Id. at 987-88.

13      The Fourth Circuit considered whether school district employees acted under color of
14  state law when they allegedly retaliated against another employee for testifying in a grand jury
15  investigation by pretending to hang him.  Hughes v. Halifax County School Bd., 855 F.2d 183,
16  184 (4th Cir. 1988).  The plaintiff argued that this was state action "because he was accosted by
17  county employees with retaliation in their eyes, on county land, with a county-owned rope,
18  during work hours." Hughes, 855 F.2d at 186.  The court found that cases where police officers
19  and judges have been found to be acting under color of state law are distinguishable because
20  those individuals were purporting to act under the authority vested in them by the state; and the
21  acts were made possible because of the privileges of their employment.  Id. at 186-87.  They
22  were literally clothed in the state power or acting behind badges.  Id. at 187.  The court held that
23  the indicia of authority was not the same and if these actions amounted to state action then any
24  state employee who commits a tort would have potentially violated section 1983, and such a
25  result cannot be endorsed.  Id.

26      In a case similar to this, Woodward v. City of Worland, 977 F.2d 1392 (10th Cir. 1992),
27  the Tenth Circuit considered a claim that law enforcement officials were acting under color of
28  state law when they sexually harassed a police dispatcher.  The Tenth Circuit found that

1  "[t]ypically, liability under the Equal Protection Clause for sexual harassment in the workplace is

2  predicated upon some authority that the wrongdoer has over the victim.  Otherwise, it is difficult

3  to establish that the abusive action was perpetrated 'under color of state law' rather than as an

4  essentially private act of sexual harassment."  Woodward, 977 F.2d at 1401.

5      The conduct at issue here is similar to Woodward, Martinez, Hughes, and Murphy, that

6  one did not act under color of law, because Defendant Smyth was not purporting to act under his

7  authority as a correctional officer nor were his actions meaningfully related to his duties as a

8  correctional officer.  Similar to Martinez and Woodward, Defendant Smyth was able to sexually

9  harass Plaintiff because they were both correctional officers which allowed him access to

10  Plaintiff.  While Plaintiff argues that Defendant Smyth's "misuse of his power was possible only

11  because he was "clothed with the authority of state law" while performing his duties as a

12  Correctional Officer (ECF No. 82 at 25), this is not the test to determine if he was acting under

13  color of state law when he allegedly sexually harassed Plaintiff.  "The mere fact that all the

14  participants were state employees or that the offending acts occurred during working hours is not

15  enough."  Woodward, 977 F.2d at 1401; Hughes, 855 F.2d at 186.  The fact that Defendant

16  Smyth was able to sexually harass Plaintiff because he worked with her as a correctional officer

17  is not sufficient in and of itself to find that his actions were taken under color of state law.

18      Applying the test set forth in Anderson, it is undisputed that Defendant Smyth was not

19  Plaintiff's supervisor, nor is there any evidence that he had any actual authority over her.  (U.F.

20  127.)  It is also undisputed that sexual harassment is not within the duties of Defendant Smyth.

21  (U.F. 127, 128.)  The actions Defendant Smyth allegedly took in sexually harassing Plaintiff do

22  not bear any similarity to the nature of the powers and duties assigned to correctional officers.

23  Plaintiff has presented no evidence that Defendant Smyth was purporting to act under the

24  authority invested in him by the State when he sexually harassed her or that his actions had a

25  sufficiently close relationship to be related in some meaningful way to his governmental status or

26  the performance of his duties.  Anderson, 451 F.3d at 1069.

27      The conduct which Plaintiff was subjected to is not related in some meaningful way

28  either to Defendant Smyth's governmental status or to the performance of his duties.  Martinez,

1   54 F.3d at 987.  The comments made by Defendant Smyth, the physical contact he made with

2   Plaintiff, and the simulations of oral sex do not bear any similarity to the nature of the powers

3   and duties assigned to a correctional officer.  Dang Vang, 944 F.2d at 480.  Based upon the

4   evidence before this Court, Defendant Smyth was solely intent on a personal frolic, tormenting

5   Plaintiff, Martinez, 54 F.3d at 987.  He was essentially engaged in private acts of sexual

6   harassment, and was not clothed with the authority of state law. Woodward, 977 F.2d at 1401.

7       The Court finds that Plaintiff has not met her burden of establishing that a genuine issue

8   of material fact exists.  Accordingly, the Court finds that Defendant Smyth was not acting under

9   color of state law by engaging in the alleged conduct.  See Woodward, 977 F.2d at, 1401;

10   Barfield v. Arizona, No. CV-90-00864-PHX-FJM, 2010 WL 3719221, *10 (D. Ariz. September

11   15, 2010) (finding actions not taken under color of state law in similar circumstances).  As

12   Defendant Smyth was not acting under color of state law while engaging in the alleged conduct,

13   Defendants' motion for summary judgment on claims brought on claims six and seven under

14   section 1983 is granted.

15   ///

16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

1

**VI.**

2

**CONCLUSION AND ORDER**

3

Based on the foregoing, IT IS HEREBY ORDERED that;

4

    1.    Defendants' motion for partial summary judgment, filed January 16, 2105, is

5

          GRANTED IN PART AND DENIED IN PART as follows:

6

    a.    Defendants' motion for summary adjudication of Plaintiff's retaliation claims

7

          under Title VII and the FEHA, second and fourth causes of action, is DENIED;

8

          and

9

    b.    Defendants' motion for summary adjudication of Plaintiff's section 1983 claims

10

          against Defendant Smyth, sixth and seventh causes of action, is GRANTED.

11

IT IS SO ORDERED.

12

13

Dated:  **February 26, 2015**

                                         

14

                              UNITED STATES MAGISTRATE JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28