UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. STANLEY A. BOONE, MAGISTRATE JUDGE


IRMA B. SANCHEZ,                  )
                                  )
            Plaintiff,            )   No. 12-CV-1835
                                  )
vs.                               )   JURY TRIAL
                                  )     DAY 6
STATE OF CALIFORNIA and           )
SYDNEY SMYTH,                     )
                                  )
            Defendants.           )
_____)

Fresno, California                      Wednesday, June 3, 2015




REPORTER'S TRANSCRIPT OF PROCEEDINGS







Volume 6, Pages 1320 through 1561, inclusive




KAREN HOOVEN, RMR-CRR
Official Court Reporter
CSR No. 5816

APPEARANCES OF COUNSEL:

For the Plaintiff:          **PAMELA Y. PRICE**
                            Attorney at Law
                            901 Clay Street
                            Oakland, California 94607

For the Defendants:         Attorney General of California
                            BY:  **MATTHEW BESMER**
                            and  **PHILLIP KLEAM**
                            2550 Mariposa Mall
                            Room 5090
                            Fresno, California 93721

1322

1          INDEX

2     PLAINTIFF'S WITNESSES:

3     IRMA SANCHEZ                                              1328
      CONTINUED CROSS-EXAMINATION BY MR. BESMER                 1328
4     REDIRECT EXAMINATION BY MS. PRICE                         1390
      RECROSS-EXAMINATION BY MR. BESMER                         1407
5     FURTHER REDIRECT EXAMINATION BY MS. PRICE                 1420
      PAUL ANDREW PACIFICO                                      1430
6     DIRECT EXAMINATION BY MS. PRICE                           1430
      CROSS-EXAMINATION BY MR. KLEAM                            1448
7     REDIRECT EXAMINATION BY MS. PRICE                         1459
      RECROSS-EXAMINATION BY MR. KLEAM                          1469
8     CONNIE GIPSON                                             1470
      DIRECT EXAMINATION BY MS. PRICE                           1470
9     CROSS-EXAMINATION BY MR. BESMER                           1492
      REDIRECT EXAMINATION BY MS. PRICE                         1527
10    ANTHONY BAER (DEPOSITION READ)                            1544
      DIRECT EXAMINATION BY MS. PRICE                           1547

11

12                          * * * * *

13

14

15                          EXHIBITS

16    DEFENDANT'S                                Received
      K                                          1336
17    MMMMMM (page 3622)                         1368
      MMMMMM (page 3500)                         1371
18    MMMMMM (pages 3520 and 3521)               1374
      MMMMMM (pages 3641 through 3643)           1377
19    QQ                                         1436
      NNNN                                       1482
20    FFFF                                       1497

21

22                          * * * * *

23

24

25

1   Wednesday, June 3, 2015                    Fresno, California

2   8:28 a.m.

3           THE CLERK:  In the matter of Irma B. Sanchez versus

4   State of California, et al.  12-CV-1835.

5           THE COURT:  Good morning.

6           MS. PRICE:  Good morning, Your Honor.

7           THE COURT:  You may be seated.  I understand

8   something was filed by the plaintiff.  I don't know what it

9   is.  So the Court will have to take a look at it.  Hasn't had

10  time to review it.  Mr. Besmer, do you have a copy?

11          MR. BESMER:  No, Your Honor.

12          THE COURT:  All right.  If you'd get Mr. Besmer a

13  copy.  I don't know what you filed, so maybe it's nothing.

14          MS. PRICE:  I don't know what I filed either, Your

15  Honor.  I think there's some mistake.

16          THE COURT:  Oh, okay.  Nevermind.  Our filings come

17  up the next day.

18          MS. PRICE:  Oh, okay.

19          THE COURT:  So whatever you filed yesterday comes up

20  the next day.  That's what it was.  So -- well, good.  Then I

21  don't have to look at anything.

22          All right.  Let's -- is the jury here?

23          MR. BESMER:  Your Honor, if I may raise one issue.

24          THE COURT:  Yes.

25          MR. BESMER:  Yesterday at 2:30 p.m., Ms. Price caused

1  to be served a subpoena at the Valley State Prison for the

2  production of Correctional Officer Chris Ortega --

3          THE COURT:  Yes.

4          MR. BESMER:  -- for production today at 6:30 a.m.

5  And my client has asked me to move to quash that subpoena on

6  grounds of lack of reasonable notice.

7          THE COURT:  All right.  Is there a point in time of

8  providing notice?  I take it this is the custodian; correct,

9  Ms. Price?

10         MS. PRICE:  No, Your Honor.  This is a witness.  And

11  counsel is -- has misinformed the Court a little bit.  But he

12  may be misinformed.  The person I think he's referring to is

13  Chris Ortega.

14         THE COURT:  Okay.

15         MS. PRICE:  And I believe the subpoena was initially

16  served on Monday is my information.

17         THE COURT:  What would Mr. --

18         MS. PRICE:  I think it was served on Friday.

19         THE COURT:  What's Mr. Ortega about?  What is he

20  being proffered for?  I assumed that this was the witness that

21  I said yesterday.  But go ahead.

22         MS. PRICE:  No, Your Honor.  This is -- he's on the

23  witness list.

24         THE COURT:  Okay.

25         MS. PRICE:  He's a witness to an incident that

1   occurred with defendant Smyth and Officer Sanchez in November

2   of 2013.  So the subpoenas were issued some time ago.

3   Apparently the process server went and served it.  We had some

4   questions about the service so we sent her -- we directed her

5   to go back with a revised -- an amended subpoena as well as a

6   witness fee check.  She apparently didn't leave the check.

7           THE COURT:  Okay.

8           MS. PRICE:  So that is what I presume he's talking

9   about.  I haven't --

10          THE COURT:  Okay.

11          MS. PRICE:  I sent the email that he sent to my

12  office and they haven't been able to confirm with the process

13  server whether or not he's -- that's actually what happened or

14  not.

15          THE COURT:  Okay.

16          MS. PRICE:  But in any event, my staff has certainly

17  reached out to Mr. Ortega to let him know that he doesn't need

18  to be here at 6:30 this morning and have been trying to place

19  him on telephone standby.  So I gave notice --

20          THE COURT:  Okay.  All right.  It seems it's a little

21  premature for me to decide this issue.  I would recommend, Mr.

22  Besmer, that the Court may order that individual to be here.

23  And I do not want to take away from the plaintiff's time.  If

24  there's an issue of timeliness, then I would allow the

25  plaintiff to call that individual.  I would hope this week, if

1   possible.  So be prepared for that.  I will hear further

2   argument as to that.  I don't know the issue and it sounds

3   like we need to have maybe a factual record further elaborated

4   whether it was yesterday, Monday or et cetera.  Or in the end,

5   whether the defendants are going to object in the end.  So you

6   were not intending on calling that person today or were you?

7           MS. PRICE:  We had given notice over -- he was on one

8   of the earlier notifications, but I don't -- I don't know that

9   we'll have -- no.  I mean, the short answer is no.  We've

10  given --

11          THE COURT:  Okay.

12          MS. PRICE:  -- plenty of notice that he's coming, but

13  does he need to come today?  No.  I'm hoping we can finish

14  Officer Sanchez.  I have Captain Pacifico in the hall.  I'm

15  trying to arrange to have someone come and read Lieutenant

16  Baer.  We have Connie Gipson also on tap, Your Honor.  So we

17  have plenty of witnesses today that I don't need Mr. Ortega.

18          THE COURT:  All right.  Because your rest time is

19  tomorrow.

20          MS. PRICE:  That's right.

21          THE COURT:  And it's possible --

22          MS. PRICE:  And it may well be today, Your Honor.

23  I'm optimistic, ever optimistic.

24          THE COURT:  That would be good.

25          MR. BESMER:  And just to correct, Your Honor, the

1   subpoena that I have in my hand here is signed by Ms. Price on

2   June 1st, 2015.  And pursuant to the folks at the prison, they

3   informed me yesterday that the subpoena was served at 2:30

4   p.m. for the production of Correctional Officer Ortega.  And

5   until that time this was the first that we heard about the

6   subpoena.  I think that Ms. Price tried to serve him at a

7   different prison where he was no longer working.  But --

8           THE COURT:  Is he on the witness list, the

9   plaintiff's witness list?

10          MR. BESMER:  He is on the witness list, Your Honor.

11          THE COURT:  All right.  Well, let's -- let's address

12  the issue so that the Court can make an informed decision

13  about it.  But I would make sure that the witness is aware

14  that the Court may order that witness to appear.  I'm not

15  making any finding yet, but I don't want to have it if I order

16  him to appear and they say, well, the witness is now

17  unavailable or went away or something like that.  So he needs

18  to be -- it's a he?

19          MR. BESMER:  Yes, Your Honor.

20          THE COURT:  All right.  He needs --

21          MR. BESMER:  We'll work with the prison.

22          THE COURT:  All right.  Thank you.  We'll call the

23  jury in, please.  And Officer Sanchez, you may resume the

24  stand.

25          (The jury entered the courtroom.)

Sanchez - X

1328

1   THE COURT:  All right.  The jury has returned all in

2   sequential order without the need to do your change up, so

3   that's nice.

4   JUROR SEAT NUMBER SEVEN:  We learn fast.

5   THE COURT:  Nice to see.  All right.  Everybody,

6   we're ready to resume testimony.

7                         **IRMA SANCHEZ,**

8   called as a witness on behalf of the Plaintiffs, having been

9   previously sworn, testified as follows:

10                  CONTINUED CROSS-EXAMINATION

11  BY MR. BESMER:

12  Q.  Good morning, Officer Sanchez.

13  A.  Good morning.

14  Q.  As a correctional officer as Corcoran State Prison, you

15  work around some of the worst of the worst convicted felons;

16  isn't that correct?

17  A.  Correct.

18  Q.  And who were -- do you work around murderers?

19  A.  Yes.

20  Q.  Do you work around rapists?

21  A.  Yes.

22  Q.  Do you work around any serial killers?

23  A.  I'm sure, yes.

24  Q.  Do you know the names of any serial killers that you've

25  worked around at Corcoran State Prison?

Sanchez - X

1329

1    A.   Yes.

2    Q.   What are those names?

3    A.   Famous names?  Does --

4    Q.   Sure.

5    A.   Charlie Manson.

6    Q.   Anyone else?

7    A.   Not that I can think of right now.

8    Q.   Do you know who Juan Corona is?

9    A.   Yes.

10   Q.   He murdered 25 people in 1971; is that correct?

11   A.   I don't know how many he murdered, but yes, the name is

12   familiar.

13   Q.   And he's an inmate at Corcoran State Prison; correct?

14   A.   Correct.

15   Q.   And do you know who Dana Ewell is?

16   A.   Yes.

17   Q.   And he was convicted of killing three of his family

18   members in 1992; isn't that correct?

19   A.   I'm not sure how many family members, but yes, the name is

20   familiar.

21   Q.   And do you recognize the name Phillip Garrido?

22   A.   No.

23   Q.   Is it fair to say that you work in a dangerous environment

24   at Corcoran State Prison?

25   A.   Yes.

Sanchez - X

1330

1    Q.  Is it fair to say that an inmate could assault you or your
2    partner at any time?
3    A.  Yes.
4    Q.  And is it fair to say that you take pride in your ability
5    to work among the worst of the worst?
6    A.  Yes.
7    Q.  And you're confident that you're able to handle yourself
8    and the situations that may develop at the prison; isn't that
9    correct?
10   A.  One more time?  Sorry.
11   Q.  And you're confident in your ability to handle situations
12   that may arise at the prison; isn't that correct?
13   A.  Correct.
14   Q.  When did you become a transportation officer?
15   A.  I believe sometime in 2013.
16   Q.  And as a transportation officer, you transport inmates
17   from the prison to locations outside the prison; is that
18   correct?
19   A.  Correct.
20   Q.  And some of the inmates that you transfer are -- I'll
21   withdraw that.
22        The inmates you transfer are convicted felons; is
23   that correct?
24   A.  Correct.
25   Q.  And some of the inmates are convicted murderers; is that

1    correct?

2    A.   Correct.

3    Q.   Some of them are convicted rapists; is that correct?

4    A.   Correct.

5    Q.   And when you transport these inmates, it's just you and

6    your partner in the transport van; is that correct?

7    A.   Correct.

8    Q.   And how many inmates -- what are the ranges of the number

9    of inmates in the transport van at any given time?

10   A.   Five.  We've had up to five inmates with two officers.

11   Q.   So you have five inmates with two officers; correct?

12   A.   Correct.

13   Q.   And it's up to you and your partner to ensure that those

14   inmates are safely and securely transported from the prison to

15   their employment and back to the prison; is that correct?

16   A.   Correct.

17   Q.   And if a situation were to arise, it's up to you and your

18   partner to address the situation; correct?

19   A.   Correct.

20   Q.   And you rely on your partner to have your back; is that

21   fair?

22   A.   Each other's, correct.

23   Q.   And you take pride in your ability to safely transport and

24   safely and securely transport some of the worst of the worst

25   from the prison to their employment and back again; correct?

Sanchez - X

1332

1    A.   Correct.

2    Q.   And yet you testified that when you met with the UC Davis

3    psychiatrist, you found him scary because he didn't smile at

4    you; is that right?

5    A.   Correct.

6    Q.   Isn't it true that some of the inmates that you work with

7    are eventually released from prison?

8    A.   Correct.

9    Q.   And you purchased a gun because of Officer Smyth; correct?

10   A.   Correct.

11   Q.   And you moved into a gated community because of Officer

12   Smyth; is that right?

13   A.   Correct.

14   Q.   And it bothered you that he invited you to his parties;

15   right?

16   A.   Correct.

17   Q.   And it bothered you that he invited you boating; isn't

18   that right?

19   A.   Correct.

20   Q.   And it's your testimony that you were upset when he

21   offered you walnuts at his house; isn't that right?

22   A.   Yes.

23   Q.   You received annual EEO training; isn't that right?

24   A.   EEO training?

25   Q.   Yes, ma'am.

Sanchez-X

1333

1    A.  At certain things, yes.

2    Q.  And that EEO training covers what constitutes sexual

3    harassment; right?

4    A.  Supposed to be every year, yes.

5    Q.  And that training covers how you file a complaint; isn't

6    that right?

7    A.  I don't remember.

8    Q.  That training covers your avenues to complain about sexual

9    harassment; isn't that true?

10   A.  One more time?  I'm sorry.

11   Q.  The EEO training that you receive covers the different

12   avenues that you may pursue if you want to file a complaint;

13   correct?

14   A.  I don't remember them telling me about the avenues.

15   Q.  There are -- yes, ma'am.  There are posters posted around

16   the prison that identify who the EEO Coordinator is; is that

17   correct?

18   A.  I believe so.

19   Q.  And those posters identify who the EEO counselors are; is

20   that right?

21   A.  Yes.

22   Q.  So if you wanted to know who you wanted to reach out to to

23   file a complaint, there are posters posted around the prison;

24   correct?

25   A.  Correct.

1334

1   Q.  You testified that after you filed your complaint, no one

2   from the prison contacted you; is that right?

3   A.  Correct.

4          MR. BESMER:  All right.  One moment, Your Honor.

5          THE COURT:  You may.

6   BY MR. BESMER:

7   Q.  Ma'am, can you please turn to Exhibit F in volume one of

8   the white binder.

9   A.  What is the number again, please?

10  Q.  Yes, ma'am.  Exhibit F.

11  A.  It has A --

12         THE COURT:  See where that A is, now see that little

13  tab, now find the F in there.

14         THE WITNESS:  I see.  The small one?

15         THE COURT:  Yeah.

16         THE WITNESS:  Okay.

17  BY MR. BESMER:

18  Q.  All right.  Ma'am, that exhibit there, it's a letter;

19  correct?

20  A.  Correct.

21  Q.  And it's a letter dated -- addressed to you; is that

22  right?

23  A.  Yes.

24  Q.  And is that a letter that you received from the EEO

25  Coordinator Sabrina Johnson?

1335

1    A.  Yes.

2            MR. BESMER:  Your Honor, at this time I request that

3    we move Exhibit F into evidence.

4            THE COURT:  Any objection?

5            MS. PRICE:  Just checking.  I thought it was in

6    already.

7            THE CLERK:  It's already in.

8            THE COURT:  It's already in.

9            THE CLERK:  On May 28th.

10           MR. BESMER:  My apology, Your Honor.  Request

11   permission to publish.

12           THE COURT:  You may.

13   BY MR. BESMER:

14   Q.  So you testified that after you filed your complaint, you

15   never heard back from anybody at the prison; correct?

16   A.  That I was not contacted by telephone.

17   Q.  Oh, by telephone.

18   A.  Yeah, that's what I assumed when you asked me.  I

19   misunderstood.

20   Q.  Okay.  You received this letter, though; correct?

21   A.  Correct.

22   Q.  And this letter informed you that you had a right to be

23   free from retaliation; correct?

24   A.  Correct.

25   Q.  And that if you had any questions, you could contact the

1  EEO Coordinator; isn't that right?

2  A.  Correct.

3  Q.  Can you please turn to Exhibit I.  Actually turn to

4  Exhibit K.  I'm sorry.

5  A.  Okay.

6  Q.  Is this a letter that's addressed to you?

7  A.  Can I see it?

8  Q.  Oh, yes, ma'am.

9  A.  Okay.  Yes.

10  Q.  And this letter was sent to you by Glenda Olmer; is that

11  correct?

12  A.  Yes, on the bottom.  Yes, it says that.

13       MR. BESMER:  Your Honor, at this time I ask that we

14  move Defense Exhibit K into evidence.

15       THE COURT:  Any objection?

16       MS. PRICE:  No objection, Your Honor.

17       THE COURT:  All right.  Exhibit K is received into

18  evidence.

19       (Defendants' Exhibit K was received.)

20  BY MR. BESMER:

21  Q.  So after you filed your complaint, the Office of Civil

22  Rights reached out to you with this letter; is that correct?

23  A.  Yes.  That's what it says here.

24  Q.  And after you filed the complaint, they reached out to you

25  and informed you that they were accepting your complaint for

1  investigation; do you see that right there?  Where I put the

2  blue arrow.

3  A.  Correct.

4  Q.  And again, the letter here informs you of your right to be

5  free from retaliation; correct?

6  A.  Correct.

7  Q.  And if you had any problems, directs you to contact your

8  EEO Coordinator; isn't that right?

9  A.  Yes.

10  Q.  And if you had any questions, contact the OCR analyst, Don

11  Budge; is that correct?

12  A.  Correct.

13  Q.  Did you ever contact Don Budge?

14  A.  I don't recall this -- calling this number, but I have

15  called other numbers, yes.

16  Q.  So you did contact Don Budge; is that correct?

17  A.  Not this one, no.  Because I don't remember this one.

18  Q.  Are you referring to the number or are you referring to

19  the name?

20  A.  The letter itself.  I don't remember this one.

21  Q.  You don't remember receiving the letter?

22  A.  No.  I don't.

23  Q.  Did you ever contact Don Budge?

24  A.  I don't remember if I did or not.

25  Q.  Can you please turn to Exhibit I.  Please review that

1338

1  exhibit, which is Exhibit I, to refresh your recollection
2  about whether you contacted Don Budge at any point in time.
3  A.  It says my name on there.
4  Q.  Okay.  So have you reviewed the whole document, ma'am?
5  A.  I don't know if I had -- if I would have scanned it or to
6  really read it.  I don't know.  Can I do that?  I wasn't sure.
7  Q.  Yes, ma'am.  Read as much as you need to read until you
8  come to the point of whether it refreshes your memory about
9  whether you contacted Don Budge.
10 A.  Okay.  Okay.
11 Q.  All right.  At this point, can you please just take the
12 Exhibit tab L and cover -- the other way, ma'am.
13 A.  Take this out?
14 Q.  Just --
15 A.  On both of them?
16 Q.  Just take out the Exhibit L and cover that exhibit so --
17 A.  I see.  Okay.
18 Q.  Thank you.  Does that document refresh your recollection
19 as to whether you ever contacted Don Budge?
20 A.  I don't remember Don Budge.  I don't remember who he is.
21 Q.  Okay.  Please turn to Exhibit L.
22 A.  Okay.
23 Q.  Do you recognize this letter?
24 A.  Yes.
25 Q.  And is this a letter that was addressed to you?

1339

1    A.  Yes.

2    Q.  And it was a letter that was signed by Otis Williams; is

3    that correct?

4    A.  Correct.

5           MR. BESMER:  Your Honor, at this time I request that

6    we move Defense Exhibit L into evidence.

7           THE COURT:  Any objection?

8           MS. PRICE:  It's already in evidence, Your Honor.

9           MR. BESMER:  My apology again.

10          THE COURT:  All right.  Thank you.

11          THE CLERK:  May 28th.

12   BY MR. BESMER:

13   Q.  So you received this letter -- it's dated December 8th,

14   2010; correct?

15   A.  Correct.

16   Q.  So after you had filed your complaint in September 2010,

17   you received the correspondence that we already reviewed in

18   addition to this letter; correct?

19          MS. PRICE:  Objection.  Misstates the witness'

20   testimony.  Sorry, Your Honor.

21          THE COURT:  That's all right.

22          THE WITNESS:  Okay.  One more time?

23          THE COURT:  If you could rephrase, I'll sustain the

24   objection.

25          MR. BESMER:  Yes, Your Honor.

Sanchez - X

1340

1    THE COURT:  For rephrasing.

2    BY MR. BESMER:

3    Q.  You filed your first complaint in September 28th, 2010;

4    correct?

5    A.  Correct.

6    Q.  And after you filed your complaint, you received a letter

7    from Sabrina Johnson; correct?

8    A.  Correct.

9    Q.  And there was the letter from Glenda Olmer that we

10   reviewed that you didn't remember receiving; correct?

11   A.  Correct.

12   Q.  And then there's this letter that you remember receiving;

13   correct?

14   A.  Yes.

15   Q.  So throughout this process, from September 28, 2010, at

16   least until December 8, 2010, you had been receiving letters

17   from the Office of Civil Rights and CDCR regarding your

18   complaint; is that correct?

19   A.  Correct.

20   Q.  You were interviewed by Otis Williams; correct?

21   A.  Correct.

22   Q.  Do you recall how long your interview was?

23   A.  No, I don't recall.  Sorry.

24   Q.  Can you turn to Exhibit P, please.

25   A.  P as in Paul?

1341

1   Q.  Yes, ma'am.  Go ahead and look at page two of Exhibit P,

2   lines 5 and 6.

3   A.  Okay.

4   Q.  All right.  Now, please turn to page 64.  And please

5   review lines 22 and 23.

6   A.  Okay.

7   Q.  Now, go ahead and just -- you can cover it with the

8   exhibit tab, just like we did on the last one.

9   A.  Okay.

10  Q.  Does that document refresh your recollection that your

11  interview with Otis Williams was about 50, five zero, minutes

12  long?

13          MS. PRICE:  Objection, Your Honor, to the form of the

14  question.

15          THE COURT:  Overruled.

16          MS. PRICE:  Assumes facts.  Lacks foundation.

17          THE COURT:  Overruled.

18          MS. PRICE:  Also appears to read from the document

19  that is not admitted in evidence.

20          THE COURT:  She's not reading from the document.

21          MS. PRICE:  Mr. Besmer, Your Honor, I'm referring to

22  his question.  He incorporates.  That's --

23          THE COURT:  Overruled.

24          MS. PRICE:  -- my objection to the question.

25          THE COURT:  Overruled as to the form of the question.

1342

1    You may proceed, Mr. Besmer.

2    BY MR. BESMER:

3    Q.  Ma'am, does that refresh your recollection that your

4    interview with Otis Williams was approximately 50, five zero,

5    minutes long?

6    A.  That's what it says on here, yes.

7            MS. PRICE:  Move to strike, Your Honor, as

8    nonresponsive.

9            THE COURT:  Well, overruled on that basis.

10   BY MR. BESMER:

11   Q.  Can you please turn to Exhibit X.

12   A.  Okay.

13   Q.  Is this a letter that was addressed to you?

14           MS. PRICE:  Objection, Your Honor.  Counsel appears

15   to -- objection.  Lacks foundation.  Document's not in

16   evidence.

17           THE COURT:  Sustained.  Why don't you ask the

18   question related to -- or move it into evidence.

19   BY MR. BESMER:

20   Q.  Do you recognize this document, ma'am?

21   A.  I was on the wrong one.  I'm so sorry.  Okay.  Yes.

22   Q.  You testified previously that you were notified via letter

23   that Lieutenant Weaver delivered to you about the results of

24   the investigation; correct?

25           MS. PRICE:  Objection to the form of the question,

1343

1    Your Honor.

2              THE COURT:  Overruled.

3              THE WITNESS:  Okay.  What was that?

4    BY MR. BESMER:

5    Q.  Did you receive a letter from -- that was delivered by

6    Lieutenant Weaver that informed you of the results of the

7    investigation?

8    A.  I don't remember if she gave me a letter.  I know she had

9    one.

10   Q.  The document that's in front of you, you recognize that

11   document, though; is that correct?

12   A.  It has my name on it.

13   Q.  Do you recall receiving this document?

14   A.  No.

15   Q.  Do you recall anybody ever providing this document to you?

16   A.  I don't remember if I was even provided.  If it was given

17   to me by Weaver.

18   Q.  You learned of the results of the investigation into your

19   first complaint through a conversation with Lieutenant Weaver;

20   is that correct?

21   A.  I'm sorry?

22   Q.  You learned of the results of the investigation from your

23   first complaint through Lieutenant Weaver; is that correct?

24   A.  I don't know if it was my first complaint, but I did learn

25   of a complaint from Lieutenant Weaver, yes.

Sanchez - X

1344

1   Q.  Well, how did you learn of the results of the

2   investigation into your first complaint?

3   A.  I remember Otis Weaver's -- I mean Otis Williams, when I

4   got the letter.

5   Q.  I'm sorry.  Can you please explain?

6   A.  Otis -- I remember Otis Williams' letter.  I can't

7   remember this one.

8   Q.  You received a letter from Otis Williams informing you of

9   the results --

10  A.  The one that you just showed me earlier.  I remember that

11  one.

12  Q.  The one that we reviewed that was Exhibit L; is that

13  correct?

14  A.  Correct.

15  Q.  And Exhibit L informed you of the results of the

16  investigation?

17  A.  Yes.

18  Q.  Could you please turn back to Exhibit L, please.

19          Actually I have it on the screen in front of you.

20  Can you please show me where on this letter from Otis Williams

21  it provides you with the results of the investigation?

22  A.  I remember this one because it had his name on the bottom,

23  it had the phone number that I called.  I called him numerous

24  times, that's how I remember Otis Williams.

25  Q.  Your testimony a few minutes ago was that you received --

1 the letter that we reviewed as Exhibit L was the letter you

2 received from Otis Williams that informed you of the results

3 of the investigation; correct?

4 A.   I remember this specific one, yes.  I remember this one.

5 Q.   Did you get some other letter from Otis Williams that

6 informed you of the results of the investigation?

7 A.   I don't believe so, but I remember this one.  I remember

8 this letter and his name with his phone number because I did

9 contact him.

10 Q.   You eventually learned at some point in time that your

11 investigation unsubstantiated your complaints; is that

12 correct?  Correct?

13 A.   Sorry?

14          MS. PRICE:  Objection, Your Honor.  The question

15 is -- I think counsel misspoke.

16          THE COURT:  Overruled.

17          THE WITNESS:  One more time?  I didn't understand.

18 BY MR. BESMER:

19 Q.   You eventually learned the results of the investigation

20 into your first complaint; is that correct?

21 A.   I believe so.

22 Q.   Did you ever learn the results of the investigation into

23 your first complaint?

24 A.   I don't remember if I got a letter from that complaint.  I

25 don't remember.  There's so many different ones.  I don't

1  remember.

2  Q.  Yes, ma'am.  I'm only asking did you ever, at some point

3  in time, learn of the results of the investigation into your

4  first complaint?

5  A.  I learned them more from my supervisors.

6  Q.  So your supervisors informed you of the results of the

7  investigation; is that correct?

8  A.  They told me it was unfounded.

9  Q.  And you don't recall ever receiving any letters notifying

10 you of the results; is that your testimony?

11 A.  I may have.  I can't remember.

12 Q.  Do you recall being informed that if you were unhappy with

13 the results of the investigation, you had the opportunity to

14 appeal to the state personnel board?

15 A.  I don't remember that either.

16 Q.  Can you please turn to Exhibit -- before you turn to this

17 exhibit, yesterday I asked you questions regarding your report

18 to your supervisors, to Sergeant Doria, to Buller and to Marsh

19 that Smyth had been sexually harassing you; do you remember

20 those questions?

21        MS. PRICE:  Objection, Your Honor.  Overbroad.

22        THE COURT:  Overruled.

23        THE WITNESS:  Can you ask them again?

24 BY MR. BESMER:

25 Q.  Sure.  Do you recall your testimony yesterday that you had

Sanchez - X

1347

1  reported to Sergeant Doria that Smyth had sexually harassed

2  you?

3  A.  Correct.

4  Q.  Do you recall your testimony from yesterday that you

5  reported to -- is it sergeant or Lieutenant Buller?

6  A.  No, it's sergeant.

7  Q.  Do you recall your testimony from yesterday that you

8  reported to Sergeant Buller that Smyth had sexually harassed

9  you?

10 A.  Sergeant Buller was there when I did mention it to Kraay,

11 yes.

12 Q.  And do you recall your testimony from yesterday that you

13 reported to Lieutenant Marsh that you had reported Smyth's

14 sexual harassment to him?

15 A.  That's correct.

16 Q.  And do you recall your testimony that you told the EEO

17 investigator that you felt your supervisors didn't do enough

18 in response to your reports; is that correct?

19 A.  Correct.

20 Q.  And as a result, an investigation was opened into those

21 supervisors; is that correct?

22 A.  I don't know.  Was it?

23 Q.  Can you please turn to Exhibit OO.

24 A.  Is that a different one?  Different section?  They're all

25 doubled?

                                                              1348

1    THE COURT:  See where the double A is there, now look

2    for the Os in there.

3         THE WITNESS:  Thank you.

4         THE COURT:  You're welcome.

5         THE WITNESS:  Okay.

6    BY MR. BESMER:

7    Q.  Do you recognize Exhibit OO?

8    A.  Do I recognize it?

9    Q.  Yes, ma'am.

10   A.  Like it was given to me?  Are you asking me?  I don't

11   know, what do you mean?

12   Q.  Have you ever seen Exhibit OO before?

13   A.  I don't remember at this time.

14   Q.  Do you ever recall being informed that your claim that

15   your supervisors Doria, Marsh -- I'll withdraw that.

16        Do you recall being informed of the results of the

17   investigation into your claim that your supervisors didn't do

18   enough to respond to your complaints of sexual harassment?

19   A.  Yes, I remember saying, yes.

20   Q.  Do you remember being informed of the results of that

21   investigation?

22   A.  No, I do not.

23   Q.  Do you ever remember receiving any letter that informed

24   you of the results of that investigation?

25   A.  No, I don't remember receiving it.

Sanchez v. X

1349

1   Q.  Ma'am, if you could please turn to Exhibit HHH, that's

2   three Hs in the same binder.

3   A.  Okay.

4          MR. BESMER:  Your Honor, it appears that Defense

5   Exhibit HHH has already been admitted as a plaintiff's

6   exhibit, so I'm just confirming the number there so we

7   don't --

8          THE COURT:  Yes.

9          MR. BESMER:  -- duplicate exhibits.  I apologize for

10  the delay.

11         THE COURT:  No worry.

12         MR. BESMER:  We'll move on to another letter while we

13  sort that out, Your Honor.

14  Q.  Can you please turn to Exhibit KKKK, KKKK in the same

15  binder.

16         THE COURT:  Mr. Besmer, was your question related to

17  whether HHH was in evidence?

18         MR. BESMER:  Your Honor, we're sorting out the

19  cross-reference to plaintiff's exhibit and I'll go back to

20  that exhibit.  I'm going to use plaintiff's exhibit instead of

21  the defense 4 H since I understand it's the same document.

22         THE COURT:  Oh, okay.

23         MR. BESMER:  Administratively we're working that out

24  right now.

25         THE COURT:  I understand what you're saying.  Okay.

1 BY MR. BESMER:

2 Q.  So if you turn to Exhibit KKKK, ma'am.

3 A.  Yes.

4 Q.  Do you recognize this document?

5 A.  I'll look at it.  Okay.

6 Q.  Do you recognize this document?

7 A.  Well, it's to Smyth, not to me.  But --

8 Q.  I'm sorry.  You may be looking at the wrong tab, ma'am.

9 KKKK.  Four Ks.

10 A.  I'm sorry.  Where was I at?  I went this way.  It's back

11 here.  I'm so sorry.  Okay.

12      All right.  I see this has my name on it, yes.

13 Q.  Do you remember receiving this letter?

14 A.  I may have.  Yes.

15 Q.  You filed a second internal EEO complaint in November of

16 2011; is that correct?

17 A.  I believe so, yes.

18 Q.  And you were interviewed as part of that complaint;

19 correct?

20 A.  I believe so, yes.

21 Q.  Do you recall being interviewed by Ann Hoopes?

22 A.  A phone conversation, yes.

23 Q.  Was that an interview?

24 A.  The -- with Ann Hoopes?  I remember her phone conversation

25 when I was interviewed with her.

1    Q.  Was it more of a conversation?

2    A.  I don't recall.  I don't remember a conversation with her.

3    I remember her interview.

4    Q.  That was my question, ma'am, was it an interview with Ann

5    Hoopes over the phone?

6    A.  The interview, yes, that I had with Ann Hoopes was over

7    the phone.  Investigate.

8    Q.  And that was part of the investigation into your second

9    internal EEO complaint; is that correct?

10   A.  I don't know if it was my second.  But I do remember her

11   interview.

12   Q.  And do you recall how long that interview was?

13   A.  No.  I don't remember how long.

14   Q.  Can you please turn to Exhibit -- well, before we do that,

15   let's talk about the results of the investigation into your

16   second complaint.

17        Did you ever receive notice of what the results were

18   of the investigation into your second internal EEO complaint?

19   A.  I may have, yes.

20   Q.  You may have received notice of what the results were?

21   A.  On Ann Hoopes?

22   Q.  From the investigation into your second internal EEO

23   complaint, did you ever find out what the results were?

24   A.  No.  Not -- I can't remember.

25   Q.  As you sit here today, do you know what the results of the

1352

1   investigation were into your second internal EEO complaint?

2   A.  I just remember that it was unfounded.  It's the same,

3   everything is -- was negative.

4   Q.  So at some point in time you learned that the results from

5   the investigation into your second internal EEO complaint were

6   unfounded; is that correct, ma'am?

7   A.  My second complaint, I don't understand.  I'm sorry.  I

8   don't understand.

9   Q.  You filed a second internal EEO complaint in November of

10  2011; is that correct?

11  A.  I may have, yes.

12  Q.  Do you recall ever filing a second internal EEO complaint

13  in November of 2011?

14  A.  Yes.

15  Q.  So you did file a second internal complaint in November

16  2011?

17  A.  Yes.  I'm getting internal and outside confused.

18  Q.  Okay.  I apologize.  And so I'll make it clear then.  When

19  I say "internal," I'm referring to you meeting with the EEO

20  counselors at the prison and the documents that you filed with

21  the prison.  Okay?

22  A.  Okay.

23  Q.  So in November of 2011, did you file an internal EEO

24  complaint?

25  A.  Yes.

Sanchez - X

1353

1   Q.  And that was your second internal EEO complaint; is that
2   correct?
3   A.  Correct.
4   Q.  And that second internal EEO complaint was investigated;
5   is that correct?
6   A.  Correct.
7   Q.  And you eventually learned of the results of that
8   investigation; is that correct?
9   A.  Correct.
10  Q.  And what did you learn the results of that investigation
11  were?
12  A.  Unfounded.
13  Q.  And how did you learn what the results of the
14  investigation were?
15  A.  I believe maybe a letter.
16  Q.  And does the -- did anybody inform you over the phone of
17  what the results of the investigation were?
18  A.  I don't remember.
19  Q.  Did somebody in person tell you what the results of the
20  investigation were?
21  A.  I know I was informed by Lieutenant Weaver on one of them.
22  I just don't remember which one.
23  Q.  So were you -- do you recall whether you were informed by
24  a letter of what the results of the investigation were for
25  your second complaint?

1354

1   A.  I don't remember.

2   Q.  The document in front of you that's labeled as Exhibit

3   KKKK, does that refresh your recollection as to whether you

4   were notified via a letter of the results of the

5   investigation?

6   A.  I may have, but I don't remember.

7   Q.  So we're going to go back to Exhibit HHH.  I understand

8   what the confusion was now, Your Honor.  HHH itself was

9   admitted into evidence by the plaintiff, it was never a

10  plaintiff's exhibit.  So I'm going to publish HHH at this

11  time.

12           THE COURT:  Yes.  That is correct.  You may.

13  BY MR. BESMER:

14  Q.  So before we talk about this exhibit, were you ever

15  notified that an investigation had been opened into your

16  second internal EEO complaint?

17  A.  I'm sorry.  One more time?  I'm just --

18  Q.  Were you ever notified that an investigation was opened

19  into your second internal EEO complaint?

20  A.  I can't remember if I was notified.

21  Q.  How did you learn that CDCR was investigating your second

22  internal EEO complaint?

23  A.  Well, I know that I filed it.  But -- I don't understand

24  the question.

25           MR. BESMER:  Your Honor, at this time we're

Sanchez - X

1355

1    publishing Exhibit HHH.

2    Q.   Ma'am, do you recognize this document in front of you?

3    A.   Well, I see it.  I do see this, yes.

4    Q.   Do you recognize this document?

5    A.   No.  I can't remember this one.

6    Q.   So this document's addressed to Irma Sanchez; correct?

7    A.   Correct.

8    Q.   And that's your name?

9    A.   Correct.

10   Q.   And the address below there is blacked out; correct?

11   A.   I -- yeah, that's blacked out.  That's what it was,

12   correct.

13   Q.   And it was signed by and sent by S. Johnson; correct?

14   A.   That's what it says here, correct.

15   Q.   And she was the EEO Coordinator at Corcoran State Prison;

16   correct?

17   A.   Correct.

18   Q.   And you were informed via this letter that you had the

19   right to be free from retaliation; correct?

20   A.   Yes, that's what it says.

21   Q.   And if you had been retaliated, the letter informs you to

22   contact her immediately; is that correct?

23   A.   Correct.

24   Q.   After November 23rd, 2011, did you ever contact Sabrina

25   Johnson with any issues you were having?

1356

1    A.   One more time.  That was too quick.  I'm sorry.

2    Q.   No problem.  After November 23rd of 2011, isn't it true

3    that you never contacted Sabrina Johnson with any issues you

4    were having?

5    A.   I don't believe I did.

6    Q.   And isn't it true that by that time, Officer Smyth had

7    been completely moved off the 3C facility?

8    A.   In what year did you say that was?

9    Q.   2011, ma'am.

10   A.   Correct.

11   Q.   You filed your second internal EEO complaint on November

12   9th of 2011; correct?

13   A.   November 9th.  Yes.

14   Q.   And before you filed that second internal EEO complaint,

15   you had conversations with supervisors, including Lawton and

16   Lieutenant Baer; is that correct?

17   A.   Say it again.

18   Q.   Before you filed your second complaint in November of

19   2011, you had conversations with Sergeant Lawton and

20   Lieutenant Baer regarding Officer Smyth; is that correct?

21   A.   Before my second complaint?

22   Q.   Yes, ma'am.

23   A.   I had conversations with Lieutenant Baer and Lawton?

24   Q.   Yes, ma'am.

25   A.   Yes.

Case 1:12-cv-01835-SAB   Document 240   Filed 09/17/15   Page 38 of 243
Sanchez v.

1357

1  Q.  And isn't it true that in February of 2015, just a few

2  months ago, you signed a declaration concerning this case?

3  A.  I signed a declaration?  Can you -- what's a declaration?

4  Q.  Isn't it true that in February of 2015, you signed a

5  declaration under penalty of perjury that set forth the facts

6  regarding your complaint in this case?

7  A.  Correct.

8  Q.  And isn't it true, in that declaration you stated that you

9  filed your second internal EEO complaint after Lieutenant Baer

10  told you that you needed to file a second complaint if you

11  didn't want to work with Smyth?

12  A.  Can you break it down?

13  Q.  Isn't it true that you met with Lieutenant Baer in October

14  of 2011?

15  A.  October of 2011.  I don't remember the date.  But I know I

16  did at one time, yes.

17  Q.  And isn't it true that you have stated under penalty of

18  perjury that during a meeting with Lieutenant Baer in October

19  of 2011, he told you to file another EEO complaint?

20  A.  Correct.

21  Q.  And isn't it true that he told you that you needed to file

22  that complaint if you didn't want to work with defendant

23  Smyth?

24  A.  I don't remember that.

25  Q.  And isn't it true that after Lieutenant Baer told you that

1    you needed to file another internal EEO complaint, you went a
2    few weeks later and filed another EEO complaint?
3    A.   I may have.
4    Q.   Did you file another EEO complaint in November of 2011?
5    A.   Correct.
6    Q.   And you met with Lieutenant Baer in October of 2011?
7    A.   Correct.
8    Q.   And he told you during a meeting that you needed to file
9    another EEO complaint?
10   A.   Not in that way, but yes.
11   Q.   Well, in what way did he tell you?
12   A.   He just told me that there was an EEO that I can go to.
13   Q.   So he told you to go to EEO?
14   A.   Something to that, pertaining to that.  But very quickly.
15   It was not a long conversation like you are stating.
16   Q.   So at some point you were meeting with Lieutenant Baer in
17   October of 2011 and he told you to go to EEO; is that correct?
18   A.   I cannot remember all that because I was crying and I
19   couldn't even gasp my breath.  So all that he was telling me,
20   there's no way I can comprehend all that.  My composure was
21   bad.
22   Q.   Do you remember him telling you anything about going to
23   EEO during that conversation?
24   A.   I can barely remember the words that he did say something
25   about EEO.  But I can't remember all of that.

Sanchez - X

1359

1  Q.  And you remember signing your declaration in February of

2  2015 regarding this case; correct?

3  A.  Correct.

4  Q.  And isn't it true in that declaration you declared that

5  Lieutenant Baer told you to go to EEO to file a complaint?

6  A.  Because he did say the EEO, yes.

7  Q.  And isn't it true that he told -- that you stated in your

8  declaration that you needed to go file a complaint if you

9  didn't want to work with defendant Smyth?

10 A.  I don't remember that.

11 Q.  You don't remember signing a declaration --

12 A.  I don't remember that part with him telling me so that I

13 don't have to work with Smyth.

14 Q.  So my question is do you remember signing a declaration in

15 February of 2015 where you declared that Lieutenant Baer told

16 you to file another EEO complaint so you wouldn't have to work

17 with Smyth?

18 A.  Not that last part, no.

19 Q.  You don't remember signing that declaration that said

20 that?

21 A.  I do not remember him telling me to do it so I won't have

22 to be with Smyth.

23 Q.  My question is a little bit different.  I'm asking if you

24 remember signing a declaration that said that?

25 A.  I remember signing a declaration, yes.

1    Q.   You don't remember what the declaration stated, though?

2    A.   Not right now I don't remember.

3    Q.   So after this conversation that you had with Lieutenant

4    Baer in October 20 of 2011, you went and filed a second

5    complaint; correct?

6    A.   One more time.  Slow.

7    Q.   After you had this conversation with Lieutenant Baer in

8    October of 2011, you went and filed another complaint;

9    correct?

10   A.   Correct.

11   Q.   And after you filed that complaint, isn't it true that

12   Officer Smyth was moved off the 3C facility all together?

13   A.   In November 2011, yes.

14   Q.   Thank you.  Isn't it true that in the fall of 2010 -- so

15   now I'm talking about 2010.  I apologize for going backwards.

16   But in the fall of 2010, isn't it true that your son was

17   arrested in front of you at your house?

18   A.   Correct.

19   Q.   And isn't it true that you were upset by his arrest?

20   A.   I was a little, yes.

21   Q.   Just a little upset?

22   A.   Yes.

23   Q.   You didn't yell at the police officers arresting him?

24   A.   I don't remember yelling at them.

25   Q.   You were concerned about the arrest, though; isn't that

1361

1  correct?

2  A.  Well, yes, every mother's concerned.

3  Q.  And isn't it true that you made no effort to find out what

4  your son was arrested for?

5  A.  Correct.

6  Q.  And you made no effort to find out what, if any, criminal

7  proceedings were outstanding; is that correct?

8  A.  Correct.

9  Q.  Did you ever attend any of his court proceedings?

10  A.  Just one.

11  Q.  You did attend one of his proceedings; correct?

12  A.  Partial, yes.  Very partial.

13  Q.  And during that court proceeding, you never learned what

14  the charges were; is that correct?

15  A.  That is correct.

16  Q.  And you were upset about going to that proceeding; isn't

17  that correct?

18  A.  No.

19  Q.  In fact, didn't you need to bring a friend along for

20  support?

21  A.  No.  That's not correct.

22  Q.  Did you bring a friend along with you?

23  A.  She did not travel about me, I didn't bring her in my car.

24  Q.  Did she attend the Court proceeding with you?

25  A.  Later, yes, she was there.

1362

1    Q.   So she was there with you in court; is that correct?

2    A.   She attended the Court also.

3    Q.   With you; is that correct?

4    A.   Well, she saw me so she sat by me, yes.

5    Q.   Was she at court for any other reason?

6    A.   I don't know.

7    Q.   Did you ask her to come along with you?

8    A.   She asked if she could come along with me.  And I said

9    yes.

10   Q.   Well, how did she know that you were going to court?

11   A.   She mentioned it where I was going to go because she

12   wanted to go somewhere else.

13   Q.   I'm sorry, what do you mean "she mentioned it"?

14   A.   She asked if we could go out and do something, I told her

15   that I was going to go to court.

16   Q.   And did you tell her why you were going to court?

17   A.   Just going to go to court and see my son.

18   Q.   And how did you learn that he had a court date?

19   A.   I just knew that it was the last one, the last court date.

20   Q.   The last court date for what?

21   A.   The last court date ever.

22   Q.   For what, though, what was the purpose of the Court

23   proceeding?

24   A.   I have no idea.  I just remember going and attending one

25   that was for his court.

1    Q.  And who told you about that court date?

2    A.  I just learned of it.  I knew that if I go to court, I'll

3    find out.  They have a schedule there.  And you can see the

4    names.  So I just wanted to attend one.

5    Q.  Isn't it true that you made no effort, though, to find out

6    what he was arrested for?

7    A.  That is correct.

8    Q.  And you made no effort to find out what the criminal

9    charges were; is that correct?

10   A.  That is correct.

11   Q.  But you made an effort to find out when his court

12   appearances were; is that correct?

13   A.  No.  That is not correct.

14   Q.  How did you learn what his court dates were?

15           MS. PRICE:  Objection, Your Honor.  Relevancy.  May

16   we approach?

17           THE COURT:  Briefly.

18           (The following proceedings were held at sidebar

19           between the Court and counsel:)

20           THE COURT:  All right.  We're outside the presence of

21   the jury.  The relevance argument?

22           MS. PRICE:  I'm wondering how she learned about the

23   court or who -- how a friend learned about the court has

24   anything to do with defendant -- with her emotional distress.

25   Because I think the Court seems to be giving him some leeway,

1  but I thought you were clear we weren't going to be beat this

2  to death.

3        THE COURT:  My question to you is, Mr. Besmer:  It

4  seems like we're getting a little far afield.  Can you tell me

5  where you're going with this.

6        MR. BESMER:  We have evidence, Your Honor, that she

7  absolutely knew what her son had been charged for.  She went

8  to court.  She was emotionally upset about it.  In fact, she

9  was so upset that she had to have a friend go along with her.

10  And this is relevant for two reasons.  One, this goes directly

11  to her emotional distress claims.

12        THE COURT:  I agree with that.  And let me interrupt

13  you though.  That -- can you get -- I mean, I think you've

14  established, at least from circumstantial evidence, whether

15  the jury accepts her proffer that it does.

16        MR. BESMER:  Okay.

17        THE COURT:  She goes to court for -- she just

18  randomly went to court and figured it out.  But -- and she

19  says "no."  That's fine.

20        MR. BESMER:  Okay.

21        THE COURT:  But if there's any more questioning, I

22  mean, the jury can infer from her testimony as to whether or

23  not --

24        MR. BESMER:  I have a few more questions, then I

25  won't --

1    THE COURT:  Because I think it is getting outside of

2  the area of relevance.  So I will allow you a little leeway,

3  but I will entertain further relevance arguments if I see

4  it --

5    MR. BESMER:  Yes, Your Honor.

6    THE COURT:  -- going there.

7    MS. PRICE:  Thank you, Your Honor.

8    THE COURT:  Thank you.

9    (The following proceedings were held in open court:)

10  BY MR. BESMER:

11  Q.  So at some point you eventually learned what this Court

12  date was; correct?

13  A.  Yes.

14  Q.  And you never learned through this Court date what -- or

15  attending court, what the issues were; is that correct?

16  A.  That's correct.

17  Q.  And you -- and your friend just happened to mention that

18  she would go along with you; is that correct?

19  A.  Well, she asked -- we were going to do something else, but

20  I had -- I told her where I was going and she accompanied me,

21  she said that she might go there.  I said "okay."

22  Q.  And she went to court with you; is that correct?

23  A.  No, not with me.

24  Q.  She was present in court when you were in court; is that

25  correct?

                                                                        1366

1    A.  She was present later, yes.  I don't even know if she

2    arrived there before me, she was there before me.

3    Q.  Did the two of you sit together?

4    A.  I believe so.  She did.

5    Q.  Did you ever talk to your friend about the issues

6    involving your son?

7            MS. PRICE:  Objection.  Relevancy, Your Honor.

8            THE COURT:  Overruled.

9            THE WITNESS:  I don't remember.  No.

10           MS. PRICE:  Vague.

11   BY MR. BESMER:

12   Q.  And isn't this friend Sergeant Doria?

13   A.  Friend?  The person that we're talking about?  Yes.

14   Q.  And she's the one that went to court with you; correct?

15           MS. PRICE:  Objection.  Misstates the witness'

16   testimony.

17           THE COURT:  Overruled.

18           THE WITNESS:  One more time?

19   BY MR. BESMER:

20   Q.  And she's the one that went to court with you; isn't that

21   correct?

22   A.  She was the one that was in court, yes.

23   Q.  Now, you testified that at some point your relationship

24   with your husband started to unravel; is that correct?  For

25   lack of a better word, terms.

Sanchez X

1367

1    A.   Unravel.  What's the different way of understanding it?
2    Could you rephrase it?
3    Q.   Sure.  You testified that at some point in time things
4    with you and your husband just weren't working out; correct?
5    A.   Correct.
6    Q.   And isn't it true that when you learned about his affair
7    in May of 2009, you missed several days of work because of the
8    stress and the migraines you were having?
9    A.   I missed some work, yes, for my kids, yes.
10   Q.   For your kids.
11   A.   Correct.
12        MR. BESMER:  One moment, Your Honor.
13   Q.   Isn't it true that you missed so many days of work
14   relating to that, that you had to go back a couple of years
15   later and get a note from your doctor to sort out all the days
16   of work that you missed?
17   A.   Yes, that's correct.
18        MR. BESMER:  Your Honor, I'd like to publish at this
19   time Exhibit MMMMMM, which is from the medical records, and
20   it's CDCR page 3622.
21        MS. PRICE:  If I can have a moment, Your Honor.
22        THE COURT:  Do you have that admitted?
23        THE CLERK:  No.
24        THE COURT:  It's not admitted.
25        MR. BESMER:  You're right, Your Honor.  I'm

Sanchez - X

1368

1   requesting that the Court move that page of Exhibit MMMMMM

2   into evidence.  And it's page 3622.

3          THE COURT:  Ms. Price?

4          MS. PRICE:  No objection, Your Honor.

5          THE COURT:  All right.  MMMMMM, 3622 is admitted into

6   evidence.

7          (Defendants' Exhibit MMMMMM (page 3622) was

8          received.)

9   BY MR. BESMER:

10  Q.  Do you see that okay on your screen, ma'am?

11  A.  Yes.

12  Q.  So sometime in June of 2011, you were called because the

13  prison was auditing your leave time; is that correct?

14  A.  That's correct.

15  Q.  And they saw that you had missed several days of work;

16  correct?

17  A.  Correct.

18  Q.  You had missed May 20th, May 23rd, May 24th, May 25th and

19  May 26th; is that correct?

20  A.  Yes, that's correct.

21  Q.  You missed five days of work; right?

22  A.  Correct.

23  Q.  And you missed all five days of work because you

24  were -- right here it says, "I was so stressed out and had

25  migraines so I had to miss so much work."

                                                                      1369

1        Do you see that there?

2   A.   Yes.

3   Q.   And then you needed to miss another day of work in June

4   just to get the doctor's note; correct?

5   A.   Correct.

6   Q.   And isn't it true that your migraines are caused by

7   sources of stress other than Officer Smyth?

8   A.   You have to -- can you say it one more time?

9   Q.   Isn't it true that the migraines you have are caused by

10  sources of stress other than Officer Smyth?

11  A.   Maybe, yes.

12  Q.   Is Officer Smyth the only reason you have migraine

13  headaches?

14  A.   They've increased, yes.

15  Q.   And isn't it true that at one point in time, you went to

16  the doctor because you believed that you had a kink in your

17  neck that was causing migraines; isn't that correct?

18  A.   I -- maybe, but I don't recall.  I mean, I don't remember.

19  But yes, maybe.

20  Q.   Do you recall having a kink in your neck at one point in

21  time that was bothering you?

22  A.   I'm sure I've had many kinks in my neck, but yeah.

23  Q.   Do you ever recall going to the doctor regarding a kink in

24  your neck?

25  A.   Yes, uh-huh.

1  Q.  Did you recall going to the doctor and telling the doctor

2  that you thought the kink in your neck was caused by -- that

3  the kink in your neck was causing your migraines?

4  A.  I don't remember if I said it like that.

5  Q.  Now, one of the things that you blame on Officer Smyth is

6  your weight gain; is that correct?

7  A.  During a period of time, yes.

8  Q.  And what period of time would that be?

9  A.  The sexual harassment, when I wasn't able to get any

10  sleep.  During sexual harassment.

11  Q.  Have you had concerns about weight gain -- did you have

12  concerns about weight gain before any of the sexual harassment

13  started?

14  A.  Yes.

15  Q.  And did you go to your doctor about those concerns?

16  A.  Yes.

17        MR. BESMER:  Your Honor, at this time I request that

18  we introduce into evidence Defense Exhibit MMMMMM and it's

19  page 3500.

20        THE COURT:  Any objection?

21        MS. PRICE:  Just a moment, Your Honor.

22        THE COURT:  All right.

23        MS. PRICE:  3500?

24        THE COURT:  Yes.

25        MS. PRICE:  Objection.  Relevancy and privacy.

1    THE COURT:  Well, as to the privacy, that objection

2  is overruled.  I'm trying to find it myself.  Which binder?

3    MS. PRICE:  I think it's binder two, Your Honor.  The

4  labels are off.

5    THE COURT:  I don't know if the labels are off, I

6  don't need to make that finding.  So let's --

7    Mr. Besmer.

8    MR. BESMER:  Yes, Your Honor.

9    THE COURT:  Your objection is relevance?

10   MS. PRICE:  Yes, Your Honor.

11   THE COURT:  All right.  Based upon that objection,

12  the objection is overruled.  Exhibit MMMMMM, page 3500 is

13  received into evidence.

14   (Defendants' Exhibit MMMMMM (page 3500) was

15   received.)

16  BY MR. BESMER:

17  Q.  Ma'am, you testified yesterday that your sexual

18  harassment -- I'll withdraw that.

19   You testified yesterday that Officer Smyth started

20  sexually harassing you in 2010; correct?

21  A.  That he started harassing -- sexually harassing me in

22  2010?

23  Q.  Yes, ma'am.

24  A.  He started sexually harassing me in 2010, no, I don't

25  remember that.

Sanchez - X

1372

1   Q.  You don't remember him sexually harassing you in 2010?

2   A.  Well, he --

3          MS. PRICE:  Objection.  Misstates the witness'

4   testimony.

5          THE COURT:  Well, he's clarifying that right now.

6   The objection is overruled.

7          THE WITNESS:  Yes.  Could you please say it again?

8   BY MR. BESMER:

9   Q.  Are you claiming now that he started to sexually harass

10  you before 2010?

11  A.  Yes.  Always been.

12  Q.  And what did he -- I'll withdraw that.

13         I'm publishing what's been marked as Exhibit page

14  3500.  So ma'am, do you see the date of service on there

15  that's April 24th, 2009?  It's right up there.

16  A.  Yes.

17  Q.  And it says here you are at appointment to reinstate diet

18  pills; is that correct?

19  A.  Yes.

20  Q.  And it says that you gained weight right there.  Do you

21  see that?

22  A.  That's what it says.  Yes.

23  Q.  And there's a -- do you see the arrow where it's pointing

24  up and "fatigue"?

25  A.  Correct.

1  Q.  You understand that to be increased fatigue?

2  A.  Correct.

3  Q.  And that was on April 24th, 2009; correct?

4  A.  That's what it says on there, yes, correct.

5  Q.  Are you blaming Officer Smyth for gaining weight and

6  having increased fatigue in April -- on April 24th, 2009?

7  A.  Can you say that again?

8  Q.  Are you blaming Officer Smyth for your weight gain and

9  your increased fatigue that you were experiencing in April of

10  2009?

11  A.  Yes.

12          MR. BESMER:  Okay.  Your Honor, at this time I ask

13  that we move Exhibit MMMMMM, pages 3520 and 3521 into

14  evidence.

15          THE COURT:  Any objection?

16          MS. PRICE:  Same objections, Your Honor.  Privacy.

17  Relevancy.

18          THE COURT:  All right.

19          MS. PRICE:  It's 3520 through what number?

20          THE COURT:  3520 through 3521.  Based upon the

21  objection, the Court has considered it.  In light of the fact

22  of the elements of this case and the issues raised on direct

23  examination, it is relevant and also the issue related to the

24  claim.  The privacy objection is also overruled.  So both of

25  those objections are overruled.

1374

1    (Defendants' Exhibit MMMMMM (pages 3520 and 3521)

2    was received.)

3    MS. PRICE:  I'm sorry, Your Honor.  I don't have a

4    copy of 3521.  Could someone provide me that?

5    THE COURT:  You may have my copy.  Mr. Besmer, I'll

6    give her my copy.  Subject to return.

7    MS. PRICE:  Thank you.  I just need 21.

8    BY MR. BESMER:

9    Q.  So ma'am, a few minutes ago, we were talking about the

10   kink in your neck; is that correct?

11   A.  You did ask earlier, yes.

12   Q.  Do you see the date on this medical record here?  Right

13   there.

14   A.  Yes.

15   Q.  And do you see here where it says your chief complaint,

16   "kink left side of neck times 2 WK."  I'm not sure what the

17   "WK" stands for.  Do you know what it stands for?

18   A.  You're asking me that?  I don't know.

19   Q.  All right.  And then it says "visit notes" right below

20   that.  Do you see that?

21   A.  Yes.

22   Q.  Do you recognize "PT" to stand for patient?

23   A.  Correct.

24   Q.  It says, "Patient feels that kink is causing migraines to

25   occur."  Do you see that?

1    A.   Yes.

2    Q.   Does that refresh your recollection as to whether you went

3    to the doctor and reported that you felt the kink in your neck

4    were causing your migraines?

5    A.   At that time, I remember, yes, that kink, I had slept

6    wrong and I couldn't get rid of that kink at the time, yes.

7    Q.   So it refreshes your recollection that the kink in your

8    neck may have been causing your migraines is what you thought;

9    correct?

10   A.   At that time, yes.

11   Q.   Did you think that Officer Smyth had anything to do with

12   the kink in your neck?

13   A.   At that appointment, at that time?  I really can't answer

14   that.  For this appointment?

15   Q.   Yes, ma'am.  Did you have -- did you have any belief that

16   Officer Smyth was somehow responsible for the kink in your

17   neck?

18   A.   Yes.

19   Q.   How did Officer Smyth cause the kink in your neck?

20   A.   Not being able to sleep and, you know, just tossing and

21   turning at night caused my kink in my neck.

22   Q.   And that was September of 2012; correct?

23   A.   I remember September something, but I don't

24   remember -- was it 2012?  I'm sorry.

25   Q.   Yes, ma'am.  The medical record notes --

1    A.   Yes.

2    Q.   -- were kept 2012.  And at that time, Officer Smyth had

3    been completely moved off the 3C facility for almost an entire

4    year; is that correct?

5    A.   That's correct.

6         MS. PRICE:  Objection.  Lacks foundation.  Assumes

7    facts.  Misstates the record.

8         THE COURT:  Those objections are overruled.  You may

9    answer the question.

10   BY MR. BESMER:

11   Q.   And so you hadn't been working with him on the 3C facility

12   for almost an entire year at that point; is that correct?

13   A.   That's correct.

14   Q.   And you blame Officer Smyth at that point in time for your

15   sleeplessness; is that your testimony?

16   A.   Yes.

17   Q.   How long have you been having migraine headaches?

18   A.   As far as I can remember, I believe approximately maybe

19   2000.

20   Q.   And ma'am, in 2000, how old were you?

21   A.   I am 49 now, so go back.  I'm not very good with math.

22   Sorry.  To be honest.

23   Q.   So in your mid 30s; is that fair?

24   A.   Yeah, that's fair.

25   Q.   And as far as you remember, you had migraines since that

1    time; correct?

2    A.   About, yes, 2000.

3    Q.   And it came to a point in time where you filled out some

4    FMLA paperwork; isn't that correct?

5    A.   At one time, yes, I do remember.

6    Q.   And you filled out the paperwork because you were missing

7    work because of your migraine headaches; isn't that right?

8    A.   That's correct.

9            MR. BESMER:  Your Honor, at this time I ask that we

10   move Defense Exhibit MMMMMM, page 3642 into evidence.

11           THE COURT:  Any objection?

12           MR. BESMER:  Actually, Your Honor, to do a full

13   page -- that's just one of set of pages.  I'd like to move

14   pages 3641, 3642 and 3643 into evidence.

15           THE COURT:  All right.  So you're requesting to move

16   Defense Exhibit MMMMMM, 3641, through and including 3643.  Any

17   objection?

18           MS. PRICE:  No, Your Honor.

19           THE COURT:  All right.  Those exhibits are received

20   into evidence.  That's MMMMMM, 3641 through and including

21   3643.

22           (Defendants' Exhibit MMMMMM (pages 3641 through 3643)

23           was received.)

24   BY MR. BESMER:

25   Q.   Dr. Kenneth Melashenko was your doctor at one point in

1  time; correct?

2  A.  Yes, correct.

3  Q.  And you saw him for your general family care issues;

4  correct?

5  A.  Correct.

6  Q.  And at one point in time you went to him to have him

7  complete some paperwork for your FMLA leave; is that correct?

8  A.  Correct.

9  Q.  And the address for your doctor was on Lacy Boulevard in

10 Hanford, California; correct?

11 A.  Correct.

12 Q.  And you used the documents that he completed to provide to

13 CDCR for approval for your FMLA; correct?

14 A.  I'm sorry.  What was that again?

15 Q.  You used the documents that he completed so that you could

16 obtain approval to take FMLA leave; is that correct?

17        MS. PRICE:  Objection.  Assumes facts.  Lacks

18 foundation.

19        THE COURT:  All right.  Sustained.  If you'll break

20 it up.

21 BY MR. BESMER:

22 Q.  You went to Dr. Melashenko to complete paperwork for FMLA

23 leave; correct?

24 A.  Correct.

25 Q.  And you needed documentation completed so that you could

1379

1   obtain approval from CDCR for FMLA leave; is that correct?

2   A.  Correct.

3   Q.  And that FMLA leave document was pertaining to your

4   migraine headaches; correct?

5   A.  Correct.

6   Q.  Do you recall telling Dr. Melashenko that you've had

7   migraine headaches since the teenage years?

8   A.  I don't remember, but could be.

9   Q.  So what I've put on the screen here is Defense Exhibit

10  MMMMMM, page 3642.  Is that your handwriting?

11  A.  I believe so.

12  Q.  And it says "has had migraine headaches" -- H/As -- "since

13  the teenage years."  Is that correct?

14  A.  I don't think that's my handwriting.  That's not my

15  handwriting.

16  Q.  Would that be the doctor's handwriting?

17  A.  Probably, yeah, that's not mine.

18        MS. PRICE:  Objection.  Move to strike as speculation

19  with respect to the handwriting.

20        THE COURT:  She's testified as to the answer, so your

21  objection is considered and overruled.

22  BY MR. BESMER:

23  Q.  Does this document refresh your recollection as to when

24  your migraine headaches started?

25  A.  The question?

1380

1    Q.  Does this document in front of you from your medical
2    records, does it refresh your recollection as to when your
3    migraine headaches started?
4    A.  The teenage years doesn't sound right.  I didn't have them
5    when I was a teenager.
6    Q.  So do you think your medical records are inaccurate then?
7    A.  That right there may be inaccurate.
8    Q.  Do you recall whether that was a form you used to turn
9    into CDCR to obtain approval for FMLA leave?
10   A.  I don't know if that was the form, but I think it looks
11   like it.
12   Q.  So you turned in some form to obtain approval for FMLA
13   headaches; correct?
14   A.  Correct.
15   Q.  And you would have reviewed that form before you turned it
16   in; correct?
17   A.  I should have.
18   Q.  And you would have reviewed that form and you would have
19   ensured that it was true and correct; right?
20   A.  I just turned them in.  I just turned them in.  Sorry.
21   Q.  In fact, isn't it true that the issues regarding your
22   weight dated years before Officer Smyth ever started to
23   sexually harass you?
24        MS. PRICE:  Objection.  Vague as -- vague.
25   Overbroad.

1381

1    THE COURT:  Overruled.

2    THE WITNESS:  I don't understand.

3    BY MR. BESMER:

4    Q.  Isn't it true that you were -- your weight gain issues

5    pre-dated any sexual harassment by Officer Smyth?

6    MS. PRICE:  Objection.  Asked and answered.

7    THE WITNESS:  I still don't understand.

8    MS. PRICE:  Cumulative.

9    THE COURT:  Overruled.

10   THE WITNESS:  I still don't understand.

11   BY MR. BESMER:

12   Q.  Isn't it true that your issues with weight gain started to

13   occur before Officer Smyth ever sexually harassed you?

14   A.  I've had weight gain, yes.

15   Q.  Before Officer Smyth ever started sexually harassing you;

16   isn't that correct?

17   A.  Even before, yes.

18   Q.  And isn't it correct that you were on -- you were taking

19   diet pills before Officer Smyth started to sexually harass

20   you?

21   A.  Correct.

22   Q.  And isn't it true that you went to your doctor years

23   before Officer Smyth started to sexually harass you and you

24   had complaints of irritability, mood swings and increased

25   fatigue?

Smyth - X

1382

1    A.   That's a long one.  Can you break it down just a little
2    bit?  I don't understand.
3    Q.   Isn't it true that you went to your doctor years before
4    Officer Smyth started to sexually harass you, according to
5    what you claim, and you saw your doctor for irritability?
6            MS. PRICE:  Objection, Your Honor.  It's compound.
7            THE COURT:  Overruled.
8            THE WITNESS:  Irritability.  That's -- go ahead, say
9    it again.
10   BY MR. BESMER:
11   Q.   No problem.
12   A.   One more time.
13   Q.   Did you report to your doctor years before Officer Smyth
14   started sexually harassing you, according to your claim, that
15   you had irritability issues?
16   A.   Could be.  I don't remember, but yes, could be.
17   Q.   That you had mood swing issues?
18   A.   Could be.
19   Q.   And that you had increased fatigue.
20   A.   Yes.
21   Q.   So issues that you had with mood swings, increased fatigue
22   and irritability, those things you were experiencing before
23   any of the alleged sexual harassment; isn't that correct?
24           MS. PRICE:  Same objection, Your Honor.  Vague as to
25   "issues."

1383

1    THE COURT:  Overruled.

2    THE WITNESS:  Could be correct, yes.

3    BY MR. BESMER:

4    Q.  Do you have any reason to believe that it's not correct?

5    A.  The -- just my job itself is very stressful too.  But yes.

6    Q.  So you -- before Officer Smyth ever started to sexually

7    harass you, you had experienced stress from your job; correct?

8    A.  One more time.

9    Q.  Before Officer Smyth ever started to sexually harass you,

10   you experienced stress from your job; isn't that correct?

11   A.  There's -- there's stress every day in your jobs.  I mean,

12   it's -- some are better, worse than others.

13   Q.  And part of that is the fact that you work with the worst

14   of the worst; right?

15   A.  In the beginning, before.  If that's what you're asking.

16   Q.  Working with the worst of the worst, does that have any

17   impact on your stress?

18   A.  No.

19   Q.  It doesn't bother you at all?

20   A.  No.  I mean, it doesn't -- there has to be a reason for

21   that to bother me.  I don't understand what you're --

22   Q.  Does working around murderers cause any stress at all?

23   A.  No.  I'm more alert, if that's what you mean.

24   Q.  You testified earlier today that inmates can attack you or

25   your partner at work; correct?

1    MS. PRICE:  Objection, Your Honor.  It's cumulative.

2    THE COURT:  He's laying a foundation.  So overruled.

3    THE WITNESS:  Yes, correct.  But anybody can attack

4    you.  Anybody.  Doesn't have to be bad people.

5    BY MR. BESMER:

6    Q.  Doesn't have to be people at work?

7    A.  Right.  Anybody can.

8    Q.  Is the increased risk of harm -- I'll withdraw that.

9        Is there an increased risk of harm at work compared

10   to working outside of a prison?

11   A.  This is -- for me, I don't think so.  Because I know

12   they're all convicted felons.  I don't know out on the street

13   who's who and what they're about.

14       THE COURT:  Mr. Besmer, a natural breaking point, if

15   you would advise me.

16       MR. BESMER:  This is fine, Your Honor.

17       THE COURT:  All right.  Ladies and gentlemen of the

18   jury, we're going to take our morning recess.  Remember that I

19   advised you yesterday that the Court does have other matters

20   that the Court must address in the interest of ensuring that

21   parties, all parties in this Court receive their matters

22   decided in a timely fashion.

23       I must take a matter now.  Rest assured that I will

24   get back to the Court.  While our break is usually to 10:15, I

25   expect to be back and ready to go again at 10:20.  So

1  everybody have a good break.  Please do not form an opinion.

2  Do not discuss this case amongst yourselves.  And we'll see

3  you back at 10:20.

4            (The jury left the courtroom.)

5            MR. KLEAM:  Your Honor, do we need to make room?

6            THE COURT:  We're outside the presence of the jury.

7  Just scoot your stuff -- Ms. Price, you're fine.

8            MS. PRICE:  Okay.  Thank you, Your Honor.

9            THE COURT:  Actually, you seem to be fine.  All

10 right.  So we're moving to ECRO for the other parties and the

11 Court is going to be back in one minute.

12           (Recess.)

13           (The jury entered the courtroom.)

14           THE COURT:  All right.  The record will reflect the

15 jury has returned.

16           THE WITNESS:  May I approach, Your Honor?

17           THE COURT:  You may.  All right.  The record will

18 reflect that we're resuming court at 10:25.  You may proceed.

19 BY MR. BESMER:

20 Q.  Officer Sanchez, do you know a Correctional Officer Kevin

21 Edmonds?

22 A.  Yes.

23 Q.  And do you consider Kevin Edmonds to be a mutual friend of

24 both yours and Officer Smyth's; correct?

25 A.  Mutual?

Sanchez - X

1386

1   Q.  Yes, ma'am.

2   A.  Co-worker.  More of a co-worker towards me.

3   Q.  And isn't it true that at one point you claim that you

4   approached Officer Edmonds and told him that Officer Smyth was

5   sexually harassing you?

6   A.  Correct.

7   Q.  Isn't it true that you discussed with Ms. Hurt that you

8   were having some stress related to financial issues and a

9   separation from your husband?

10  A.  I don't recall.  I don't remember that.

11  Q.  You don't remember --

12  A.  The stress issues of -- repeat it.

13  Q.  Isn't it true that you talked with Ms. Hurt about stress

14  relating to dividing up assets involving the separation from

15  your husband?

16  A.  No.  Not to that -- not like you're saying it, no.  No.

17  Q.  Did you ever talk to her at all about the stress involved

18  from separating from your husband?

19  A.  I did mention it.

20  Q.  And is part of that stress related to dividing up assets

21  and liabilities and figuring out income and all that kind of

22  stuff?

23  A.  Somewhat, yes.

24  Q.  And you're still undergoing that process; isn't that

25  correct?

1387

1   A.  What are you asking me?

2   Q.  You're still undergoing -- well, I'll withdraw that.

3       When you met with Ms. Hurt in 2014, you were in the

4   process of still dividing up your assets, liabilities; is that

5   correct?

6   A.  Dividing our assets.  I haven't done that yet.  What are

7   you asking me?  That I am doing it now?  Or --

8   Q.  Did you ever talk to Ms. Hurt about that?

9   A.  It was more like retirement.

10  Q.  And in that context, there was stress related to how you

11  were dividing up things with your husband; correct?

12  A.  I don't remember all that stuff, no.

13  Q.  On Friday, you testified about Dr. Scott's office;

14  correct?

15  A.  Correct.

16  Q.  You testified that you thought his office was scary;

17  correct?

18  A.  Correct.

19  Q.  You testified that you didn't see any staff to greet you;

20  correct?

21  A.  Correct.

22  Q.  You testified that there were boxes and it looked like

23  somebody was moving; correct?

24  A.  Correct.

25  Q.  And his office environment made you uncomfortable;

Sanchez - X

1388

1    correct?

2    A.   Correct.

3    Q.   You were deposed on August 14th, 2014; correct?

4    A.   I was -- one more time.  I was what?

5    Q.   You were deposed.  You had your deposition taken on August

6    14th, 2014; correct?

7    A.   I don't remember the date of the deposition.  I did have a

8    deposition, but I don't remember the date.

9    Q.   Do you recall that the deposition you took was two days

10   after your appointment with Dr. Scott?

11   A.   I know it was some time after.

12   Q.   It was just a few days after; correct?

13   A.   I don't know.  I don't remember if it was a couple of days

14   after.

15   Q.   And that was in August of -- I'll withdraw that.

16        Your appointment with Dr. Scott was in August of

17   2014; correct?

18   A.   I don't remember the date.  I do remember seeing him.

19   Q.   Do you remember the month that you saw him?

20   A.   No, I don't.

21   Q.   Do you remember the year that you saw him?

22   A.   It was the same time that I -- after I had the deposition,

23   correct.  That same year I had the deposition.

24   Q.   And you had -- your deposition was taken over the course

25   of two days; correct?

1389

1   A.  Correct.

2   Q.  Do you recall during your deposition you were asked about

3   how your examination went.  Do you recall that?

4   A.  Oh, by whom?  Who are you -- who asked me that?  I don't

5   understand.

6   Q.  Do you recall that during your deposition, I asked you

7   about how your examination went?

8   A.  I don't remember you asking.

9   Q.  So, Your Honor, I'm going to read from the plaintiff's

10  deposition.  I'm going to start on page 409 at line 25.  And

11  I'm going to conclude at page 410, line 13.

12          And the question was:  "Did you undergo the mental

13          health examination on August 12th?"

14          Your answer was:  "Yes."

15          "How did you feel that that went?"

16          You answered:  "I thought it went good."

17          I asked:  "Did you have any concerns about the

18          examination?"

19          And you said:  "No."

20          I asked:  "Did you feel that Dr. Scott and his staff

21          treated you fairly?"

22          And you answered:  "Yes."

23          "Is there anything that you feel you need to clarify

24          or elaborate on that you told him on the 12th?"

25          And your answer was:  "No.  Not that I know of right

Sanchez - RD

1390

1   now."

2          Do you recall that testimony?

3   A.  That's correct.

4          MR. BESMER:  I have nothing further at this time,

5   Your Honor.

6          THE COURT:  Redirect.

7          MS. PRICE:  Yes, Your Honor.

8          THE COURT:  All right.  You may proceed.

9          MS. PRICE:  I want to reserve my right to review

10  lines -- I mean, I'm sorry, to introduce page 410, line 14

11  through 411, line 12.  I need to confirm that it's --

12         THE COURT:  No speaking objections are necessary.

13         MS. PRICE:  Yes, sir.

14         THE COURT:  And the record is what the record is.  So

15  if we can proceed with the examination.

16         MR. BESMER:  What page and line?

17         THE COURT:  Thank you.

18         MS. PRICE:  410, line 14 through 411, line 12.

19         THE COURT:  Thank you.

20         MS. PRICE:  Thank you, Your Honor.

21                     REDIRECT EXAMINATION

22  BY MS. PRICE:

23  Q.  Good morning.

24  A.  Good morning.

25  Q.  How you doing?

1391

1   A.  I'm good.  Thank you.

2   Q.  You mentioned some -- Mr. Besmer asked you about your

3   issues, some -- he asked you about your husband's -- your

4   finances with you and your husband.  I want to direct your

5   attention to that area.

6           Are you and your husband having some

7   adversarial -- are you and your husband fighting about money

8   at this time?

9   A.  No, not at all.

10  Q.  Were you fighting about money in 2014?

11  A.  No.

12  Q.  Okay.  Have you checked in to some -- talked to someone

13  about what your rights are, what your husband's rights are, if

14  he has any rights, with respect to your retirement?

15  A.  Not yet.

16  Q.  Okay.  And your husband, you testified earlier, he works

17  for the -- for CDCR; correct?

18  A.  Correct.

19  Q.  How many years does he have in?

20  A.  I believe he has about 29 years.

21  Q.  So he's got more time in than you; correct?

22  A.  Correct.

23  Q.  And he would have more of a retirement than you; correct?

24  A.  Correct.

25  Q.  So have you talked to anyone about what your interests

1392

1   might be in his retirement?

2   A.   I haven't talked to anybody yet about the retirement.  I

3   mean, it's like -- somebody specific or --

4   Q.   Like a counselor or financial person or --

5   A.   No.

6   Q.   Okay.  All right.  And that's not anything that you really

7   discuss with Ms. Hurt; is it?

8   A.   No.

9   Q.   Why did you go see Ms. Hurt?

10  A.   I went to go see Ms. Hurt because I want to learn what I

11  can do to put all of this behind me.  And so that I can move

12  forward in my life and forget everything.  I want to forget

13  all of it.

14  Q.   Now, Larry, your husband who we just talked about, he's

15  the father of your son; correct?

16  A.   Yes.

17  Q.   And did he ask you -- did your -- did Larry Sanchez ask

18  you to come to court for your son?

19  A.   Yes.

20  Q.   And about how long do you remember staying in the

21  courtroom where whatever was happening with your son was

22  happening?

23  A.   I believe it was for 10 to 15 minutes at the most.  It was

24  quick.

25  Q.   And that's the only time you went to court?

1   A.   Yes.

2   Q.   Now, after -- oh, you testified that this doctor was a

3   scary doctor.  Dr. Scott.  You remember that?

4   A.   Yes.

5   Q.   And the only reason you were scared of him was because he

6   didn't smile at you?

7   A.   No.  His demeanor.  He didn't display any body language.

8   He wasn't courteous.  He was just -- I didn't know him.  He

9   didn't seem very friendly.  He was -- I don't know how to

10  explain how a person is when you don't know them and

11  they're -- they don't display body language.  And then he

12  didn't want Mario there.  He wanted him to go out shopping or

13  doing something out of the building.  Just scared me.

14  Q.   And was there any staff present when you went to see Dr.

15  Scott?

16  A.   No.

17  Q.   So when you testified at the deposition that he -- you

18  didn't have any problems with him and his staff, did you

19  understand what Mr. Besmer was asking you?

20  A.   If I had -- I'm sorry, what was that?

21  Q.   When you testified at the deposition that you didn't have

22  any problems with Dr. Scott or his staff.

23  A.   Right.

24  Q.   Did you understand what Mr. Besmer was asking you?

25  A.   I didn't have any problem with them, like disrespecting

1394

1  me.  But I didn't understand as far as like the scenery, how

2  he was.  I didn't know that that's what he was asking me in

3  the beginning.  I didn't know that.

4  Q.  Did you have any trouble finding your way to the

5  appointment?

6  A.  No.  Actually we did GPS, so we did pretty good.  The only

7  thing was that we couldn't find -- the building was off-site.

8  It was a -- not what we expected.  It was different.

9  Q.  And the day you went to -- that Mr. Besmer took your

10  deposition, that was the second day of your deposition; wasn't

11  it?

12  A.  Yes.

13  Q.  And did you -- had you formed some type of friendly

14  relationship with Mr. Besmer by that time?

15          MR. BESMER:  Objection.  Relevance.

16          THE COURT:  Sustained.

17  BY MS. PRICE:

18  Q.  You testified that before you began to be sexually

19  harassed by defendant Smyth, that you were concerned about

20  your weight; do you recall that?

21  A.  Yes.

22  Q.  Okay.  You had taken steps to try to lose weight; correct?

23  A.  Yes.

24  Q.  Let me show you -- just a moment.

25          If you go to the second volume of Defendant's

1395

1  Exhibits, the triple -- I guess it's six Ms, it's the tab that

2  has six Ms on it.  And there's a page, CDCR 003500.

3          Do you have it there?

4  A.  I think I do.

5  Q.  I've displayed it on the screen.  It looks like it's -- I

6  think it's -- it's in evidence.

7  A.  Okay.  I'm on the right page.

8  Q.  It has a Bates number at the bottom.  And I think --

9          THE COURT:  Can you do it on the screen or --

10 BY MS. PRICE:

11 Q.  Why don't you look on the screen.  I can't really tell --

12 A.  I think I have -- well, no, that's not it either.

13         THE COURT:  The problem is there's no exhibit sticker

14 on it so she can't tell -- she can't see the Bates number

15 right now on the screen.  If you could do it on the screen,

16 that might be --

17 BY MS. PRICE:

18 Q.  Oh.  On the screen, the Bates number is CDCR 003500.

19         THE COURT:  Thank you.

20         THE WITNESS:  This is a lot.

21         THE COURT:  You can zoom it back if you wish to do

22 your examination --

23         MS. PRICE:  Thank you.

24         THE COURT:  -- by showing the document.  You can just

25 look on the screen.

1396

1      MS. PRICE:  Thank you.

2   Q.  Okay.  Can you tell -- is the date of this document April

3   or September?  Do you know?

4   A.  It looks like a 4, so April.

5   Q.  Okay.  And it indicates -- appears to indicate -- well,

6   can you tell what your weight was at that time?

7   A.  It looks like -- WT 165.

8   Q.  Okay.  And then it says that you were there to restart

9   diet pills.  Do you see that?

10  A.  Yes.

11  Q.  Okay.  So at some time in your life, before you began

12  to -- in April -- at least in April of 2009, you were

13  concerned about your weight; correct?

14  A.  Correct.

15  Q.  Okay.  And do you believe that you were working with

16  defendant Smyth at that time?

17  A.  In April, I don't -- not in April.  I know in 2009 I did.

18  I don't believe in April, but I know in 2009.

19  Q.  All right.  So are you -- do you blame defendant Smyth for

20  every ailment you've ever had in your life?

21  A.  No, I do not.

22  Q.  Do you blame him for every issue that you've had with your

23  weight in your life?

24  A.  No, I do not.

25  Q.  What about issues with your children, do you blame him for

1  that?

2  A.  No.

3  Q.  Do you blame him for issues with your husband?

4  A.  No.

5  Q.  In -- Mr. Besmer showed you a note as well from your

6  medical records regarding your husband's affair from May of

7  2009.  Or I want to -- the note was from June of 2011.  Do you

8  remember that?

9  A.  Yes.

10 Q.  Okay.  And the note indicated that you learned about this

11 affair in May of 2009; correct?

12 A.  Right.

13 Q.  And you learned about that affair from your children?

14 A.  Yes.

15 Q.  And why did you take the time off work for those few days?

16 A.  Why did I take the -- that time off?

17 Q.  Yes, ma'am.

18 A.  I needed it for my kids.  I needed to explain to them

19 myself and my husband on what was going on.  Because they were

20 confused.  I needed to explain the situation between my

21 husband and myself to what we were -- to let them know that we

22 were already planning on getting divorced.  Because they had

23 no idea.

24 Q.  Was that stressful for you to have to explain that to your

25 children?

1   A.  Yes.  I didn't want them to know that mom and dad lied to

2   them.

3   Q.  And did you experience a migraine headache during those

4   days, few days that you were off work dealing with your

5   children?

6   A.  Yes, I did.  And I tried to get at least a week so that I

7   can spend time with them and explain it to them right.  Even

8   though they were grown adults, I still needed to explain to

9   them.

10   Q.  Were all of them grown --

11   A.  Not all of them -- well, no, I think, but the little one

12   was our concern.  The youngest one.

13   Q.  Now, after September of -- excuse me, November of 2011,

14   how did you learn that Smyth had been removed from -- or

15   reassigned from C yard?

16   A.  I believe, if I can remember, he just wasn't there

17   anymore.  I -- on the FLSA, he wasn't on the FLSA to my

18   knowledge right now.

19   Q.  Do you remember anybody from EEO at the prison contacting

20   you and saying, "Okay, we're going to move this guy now"?

21   A.  No.  I didn't hear anything, no.

22   Q.  And your complaint that you filed in November of 2011 was

23   still pending internally; correct?

24   A.  Correct.

25   Q.  All right.  Did you have any contact with defendant Smyth

1   after November of 2011 at work?

2   A.   Yes.

3   Q.   What type of contact did you continue to have with him at

4   work?

5   A.   We had a riot on 3A, 3A yard.  And they called for a Code

6   3, where staff had to respond to 3A yard.  I do not remember

7   if I was either -- oh, no, I do know.  I was in block training

8   and we -- in block training, we have classes.  I had to

9   respond, along -- all the other officers as well had to

10  respond to a Code 3 to 3A.  After the riot was done, we

11  usually escort the inmates -- we tell them to get up and we

12  escort two officers to an inmate back to their unit.  There's

13  over 300 inmates, so a lot of staff responded.

14          As I was escorting, halfway through the riot, after

15  everything calmed down, I remember escorting an inmate and I

16  saw Officer Smyth coming towards me as we were escorting him

17  out to his unit.  And he passed -- he passed by me.  And I

18  remember him slightly hitting my shoulder.  That was on one

19  occasion.  Didn't say anything.  But he did slightly hit my

20  shoulder.

21  Q.   He made contact with you, physical contact?

22  A.   Correct.

23  Q.   Were there any other occasions that you encountered him at

24  work?

25  A.   Yes.  In transportation, I went to go pick up inmates for

1   court in 3A03.  He worked in 3A03 in the mental health EOP

2   building.  It's separate from the unit 3A03 and 3A04.  We, as

3   transportation, had to park in the back, which there

4   is -- it's gated fences.  The fence is gated.  We have the key

5   to open it up.  So we open it up, go pick up the inmates we

6   needed.

7           He is in a separate building is where they

8   usually -- when they bring the inmates for mental health

9   clinicians.  I went to go pick up, me and my partner, an

10  inmate in 3A03 for court.  And it was early in the morning.

11  And when we walked in, I went to go check to see his -- his

12  house, his cell, to see if he was in C section.  Because

13  that's usually what we look to see 121, if they have two

14  inmates because then we have to use two cuffs.  I went in

15  front of him to see if there's two cards on there so that I

16  can let him know we have to use two cuffs.

17          Well, when I was walking towards C section, and

18  that's just a section of the unit, I observed his voice.  He

19  said, "Well, ain't that sweet."  I heard his voice.  And I

20  looked back, realized it was him as I was walking

21  towards -- closer to the cell so I could observe.

22          When I looked back, he did the tongue thing again

23  really quick, but he was walking towards me.  So I made a U

24  turn and went right back to where my partner was at.  It was

25  Officer Ortega.  And I told him, I said, "Could you please

1401

1   just stay with me?  Make sure that you just stay with me."

2   And he did.  I didn't tell him at the time what was going on

3   because he was walking with me to go get the inmate.

4           We walked up there and got the inmate.  Officer Smyth

5   was no longer there.  He had walked somewhere else.  And when

6   we cuffed up the inmate, brought him down because it takes two

7   to escort, I was walking halfway out of the building 3C -- I

8   mean 3C03, out of that building, 3A03, out of that building.

9   In his unit where he brings his inmates is the EOP building,

10  it's the mental health crisis unit.  He was not there.  But we

11  walked halfways, and as I can see where that gate is that

12  where we open and we park our vans on the outside.  He was out

13  there with my transportation, other transportation officers

14  that came in to pick up other inmates in the other building.

15          And I stopped and I told one of the sergeants,

16  Sergeant Lopez had passed by me, and I told him to the side --

17  pulled him to the side, and I said "Could you please do me a

18  favor?"  And he says, "Yes, what's wrong?"  I said, "Could you

19  please go over there and ask Smyth to step away from there?"

20  I said, "I don't want to have interaction with him.  He's not

21  even supposed to be by me.  Could you tell him to please move

22  away?"

23          So the sergeant did go over there because where my

24  van is at, he was there talking to those officers.  On the

25  outside.  You have to come out the gate in order to where our

1   vehicles are parked.  And he did.  He went over there and told

2   him.  I don't know exactly what was said to Sergeant Lopez.

3   He was angry is what he did mention.  But --

4   Q.  Who was angry?

5             MR. BESMER:  Objection.  Hearsay.

6             THE WITNESS:  Smyth.

7             THE COURT:  Sustained.

8   BY MS. PRICE:

9   Q.  So you did report that contact to your sergeant?  To a

10  sergeant?

11  A.  Yes.  To my -- to Sergeant Lopez at the time, you know, to

12  just tell him to move in the situation.  And then I reported

13  it to Officer Ortega when we got back to put our equipment up

14  for the day, I told him what was going on.  And I, you know,

15  explained a little bit of what happened out there.  And he

16  understood a little bit.  But then I went and also told

17  Lieutenant Rousseau.

18  Q.  And was there documentation created with respect to those

19  incidents?

20            MR. BESMER:  Objection.  Lacks foundation.

21            THE WITNESS:  I believe so.

22            THE COURT:  Yes.  If you can -- sustained due to the

23  plural nature of the question asked.

24  BY MS. PRICE:

25  Q.  Was -- did you encounter Smyth during the time you were in

Sanchez - RD

1403

1    transportation more than one time?

2    A.   Yes.

3    Q.   Was there documentation created to document -- that

4    reflected those incidents?

5              MR. BESMER:  Lacks foundation.

6              THE COURT:  Sustained.

7    BY MS. PRICE:

8    Q.   Do you know if anyone created a document that reflects

9    those incidents?

10   A.   Yes.

11   Q.   Okay.  Who created that document?

12   A.   Lieutenant Rousseau and Sergeant Lopez.

13   Q.   And when -- approximately when did those incidents in

14   transportation with defendant Smyth occur?

15   A.   I believe some time in 2013.

16   Q.   If you could look at Exhibit Number 36, please.  In the

17   purple binder.

18              Just if you could review that and don't talk.  Just

19   look at it.

20   A.   Scan it?

21   Q.   Yes, ma'am.  And then I'll ask you a question after you

22   cover it up.

23   A.   Okay.

24   Q.   Cover it up, please.  Does that refresh your recollection

25   as to when those incidents with defendant Smyth occurred --

1  A.  Yes.

2  Q.  -- in transportation.

3  A.  Yes.

4  Q.  When was it?

5  A.  In November of 2013.

6  Q.  Did they all occur in November?

7  A.  No.

8  Q.  What other time did they occur?

9  A.  They -- I don't remember the other dates for the other

10  occurrences.  But it was in 2013.

11  Q.  Let me have you look again at Exhibit Number 36 at the

12  second page, please.  Just review that.  Don't talk.  Just

13  scan it again.  Or you can read it.  It's up to you.  Exhibit

14  36, please.

15  A.  On the second page?

16  Q.  Yes, ma'am.

17  A.  Okay.

18  Q.  Does that refresh your recollection as to when -- oh, I'm

19  sorry.  Cover it up, please.  Did you cover it up?

20  A.  I can't -- I can't see it.

21  Q.  Okay.

22  A.  Yeah, I'll cover it up.

23  Q.  Thank you.  Does that refresh your recollection as to when

24  another -- if there was another time of an incident with

25  defendant Smyth while you were in transportation?

1405

1    A.  Yes.

2    Q.  What -- do you know what date or month that took place?

3    A.  It was in the same year, but it's at a

4    different -- different time.

5    Q.  All right.  Thank you.  You filed a discrimination

6    complaint with EEOC in January 2012; do you recall that?

7    A.  Yes.

8    Q.  And following that, you received -- you were interviewed

9    by Ms. Hoopes on the telephone; do you remember that?

10   A.  Yes.

11   Q.  And did you ever -- to the best of your knowledge, did you

12   ever see Ms. Hoopes at the -- did she ever come to the

13   institution to see you?

14   A.  No.

15   Q.  No?

16   A.  No.

17            MS. PRICE:  If I can have a moment, Your Honor.

18            THE COURT:  You may.

19   BY MS. PRICE:

20   Q.  Oh.  You testified that you heard defendant Smyth make

21   some reference after -- when you encountered him outside of 3

22   yard, something about "a sweet thing."  Do you recall that

23   testimony?

24   A.  Yes.

25   Q.  And can you tell us again what you heard him say?

Sanchez - RD

1406

1    A.  Yes.  He said, "Well, ain't that sweet."

2    Q.  Is that the only time that he's made a comment like that

3    or said something like that to you?

4    A.  No.  It's -- he's done that before when I've -- when I've

5    run into him at the hospital, the ACH.

6    Q.  Done what before?

7    A.  The "ain't that sweet."  To get my attention.

8    Q.  Do you recall if defendant Smyth has ever referred to you

9    as "a sweet thing"?

10   A.  Just during those times when I'd run into him, he'd

11   afterwards, after he was moved is when he started referring to

12   me -- well, as to get my attention like that.

13   Q.  All right.  Now, you were asked about your relationship

14   with Sergeant Doria.  Do you recall that?

15   A.  Yes.

16   Q.  And have you and Sergeant Doria ever been close friends

17   outside of work?  As far as in your view.

18   A.  Not really close friends before.  I think it's just

19   friends outside now.

20   Q.  Okay.  Did you like Doria?

21   A.  Yes.  Yes.

22   Q.  And did you -- have you ever spoken to her about this

23   lawsuit?

24   A.  When I was being sexually harassed, I did tell her.

25   Q.  After you filed the lawsuit, did you ever talk to Doria

Sanchez - RX

1407

1    about what the issues were?

2    A.  I just -- yeah, I told her that, you know, that Smyth was

3    sexually harassing me.  And, you know, leering at me.

4    Q.  Did it ever -- was it ever your understanding that you had

5    initiated some type of adverse -- or made allegations against

6    Doria that would result in her being, you know, investigated?

7    A.  I didn't make -- I don't believe I made allegations

8    stating that she should be investigated.  But I know that they

9    could have -- they -- well, I was told that they were.  I

10   didn't know that they were being investigated for allegations

11   like that, the supervisors.  I did not know.

12   Q.  Did you ever try to have your -- well, did you ever bring

13   any kind of claims against your supervisors individually?

14   A.  No.  Not that I know of.

15         MS. PRICE:  All right.  Nothing further at this time.

16   Thank you, Officer Sanchez.

17         THE COURT:  Anything further?

18         MR. BESMER:  Yes, Your Honor.

19         THE COURT:  All right.  You may.

20                         RECROSS-EXAMINATION

21   BY MR. BESMER:

22   Q.  Officer Sanchez, you testified that there was this riot at

23   the prison; correct?

24   A.  Correct.

25   Q.  And that all the officers responded to the riot; correct?

Sanchez - RX

1408

1    A.  A lot of officers did, yes.

2    Q.  And you testified that the officers were moving the

3    inmates from the yard back -- well, I'll withdraw that.

4          Isn't it true that the officers were moving the

5    inmates from the yard back to the buildings?

6    A.  They -- the officers were moving the inmates back to the

7    buildings, correct.

8    Q.  And all of the officers from the prison who were available

9    were on that yard; correct?

10   A.  The ones that did show up, yes.

11   Q.  And you said that there were about 300 inmates in the yard

12   at the time; correct?

13   A.  When the riot happened, yes.

14   Q.  And you responded; correct?

15   A.  Yes.

16   Q.  And about how many officers responded to the riot?

17   A.  I don't know.  I didn't count them.

18   Q.  Do you have any estimate?

19   A.  No.  I couldn't put a number.  It was a lot.

20   Q.  A lot of officers responded; correct?

21   A.  Yes.

22   Q.  And there were officers all over the yard; correct?

23   A.  Yes.

24   Q.  And you testified that you were walking by Smyth and he

25   hit you on the shoulder; correct?

1   A.  I observed him coming towards me, yes.

2   Q.  And he hit you on the shoulder; correct?

3   A.  Slightly, yes.

4   Q.  He slightly hit you on the shoulder; correct?

5   A.  Correct.

6   Q.  Somebody must have witnessed that out there; correct?

7           MS. PRICE:  Objection, Your Honor.  Lacks foundation.

8           THE WITNESS:  I didn't ask.

9           MS. PRICE:  Calls for speculation.

10          THE COURT:  Overruled.

11          THE WITNESS:  I didn't ask.

12  BY MR. BESMER:

13  Q.  You didn't ask if anybody witnessed that?

14  A.  It happened so fast.  I -- when he passed by me, he hit me

15  in the shoulder and I let it go.

16  Q.  You just let it go?

17  A.  I have to continue with the inmate and I have to take him

18  to his house.

19  Q.  Well, you must have made a report about that; correct?

20  A.  It was a slight nudge, but, yes, I let it go.

21  Q.  It didn't bother you then?

22  A.  I wanted to forget it.  No, it did bother me, yes.

23  Q.  But you never reported that to any of your supervisors; is

24  that correct?

25  A.  I don't remember if I did or not, but it happened.

1   Q.  And you never told the EEO investigators about this slight

2   hit on the shoulder; is that correct?

3           MS. PRICE:  Objection.  Assumes facts and.

4           THE WITNESS:  That was after.

5           MS. PRICE:  -- lacks foundation.

6           THE COURT:  Overruled.

7           THE WITNESS:  That was 2013.

8   BY MR. BESMER:

9   Q.  Officer Smyth did that in 2013; correct?

10  A.  Some time after 2013, yes.

11  Q.  And you never testified about that hit during your

12  deposition; isn't that correct?

13  A.  Because it happened after.

14  Q.  Your deposition was in 2014; correct, ma'am?

15  A.  Correct.

16  Q.  And you claim that the hit had occurred in 2014 -- excuse

17  me, 2013; correct?

18  A.  Yes.

19  Q.  And until today, you haven't told anyone, other than say

20  your attorney -- I don't want to know what you told your

21  attorney -- you've never told anybody else about this slight

22  hit on the shoulder; isn't that correct?

23  A.  I might have told somebody, but I don't remember.  But I

24  let it go.

25  Q.  And going back now to your first EEO complaint.  The one

1   you filed internally.

2   A.   Yes.

3   Q.   You were interviewed by Otis Williams; is that correct?

4   A.   What was the date again?

5   Q.   I'm just asking if you were interviewed by Otis Williams.

6   A.   Yes.

7   Q.   And do you recall -- do you recall Otis Williams asking

8   you whether you believed Doria and Buller failed to take

9   immediate and appropriate action in response to your

10  complaints?

11  A.   Yes.

12  Q.   And you recall that your answer was yes, you don't believe

13  that they took immediate and appropriate action in response to

14  your complaints; is that correct?

15  A.   I recall saying that, yes.

16  Q.   And Doria was your friend who you went yard saling with at

17  that time; correct?

18  A.   I don't remember if I went yard saling at that time.

19  Q.   But she was somebody who you considered a friend outside

20  of work; correct?

21  A.   Yes.

22  Q.   You did social things together outside of work; right?

23  A.   I don't know during that time.

24  Q.   You testified about another incident where you were

25  working transportation and you went to the hospital; correct?

1    A.   Correct.

2    Q.   And Officer Smyth at the time was working at the hospital;

3    correct?

4    A.   Yes.

5    Q.   So when you saw Officer Smyth that time, he was in his

6    area of responsibility; correct?

7    A.   Yes.

8    Q.   And you went to his area; correct?

9    A.   Yes.

10   Q.   And you saw him there; right?

11   A.   Yes.

12   Q.   And you didn't like seeing him there; right?

13   A.   No.

14   Q.   You didn't mind that he was in his area working?

15   A.   As long as he doesn't say anything to me.

16   Q.   And you claim that he made a comment "ain't that sweet";

17   correct?

18   A.   Correct.

19   Q.   And that was in 2013; correct?

20   A.   Correct.

21   Q.   And so your testimony is -- well, I'll withdraw that.

22        You filed your lawsuit against Officer Smyth in

23   November 2012; correct?

24   A.   I don't know if that lawsuit was in 2012.

25        MR. BESMER:  Your Honor, ask --

1413

1       THE WITNESS:  My first claim.  Sorry.

2       MR. BESMER:  I ask that the Court take judicial

3    notice that the lawsuit in this case against CDCR and

4    defendant Smyth was filed in November of 2012.

5       THE COURT:  Ms. Price, I have the exact date.

6       MS. PRICE:  I don't have the exact date, Your Honor.

7       THE COURT:  November 8.

8       MS. PRICE:  Whatever -- I don't recall the exact

9    date, Your Honor.

10      THE COURT:  Do you want November or do you want the

11   exact date?

12      MS. PRICE:  The exact date would probably be good if

13   the Court is going to take judicial notice.

14      THE COURT:  All right.  Anybody have any objection

15   that the date is November 8th, 2012?

16      MR. BESMER:  No, Your Honor.

17      THE COURT:  All right.  Ladies and gentlemen, the

18   Court is taking judicial notice of the fact that the complaint

19   filed in this case against CDCR and defendant Smyth was on

20   November 8th, 2012.  You will assume that as a fact in this

21   case.

22      Any time I take judicial notice and advise you of

23   judicial notice, that's the effect of what I say about

24   judicial notice is that you will assume -- you will take that

25   as a fact in the case.  Thank you.

1414

 1   BY MR. BESMER:

 2   Q.   So Ms. Sanchez, what the Court has done is essentially

 3   establish that there's no question that you filed your lawsuit

 4   against Officer Smyth and the department in November of 2012.

 5   Do you understand that?

 6   A.   Yes.

 7   Q.   And by November of 2012, you had already filed two

 8   internal complaints against Officer Smyth; correct?

 9   A.   Say it again.

10   Q.   By November of 2012, you had already filed two internal

11   complaints against Officer Smyth; correct?

12   A.   Correct.

13   Q.   And by that time, you'd filed complaints with the DFEH;

14   correct?

15   A.   Correct.

16   Q.   And your testimony is that while you were suing Officer

17   Smyth for damages, he continued to sexually harass you?

18   A.   One more time.

19   Q.   Is it your testimony that while you had already sued or

20   while you were suing Officer Smyth for damages, he continued

21   to sexually harass you?

22   A.   Correct.

23   Q.   And you claim that he made this tongue gesture; correct?

24   A.   That's correct.

25   Q.   But you never told anybody about the tongue gesture when

1   it happened that day; correct?

2           MS. PRICE:  Objection.  Misstates the witness' --

3           THE WITNESS:  That's not true.

4           MS. PRICE:  -- testimony.

5           THE COURT:  Overruled.

6           THE WITNESS:  That's not true.

7   BY MR. BESMER:

8   Q.  You never told Sergeant Lopez about the tongue gesture;

9   correct?

10  A.  At that time, no.

11  Q.  You never told anybody -- who did you tell about the

12  tongue gesture?

13  A.  I told that to my officer that was with me, Chris Ortega.

14  Q.  You told Ortega about the tongue thing; correct?

15  A.  Correct.

16  Q.  And Ortega didn't witness it himself; correct?

17          MS. PRICE:  Objection.  Lacks foundation.

18          THE WITNESS:  I didn't ask him, but -- I didn't ask

19  him.

20          THE COURT:  Just a minute.  Let me rule on the -- it

21  does lack foundation, so the objection is sustained at this

22  point in time.

23  BY MR. BESMER:

24  Q.  Do you know if Officer Ortega witnessed the tongue thing?

25  A.  I don't know.

Sanchez v. RK

1416

1  Q.  So you told Officer Ortega about the tongue thing;

2  correct?

3  A.  I did.

4  Q.  But you never told any of your supervisors about the

5  tongue thing; correct?

6        MS. PRICE:  Objection.  Misstates the witness'

7  testimony.

8        THE COURT:  All right.  Sustained.  Rephrase.

9  BY MR. BESMER:

10  Q.  Isn't it correct that you never told any of your

11  supervisors that Officer Smyth flicked his tongue at you in

12  November of 2013?

13  A.  I did tell Officer -- my Sergeant Barnett.

14  Q.  And you told Sergeant Barnett that day; correct?

15  A.  Correct.

16  Q.  Never wrote it down anywhere that Officer Smyth did that;

17  correct?

18  A.  I don't know.

19        MS. PRICE:  Lacks foundation.  Calls for speculation.

20        THE WITNESS:  I don't know.

21        THE COURT:  Speculation on the part as to whether or

22  not this witness wrote something down.

23        MS. PRICE:  No, as to whether Sergeant Barnett -- I'm

24  sorry, I heard the question that he was asking her if Sergeant

25  Barnett -- he was stating that Sergeant Barnett never wrote it

1   down.  That's what I heard him say.

2           THE COURT:  Objection is overruled.

3   BY MR. BESMER:

4   Q.  Isn't it true that you never wrote down anywhere that

5   Smyth flicked his tongue at you in November 2013?

6   A.  I don't remember writing it down.

7           MR. BESMER:  One moment, Your Honor.

8   Q.  And you met with Lieutenant Rousseau about this incident;

9   correct?

10  A.  He met with me, yes.

11  Q.  And you never told Lieutenant Rousseau about this tongue

12  thing; correct?

13  A.  Yes, I did.

14  Q.  And, in fact, when he asked -- did Lieutenant Rousseau ask

15  you whether you reported everything to CDCR's EEO department?

16          MS. PRICE:  Objection.  Calls for hearsay.

17          THE WITNESS:  I don't remember.

18          MS. PRICE:  Also --

19          THE COURT:  Remember to -- so I can rule on them all

20  at one time.

21          MS. PRICE:  Yes, Your Honor.  Can the witness be

22  instructed to wait until her lawyer's objection is heard as

23  well, please.

24          THE COURT:  Well, you know, it's hard to gauge that

25  on any witness.  So the Court has considered it.  It is

1   sustained as to the foundational question.  The form of the

2   question as to foundation.  So if you could break it up, Mr.

3   Besmer.

4           MR. BESMER:  Yes, Your Honor.

5   Q.  You met with Lieutenant Rousseau or he met with you

6   regarding the November 2013 incident; correct?

7   A.  Correct.

8   Q.  And isn't it true that you never told Lieutenant Rousseau

9   about the tongue thing?

10  A.  I did tell him.

11  Q.  And isn't it true that he asked you whether you had

12  reported all this to the EEO department?

13  A.  I don't remember him asking that.

14  Q.  And isn't it true you told him no, but you had told your

15  lawyer everything?

16  A.  I don't remember that.

17  Q.  Will you take a look at Exhibit 36, please.  Purple

18  binder, yes.

19  A.  All right.

20  Q.  Go ahead and look at page two, just the first paragraph

21  there and let me know if it refreshes your memory about the

22  conversation you had with Lieutenant Rousseau.

23          MS. PRICE:  I'm going to object, Your Honor, to the

24  form of the question.

25          THE COURT:  Form of the question by counsel?

1419

1    MS. PRICE:  Yes, Your Honor.

2    THE COURT:  Objection has been considered, it's

3  overruled.  Continue to read the document silently to

4  yourself.  And then when you're done, if you'll move the tab

5  over it.  Thank you.

6    THE WITNESS:  Do I go to the back page or just this

7  one?

8  BY MR. BESMER:

9  Q.  Just that one, ma'am.  Just the first paragraph on that

10  page.

11  A.  Oh, I'm sorry.

12  Q.  That's okay.  The first paragraph on page two, that's it.

13  The first paragraph on page two.

14  A.  Okay.

15  Q.  Go ahead and flip the tab over.

16  A.  Okay.

17  Q.  Does reading -- does that document refresh your

18  recollection you told Lieutenant Rousseau that, no, you had

19  not reported everything to the EEO department but you had

20  shared it all with your attorney?

21  A.  On that paragraph?  No, I don't remember.

22    MR. BESMER:  No problem.  No further questions, Your

23  Honor.

24    THE COURT:  Ms. Price.

25    MS. PRICE:  Yes, Your Honor.

Sanchez - RD

1420

```
1                    FURTHER REDIRECT EXAMINATION

2    BY MS. PRICE:

3    Q.  Officer Sanchez, can you look at the first page of Exhibit

4    36, please.

5            THE COURT:  I'm sorry.  There's no question.  Are

6    you -- what are you --

7            MS. PRICE:  I intend to ask her about the

8    conversation with Lieutenant Rousseau.

9            THE COURT:  Why don't you ask her about the

10   conversation and see if she doesn't know.  If she doesn't

11   know, then we'll go through that exercise.  Thank you.

12   BY MS. PRICE:

13   Q.  Your conversation with Lieutenant Rousseau was longer than

14   who's on the page that Mr. Besmer showed you.

15           MR. BESMER:  Objection.

16           THE COURT:  All right.  That's -- that's -- classic

17   classic hearsay.

18           MS. PRICE:  Oh, I'm sorry.

19           THE COURT:  Classic.  So if you could just ask your

20   question, Ms. Price.  And you can't tell from a document how

21   long a conversation was.

22           MS. PRICE:  Okay.

23           THE COURT:  Thank you.

24   BY MS. PRICE:

25   Q.  Do you remember in the conversation with Lieutenant
```

1  Rousseau that you talked about the tongue thing that defendant

2  Smyth had -- that he had stuck out his tongue at you?

3  A.  Yes.

4  Q.  You told that to Lieutenant Rousseau; correct?

5  A.  Yes.

6  Q.  He documented that conversation; didn't he?

7  A.  Yes.

8  Q.  And then he also documented --

9         MR. BESMER:  Objection.  Lacks foundation.  Move to

10  strike the last part.

11         THE COURT:  Sustained.  It lacks personal knowledge

12  at this point in time.  So under 601, 602, the Court has

13  considered the objection and therefore has sustained the

14  objection.

15         MS. PRICE:  Your Honor, I move Exhibit 36 into

16  evidence then as an admission against interest.

17         MR. BESMER:  Lacks foundation.

18         THE COURT:  Sustained.

19  BY MS. PRICE:

20  Q.  Officer Sanchez, did you receive a copy of Exhibit 36?

21  A.  No.

22  Q.  In the conversation you had with Lieutenant Rousseau, did

23  he ask you if you wanted to go home that day?

24  A.  I believe so.

25  Q.  Did you leave your post that day?

1  A.  I believe it was towards the end of the shift, if I can

2  remember.  And I went and did my job.  But I did go home.

3  Q.  All right.  Your Honor, I need to -- may I approach?

4           THE COURT:  You may.

5           (The following proceedings were held at sidebar

6           between the Court and counsel:)

7           THE COURT:  Court needed to stand up.  All right.

8  Yes.  Please.

9           MS. PRICE:  I request permission to be able to ask

10  her about another exhibit, I think it's 35.  But it's right in

11  there.  Which I realize I didn't ask her about on the -- on

12  the earlier --

13           THE COURT:  So you're asking for permission to do, in

14  essence, a direct exam, in essence reopen your direct

15  examination for purpose of asking a series of limited

16  questions related to Exhibit 35 -- is that right?

17           MS. PRICE:  It's related to one of those exhibits.

18           MR. BESMER:  Can I have a moment and look at the --

19           THE COURT:  You may.

20           MS. PRICE:  It's the medical.

21           THE COURT:  Yeah.  Exhibit 35?

22           MS. PRICE:  It's in that range.  It's with

23  the -- it's not 35.  It's in that range.

24           THE COURT:  Can you --

25           MS. PRICE:  Yes.

1423

1           THE COURT:  Watch the papers.

2           MS. PRICE:  It's 37 and 38.

3           THE COURT:  And the reason I said "watch the papers"

4    is because we have a very sensitive microphone here and the

5    court reporter will get on me if we rustle papers.  All right.

6    What was the number, 36?

7           MS. PRICE:  37 and 38.

8           THE COURT:  37 and 38.  Are you intending to

9    introduce those documents?

10          MS. PRICE:  No, Your Honor.

11          THE COURT:  Okay.  Can you give me a brief proffer of

12   what the extent of the testimony will be so I can make a

13   determination as to prejudice?

14          MS. PRICE:  Yes.  That she did not see Dr. Melashenko

15   for -- really until 2013, I believe.  That her treatment and

16   her visits to the doctor where she received medication was

17   with Samantha Davis.  And that's reflected on both of those

18   documents.

19          THE COURT:  All right.  Can you ask her -- it seems

20   reasonable to ask questions regarding to what you just

21   proffered.  She should be able to testify as to personal

22   knowledge.

23          MR. BESMER:  But I have objection to her using these

24   documents to refresh her recollection because there's no

25   indication -- look at.  These go from, you know, March of 2010

1424

1  to 2013.  You know, if this was a complete list of everything

2  that went back to 2008 or whenever that document is.  But to

3  try to lead the witness to suggest going to this to refresh

4  her recollection, I think that's just entirely improper.

5          I have no problem with the initial question or if she

6  has other documents in the medical records that go back to

7  2008.  But this is a summary from Save Mart.  Doesn't --

8          THE COURT:  Right.

9          MR. BESMER:  -- mean she got all her prescriptions

10  from here.

11          THE COURT:  Right.

12          MR. BESMER:  And here's another one here.

13          THE COURT:  Can you ask her the questions as to what

14  she was receiving and what -- because this is a business

15  record of another company to which I don't think you're

16  proffering that she has the knowledge or the custodial aspect.

17  So I think you can ask the questions, can you not, about what

18  type of -- who she was seeing, what kind of medication, I take

19  it.  Can you do that?

20          MS. PRICE:  Yes, sir.  That's what I'm asking

21  permission to do.  I'm not suggesting that I would introduce

22  these documents --

23          THE COURT:  Okay.

24          MS. PRICE:  -- through Officer Sanchez.

25          THE COURT:  But I want to be careful that because

1    we've been very good today about properly referencing -- a

2    couple of slipups, but in terms of referencing the documents.

3    Remember, it's about the witness perceiving, it's not about

4    reading from the documents.  So the Court is going to

5    interject if it sees that there is reading.  But so far we've

6    been doing a much better job than we have in the past.  But

7    keep in mind that you can ask her these questions.  I don't

8    see any prejudice in allowing you to reopen your direct

9    examination for that purpose.  And obviously, Mr. Besmer, you

10   would have an opportunity to cross on those issues should you

11   feel the need to do so.

12          Anything further?

13          MS. PRICE:  No.

14          MR. BESMER:  Just to make my objection clear for the

15   record.

16          THE COURT:  Yes.

17          MR. BESMER:  I object to using these documents to

18   refresh her recollection as to when she started to see or get

19   prescriptions from Dr. Melashenko because all this is is a

20   prescription record.  It's nothing more than that.  And I know

21   the Court has previously indicated that a number of documents

22   can refresh her recollection, but I think it's misleading to

23   use these documents.

24          THE COURT:  All right.  I understand the nature of

25   your objection.  Sorry to interrupt.  But again, in the

1426

1   interest of time I do have to interrupt the parties.  But I

2   understand the nature of it.  The Court cannot make a ruling

3   on that because the Court cannot determine the extent and

4   nature of the refreshing of the recollection until it is an

5   issue.  In other words, that -- if we're doing proper

6   refreshing of recollection, she can use anything.  She could

7   even use a diagram drawn by her child if it just all of a

8   sudden refreshes her recollection.

9           MR. BESMER:  All right.

10          THE COURT:  Again, it's about the perception and the

11   memory, not about reading from the document.  And again, we've

12   been doing the exercise pretty well this morning.  So let's

13   maintain that.  And so I cannot -- I cannot decide that matter

14   until I see how it's being executed and done.  So your

15   objection is premature subject to renewal.

16          All right.  Anything further?

17          MS. PRICE:  No, Your Honor.

18          MR. BESMER:  Thank you.

19          MS. PRICE:  Thank you.

20          (The following proceedings were held in open court:)

21          MS. PRICE:  May I proceed, Your Honor?

22          THE COURT:  You may.

23          MS. PRICE:  All right.  Thank you.

24   Q.  Officer Sanchez, you were asked or shown a note this

25   morning about, I believe, from Dr. Mel -- from information

1427

1    written out apparently by Dr. Melashenko.

2    A.   Yes.

3    Q.   Do you remember who he is?

4    A.   He is my primary physician.

5    Q.   Is he someone, when you would go -- does he have an

6    office?

7    A.   Yes.

8    Q.   When you would go to his office, would you see him or

9    someone else?

10   A.   I would see his physician's assistant, which is Samantha

11   Davis.

12   Q.   How frequently did you see Dr. Melashenko in 2010 --

13   A.   Not very frequently.

14   Q.   And did you receive prescription medication from that

15   office?

16   A.   Yes.

17   Q.   What type of medication?

18   A.   There's a lot of them.

19   Q.   Did you receive medication for stress and anxiety?

20   A.   I believe so.  I don't remember the name of it.  But I

21   did, I received some for stress.

22   Q.   Let me have you take a look at Exhibit Number 37 in the

23   purple binder.

24   A.   Okay.

25   Q.   If you could review that.  Don't talk, just look at it

1428

1    yourself, please.

2    A.  Okay.

3    Q.  All right.  So I need you to cover it up, please, with the

4    paper.

5    A.  Okay.

6    Q.  All right.  Can you tell the jury what kind of medication

7    you took to deal with your stress and anxiety?

8    A.  In scanning it right now, I don't know --

9            MR. BESMER:  Objection.  Improper refresh of

10   recollection.

11           THE COURT:  Sustained.  Although I think if you could

12   finish your sentence, please.

13           THE WITNESS:  Okay.  What was the question?

14   BY MS. PRICE:

15   Q.  Do you remember -- I mean, can you tell us what type of

16   medication you were taking for your stress or anxiety?

17   A.  I know she -- she gave me a low dose of antidepressant,

18   but I don't remember the name.

19   Q.  Okay.  How often -- and the "she" was Samantha Davis?

20   A.  Right.

21   Q.  How often were you required to take that medication?

22   A.  I believe when I couldn't sleep, just to take it as

23   needed.

24   Q.  Did you take it more or less in 2010 than you did in 2011?

25   A.  I believe -- I don't remember, but -- I don't remember.

1429

1    Q.  All right.  That's fine.  Sorry.

2          Do you remember how long you continued to take the

3    medication that Ms. Davis provided for you for stress and

4    anxiety?

5    A.  I would take it when I really, really needed it.  I didn't

6    really like taking too much medication, but I took it

7    sparingly.

8    Q.  Okay.  When is the last time you took it, do you remember?

9    A.  The last time I took it, I believe was when I was having

10   the issue with the desist order.  And I believe at the end of

11   the year.  Until after -- because I would use it sparingly.

12   After Smyth was used, I really didn't use it anymore.

13          MS. PRICE:  Okay.  Thank you.  Nothing further.

14   Thank you, Your Honor.

15          THE COURT:  You're welcome.  Cross-examination.

16          MR. BESMER:  Nothing further, Your Honor.

17          THE COURT:  All right.  May this witness be excused?

18          MS. PRICE:  Yes, Your Honor.

19          THE COURT:  All right.  Thank you, Officer Sanchez.

20   You're excused.

21          Call your next witness, please.

22          MS. PRICE:  Plaintiff calls Lieutenant Paul Pacifico,

23   Your Honor.

24          THE COURT:  All right.

25          MS. PRICE:  I've got to get him.

1430

1    THE COURT:  Before we begin, do any members of the
2  jury need any water or anything?
3    JUROR SEAT NUMBER SEVEN:  I'm okay.
4    THE COURT:  You're okay?  All right.
5    **PAUL ANDREW PACIFICO**,
6  called as a witness on behalf of the Plaintiff, having been
7  first duly sworn, testified as follows:
8    THE CLERK:  Please state your full name for the
9  record and spell your last name.
10    THE WITNESS:  Paul Andrew Pacifico, P-A-C-I-F-I-C-O.
11    THE CLERK:  Please have a seat.
12    THE COURT:  All right, Ms. Price, you may proceed.
13    MS. PRICE:  Yes, Your Honor.  Thank you.
14                    DIRECT EXAMINATION
15  BY MS. PRICE:
16  Q.  Good morning.
17  A.  Good morning.
18  Q.  How you doing?
19  A.  Fine.  Thank you.
20  Q.  All right.  State your -- did you state your name for the
21  record?
22  A.  Yes, I did.
23  Q.  Okay.  And what was -- have you ever worked for the
24  Department of Corrections?
25  A.  Yes, ma'am.

1431

1   Q.   For how many years?

2   A.   30.

3   Q.   And what was your rank when you retired?

4   A.   When I retired, I was a lieutenant.  Prior to that, I was

5   acting facility captain.  I worked office of internal affairs

6   as a special agent.  I've been -- worked investigations.  I've

7   had many positions.  But the rank when I retired was a

8   lieutenant.

9   Q.   Yes, sir.  And you had some responsibility for 3C -- or

10  for C yard; correct?

11  A.   Yes, ma'am.  At Corcoran State Prison, yes.

12  Q.   Yes, sir.  And tell the jury what your

13  responsibility -- what your relationship was to C yard in

14  2011, please.

15  A.   In 2011, I was the acting facility captain.  I was

16  responsible for the supervision -- I was a manager and the

17  only manager for that facility.  We had over 1,000 inmates.

18  I'm guessing about 150 officers.  Oh, 12 sergeants and a few

19  lieutenants.  Counselors, medical staff, warehouse people.

20  And I was responsible for all of those.  But it wasn't just in

21  C facility.  I had two facilities I was responsible for.  So

22  that makes it 2,000 inmates, you know, pretty big

23  responsibility.  And I did that for approximately a year from

24  2010 to 2011.

25  Q.   Okay.  During that time, that time period, did it come to

1432

1    your attention that Officer Sanchez was having some difficulty

2    working with defendant Smyth?

3    A.   Yes.

4    Q.   And did it come to your attention through the chain of

5    command?

6    A.   Yes, ma'am.

7    Q.   And at that time, was lieutenant Anthony Baer a person who

8    reported to you?

9    A.   Actually no.  Yes, he did -- he was part of my chain of

10   command.  But he's not the one who reported the incident.  I

11   received a memorandum from Lieutenant Baer I think the

12   following day.  But the information regarding the tension and

13   the issue with Officer Sanchez and Officer Smyth was brought

14   to me from sergeants, a sergeant by the name of Lawton.

15   Q.   Sergeant Lawton, yes, sir.  And did Sergeant Lawton tell

16   you that Officer Sanchez had alleged that defendant Smyth was

17   sexually harassing her?

18   A.   Harassing her, yes.  Yes.

19   Q.   He did say "harassing"?

20   A.   Yes, ma'am.

21   Q.   Did he tell you that he understood that the harassment --

22   that she was claiming that the harassment was based on

23   her -- was sexual in nature?

24   A.   I'm going to say yes.  I'm going to say yes.

25   Q.   And you testified you received a memo the next day from

1433

1    the lieutenant?

2    A.   Correct.

3    Q.   Okay.  So we'll come to that.  Before Lawton came and told

4    you about the sexual harassment claim, did you know that there

5    was a problem with -- well, did you know Officer Sanchez?

6    A.   No, I didn't.

7    Q.   Okay.  Did you know Officer Smyth?

8    A.   No, I didn't.

9    Q.   Okay.  Did you know that there was any kind of -- had

10   anyone made you aware of any problem with these two employees?

11   A.   No.

12   Q.   And the memorandum, I gave you a copy of that yesterday;

13   right?

14   A.   Yes, ma'am.

15   Q.   Was that the first time you've seen it since your

16   retirement?

17   A.   Yes.

18   Q.   All right.  I'm going to ask you to take a look at Exhibit

19   50 in that purple binder.

20   A.   Yes, ma'am.

21   Q.   And is that the memorandum that you received from

22   Lieutenant Baer?

23   A.   Yes, it is.

24        MS. PRICE:  All right.  Your Honor, I move Exhibit 50

25   into evidence.

1434

1     THE COURT:  Any objection?

2     MR. KLEAM:  Yes, Your Honor.  Hearsay.  Foundation.

3     THE COURT:  All right.  If you could lay the

4  foundation with regard to that.  The objection is sustained at

5  this time.

6     Ms. Price, are you looking for Exhibit 50?

7     MS. PRICE:  Yes, Your Honor.

8     THE COURT:  You can utilize the Court's in the

9  interest of time.  I will need it back.

10    THE WITNESS:  Your Honor, I have a copy of it too.

11    THE COURT:  That's all right.  Just keep it.  Here

12 you go, Ms. Price.

13    MS. PRICE:  Oh.  I'm sorry, Your Honor.

14    THE COURT:  I just need it back.

15    THE WITNESS:  She might have given me hers yesterday.

16    THE COURT:  That's all right.  Just in the interest

17 of time.

18    MS. PRICE:  Yes, sir.  I've got it.  Thank you.

19    THE COURT:  You're welcome.

20 BY MS. PRICE:

21 Q.  Captain Pacifico, looking at what's been previously marked

22 as Exhibit 50, how did you receive this document?

23 A.  This was handed to me by Lieutenant Baer.  He was Acting

24 Lieutenant Baer at the time also.

25 Q.  And did you receive it in the course of your official

1435

1    responsibilities?
2    A.  Yes.
3            MS. PRICE:  Again, Your Honor, I'd offer Exhibit 50.
4            THE COURT:  Any objection?
5            MR. KLEAM:  I still object that it's hearsay, Your
6    Honor.  And I'd also note, too, that there's handwriting on
7    this copy of the document.
8            THE COURT:  It's the issue that I raised yesterday
9    generally with the parties.
10           MR. KLEAM:  And Your Honor, we do have --
11           THE COURT:  Excuse me.  For the record, it's part of
12   the Court's Exhibit Number 5.
13           MR. KLEAM:  Your Honor, we do have another copy of it
14   without that handwriting on it.
15           THE COURT:  All right.  Let's do that.  Let's have
16   that copy.
17           MR. KLEAM:  It's in Defense Exhibit QQ.
18           THE COURT:  All right.  So it's the identical copy?
19           MR. KLEAM:  Yes.  It appears to be, Your Honor.
20           THE COURT:  All right.  The Court has considered the
21   hearsay objection and that objection is overruled.
22           Ms. Price, do you have any objection that Q -- is
23   that two Qs, Mr. Kleam?
24           MR. KLEAM:  Yes.  QQ.
25           THE COURT:  All right.  QQ will be admitted into

1436

1    evidence.

2              MS. PRICE:  That's fine, Your Honor.

3              THE COURT:  All right.  Exhibit QQ is received into

4    evidence.

5              (Defendants' Exhibit QQ was received.)

6    BY MS. PRICE:

7    Q.  Okay.  So Captain Pacifico, this is addressed to you;

8    correct?

9    A.  Yes, ma'am.

10   Q.  And it referenced a conversation -- well, did you become

11   aware that sergeant -- I'm sorry, Lieutenant Baer had had a

12   conversation with Officer Sanchez on October 20th, 2011?

13   A.  Yes.

14   Q.  And was it your understanding from the memorandum that it

15   had -- Lieutenant Baer and Sergeant Lawton were working

16   together on this issue?

17   A.  Yes.

18   Q.  Okay.  And it indicates that Lieutenant Baer apparently

19   had a conversation -- well, withdraw that.

20             Was it your understanding that Lieutenant Baer had a

21   conversation with Officer Sanchez in which Sanchez alleged

22   that Smyth had sexually harassed her?

23   A.  Correct.

24   Q.  And was it your understanding that Officer Sanchez had

25   reported to Lieutenant Baer on October 20th, 2011, that Smyth

1    was continuing to sexually harass her?

2    A.   Yes.  As well as Sergeant Lawton.  Both Lieutenant Baer

3    and Sergeant Lawton brought that to my attention.

4    Q.   So they both made you aware that they had received

5    information from Sanchez --

6    A.   Yes.

7    Q.   -- that she was continuing to be sexually harassed by

8    Smyth; correct?

9    A.   Yes.

10   Q.   And isn't it true that Sergeant Lawton told you that

11   Officer Sanchez said she did not want to work with Smyth

12   because of the harassment?

13   A.   Correct.

14   Q.   And Sergeant Lawton confirmed that in your conversation

15   with him?

16   A.   He did say that Officer Sanchez did not want to work with

17   him.  Correct.

18   Q.   Okay.  And did Sergeant Lawton talk to you about

19   the -- that there was a practice of redirecting staff in order

20   to try to keep Officer Sanchez from having to work with

21   Officer Smyth?

22   A.   Negative.

23   Q.   What did he tell you about that?

24   A.   There is no practice.  He didn't -- that was not mentioned

25   in the discussion.  The discussion was that there was ongoing

1438

1  dislike and tension amongst those two individuals.  And that

2  there was a previous investigation that was conducted with the

3  allegations that Officer Sanchez was stated to both the

4  sergeant and the lieutenant.

5          Sergeant Lawton mentioned that the investigation was

6  unfounded.  And for -- and this is just secondhand because I

7  didn't -- I never had privilege to the investigation.  I never

8  read it or saw it.  However, according to Sergeant Lawton, the

9  investigation was concluded that it was unfounded regarding

10 sexual harassment.

11 Q.  So did Lawton -- Sergeant Lawton -- what did he tell you,

12 if anything, about what had been going on in the yard

13 with -- between -- with respect to Officer Sanchez' trying to

14 not work with Smyth?

15 A.  I can recall -- and to the best of my recollection, you

16 know, this has been many years ago.  To the best of my

17 recollection, he was making an attempt to keep them separated

18 because there was tension and hostility with Officer Sanchez

19 towards Officer Smyth.

20         We -- there is no standard practice of removing them

21 from another facility.  And as a matter of fact, it's against

22 federal mandates to remove an individual from a place that can

23 negatively impact them.  However -- so we didn't move him or

24 her to another facility.  So we kept them in the same

25 facility.  And this is based on seniority and their bid.  They

1439

1   actually bid for these positions.

2          But I believe that Sergeant Lawton told me he advised

3   Officer Smyth to minimize his -- any type of contact with her

4   unless it was an emergency and during emergency we have to

5   respond in order to save staff or inmate's lives.

6   Q.  Did Sergeant Lawton report to you that -- whether he was

7   having any difficulty keeping defendant Smyth away from

8   Officer Sanchez?

9   A.  No.  He didn't.  However, there was -- he did mention

10  there was occasions where they would have to have some type of

11  indirect contact.  And evidently that on those occasions, it

12  really bothered Officer Sanchez.  She was quite concerned with

13  having any type of visual contact with him.

14  Q.  All right.  And in this memorandum you got from Lieutenant

15  Baer, he indicated to you that he knew that Sanchez had

16  reported to him that Smyth looked at her and smiled and made

17  her uncomfortable; correct?

18  A.  Yes.

19  Q.  And Lieutenant Baer told you that Officer Sanchez had

20  reported to him that Smyth was making comments about her ass;

21  correct?

22  A.  He did mention that there was a comment about her ass, but

23  I don't know if that was prior to the investigation that was

24  unfounded.  I do know that he mentioned that -- I think it was

25  that day or the day before, that Officer Sanchez was very

1  concerned because just their contact in their -- their eye

2  contact in the normal realms of their duties, she felt very,

3  very intimidated and uneasy with his presence.

4  Q.  Okay.  And in his presence.  He would -- were you aware

5  that Officer -- you know what the pat down procedure is;

6  correct?

7  A.  Yes.

8  Q.  And officers have to come together to do pat downs;

9  correct?

10 A.  Correct.

11 Q.  And how -- they do pat downs inside different buildings;

12 correct?

13 A.  Yes.

14 Q.  And there can be -- how many -- do you know how many times

15 they do pat downs a day?

16 A.  When inmates are released to, let's say, the chow from

17 their housing unit from a building where they live at to the

18 culinary or their dining room, they may be pat down at that

19 time.  When inmates are released to the yard for activity or

20 education, they may be pat down at that time.  We usually send

21 a group of officers, four, five, six officers to assist in the

22 pat down process.

23 Q.  And the pat down process involves officers being on -- if

24 you remember, it involves officers being kind of in a line

25 facing --

1  A.  Correct.

2  Q.  -- each other; correct?

3  A.  Correct.

4  Q.  Almost like a soul train line; correct?

5  A.  Yes.

6  Q.  Okay.  And then the inmates go through the line; correct?

7  A.  Correct.

8  Q.  And the officers are on either side.

9  A.  And an officer will call an inmate, "come here," and they

10 conduct the pat down search.  Correct.

11 Q.  All right.  Did Sergeant Lawton mention to you if he had

12 restricted defendant Smyth in any way from going into Officer

13 Sanchez' building, for instance, to do pat downs?

14 A.  At that time, no.  He did not mention it to me.  However,

15 in the meeting I had with Lieutenant Baer and Officer -- and

16 Sergeant Lawton, I mentioned to them that I did want their

17 contact at a minimum.

18 Q.  Yes, sir.

19 A.  It was my understanding, from both the sergeant and

20 lieutenant, that there was either another investigation -- in

21 fact, I was told there was another investigation that was

22 ongoing.  And therefore, I told them I wanted minimal contact

23 with those two staff members.

24 Q.  And how did you learn that there was another investigation

25 ongoing?

1442

1   A.   That was presented to me by Sergeant Lawton.

2   Q.   So Sergeant Lawton knew that there was another

3   investigation ongoing?

4   A.   I don't know what he knew, but that's what he advised me

5   of.

6   Q.   Okay.  And that was in October of 2011.

7   A.   That's correct.

8   Q.   Would have been October 19th, 2011; correct?

9   A.   Correct.

10  Q.   All right.  And then thereafter, did Sergeant Lawton tell

11  you that he wanted to discipline Officer Sanchez?

12  A.   No.  The -- what happened is during the meeting, it was

13  brought to my attention that Officer Sanchez wanted to leave

14  because -- wanted to leave the facility because she felt so

15  uncomfortable and she was in fear of the inmates finding out

16  that she was that uncomfortable.  It is -- and I told both

17  sergeant and lieutenant, it is my expectations and the

18  department's expectations that we conduct ourselves in a

19  professional manner at all times.

20       There's going to be -- and I advised him there's

21  going to be ill feelings, there's going to be relationships of

22  staff that dissipate and there will be ill feelings.  However,

23  while on duty, they must conduct themselves in a professional

24  manner and there may be occasions when we're going to have to

25  deal with someone that we're uncomfortable with.

1443

1      Sergeant Lawton said that Officer Sanchez wanted to
2   leave the facility without being properly relieved.  And I
3   told him that he has a responsibility, as a supervisor, to
4   ensure that she is properly relieved.  And if it's not a valid
5   issue for her departing the grounds, that he is to take
6   appropriate supervisory action.
7   Q.  And did he take some action based on what he represented
8   to you?  If you know.
9   A.  I don't know.  I honestly don't know.  As a matter of
10  fact, I don't even remember this -- the topic of the tension
11  of Officer Sanchez and Officer Smyth ever brought up after
12  this one day.  So whether --
13  Q.  Let me have you take a look at Exhibit 51 in that same
14  binder.  If you could read that to yourself.
15  A.  Yes, ma'am.
16  Q.  Does that refresh your recollection that you provided some
17  assistance to Sergeant Lawton to take action against Officer
18  Sanchez?
19  A.  Negative.
20  Q.  Okay.
21  A.  That's not what this is.
22  Q.  You can't say what it is.  I'm sorry.
23       THE COURT:  It is in evidence.
24       MS. PRICE:  Oh, it is?  51?  Oh, good.
25       THE COURT:  Am I correct, Ms. Hernandez?

1444

1   THE CLERK:  Yes.

2   THE COURT:  It is.

3   MS. PRICE:  Oh, thank you.  Okay.  Sorry about the

4   "okay" Your Honor.

5   Q.  All right.  So --

6   A.  Uh --

7   Q.  Let me ask a question.

8   A.  Sure.

9   Q.  So at the bottom, there's an email from Richard Warren to

10  you; correct?  Are you looking at a series of emails?

11  A.  No, I just --

12  MS. PRICE:  May I approach, Your Honor?

13  THE COURT:  Let me -- in the interest of time.

14  THE WITNESS:  There's no email to me.

15  THE COURT:  In the middle there.

16  THE WITNESS:  Yes, this is -- okay.  Yes.  This is

17  what I read.  Okay.

18  BY MS. PRICE:

19  Q.  So you received an email from Richard Warren; correct?  On

20  October 21st, 2011.

21  A.  I don't -- I don't recall this.

22  Q.  Okay.  That's fine.  Above that is an email from you to

23  Lieutenant Baer and Eric Lawton.  Do you recall that?

24  A.  I really don't recall.

25  Q.  Okay.  Let me have you take a look -- in the same binder,

1  you can put a -- maybe mark this in a way.  We'll come back to

2  it.  But look at Exhibit 29, please.  It's in the front a

3  little forward.

4  A.  Yes, ma'am.

5  Q.  Do you recognize that as something called a cease -- well,

6  it is a cease and desist order.

7  A.  I do recall this.

8  Q.  Okay.  Did you forward that, a document like that to

9  Lieutenant Baer?

10  A.  No.

11  Q.  Okay.  Do you recall having some -- any conversation with

12  the warden's office where you received authorization to have a

13  cease and desist order issued to Officer Sanchez?

14  A.  No.  This -- this cease and desist was created by Sergeant

15  Lawton and Sergeant Lawton alone without my authorization and

16  was unauthorized.  This is an unauthorized document if I'm not

17  mistaken.

18  Q.  Yes, sir.  And why do you remember -- why do you say --

19  A.  He doesn't have the authority to create and submit a cease

20  and desist order.

21  Q.  To the best of your knowledge, was that cease and desist

22  order ever rescinded by Warden Lopez?

23  A.  This?  I want to say yes, because I do remember seeing

24  this, asking what in -- why was it -- who gave him the

25  authority to write this.  And it was -- I might have brought

1446

1    it up to the warden's office and it was retracted.

2    Q.   Okay.  Do you recall if the warden signed a document that

3    was then presented to Officer Sanchez letting her know that

4    this order had been rescinded as an unauthorized order?

5    A.   No.  No, I don't.  I don't -- I wouldn't have privilege to

6    that, I wouldn't have seen it.

7         MS. PRICE:  All right then.  Thank you, Captain

8    Pacifico.  Thank you very much.

9         THE COURT:  Does that mean you're done?

10        MS. PRICE:  Yes, Your Honor.

11        THE COURT:  Oh.  Thank you.  Cross-examination.

12        MR. KLEAM:  Yes, Your Honor.

13        THE COURT:  You know what?  Why don't we take the

14   noon recess at this time since we're at -- ladies and

15   gentlemen, we're going to take our noon recess.  We will be

16   back promptly at 1:15.  Have a good lunch.  Do not form an

17   opinion.  Do not discuss this case with anybody.  And we'll

18   see you back at 1:15.

19        (The jury left the courtroom.)

20        THE COURT:  All right.  We are outside the presence

21   of the jury.  A couple of things I want to remind the parties

22   to be back timely for -- when the Court says to be back timely

23   because the Court is trying to manage this case as well as

24   other cases.  So Ms. Price, you were late here.  And I -- you

25   need to be back on time.  Just so that I can move this case

1  along, please.

2          MS. PRICE:  Yes, sir.  I apologize.

3          THE COURT:  Okay.  And also, I just want to remind

4  the parties at three o'clock today, at the three o'clock

5  break, we are going to confirm with Ms. Hernandez any exhibits

6  for the day admitted at that time and then we'll do any

7  followup exhibits later on with regard -- between 3:15 and

8  4:30.

9          Also at the three o'clock break, you are to provide

10  my law clerk, Ms. Webb, with your yellow objections to the

11  Court's proposed jury instructions which were provided to you

12  yesterday as well as the verdict form.  If there are no

13  objections, then the Court need not have the five o'clock

14  informal hearing.  So that's why it's gauging its schedule

15  accordingly.

16          All right.  Anything further before we break for

17  lunch?

18          MS. PRICE:  Is there -- Your Honor, tomorrow, can the

19  Court refresh -- well, I'll just check my notes.  The schedule

20  is --

21          THE COURT:  Yes.  I'll be happy to.  Tomorrow the

22  Court is -- at the ten o'clock break is handling its criminal

23  matters, intends to go to 10:30.  And that's what I did

24  instruct the jury yesterday.  I did that for purposes so they

25  could gauge their understanding as well as the parties

1448

1    understanding for witness issues.  To the extent it goes over,
2    it goes over.  But I want to make sure the parties are ready
3    to go unless I see tomorrow that I'm going to reduce that
4    time, you know.  But I have to gauge ultimately when my
5    criminal calendar is final final.  And then after that, we're
6    on business as usual.  Okay?
7             MS. PRICE:  Yes, sir.
8             THE COURT:  All right.  Thank you everybody.  Have a
9    good lunch.  We'll see you back at 1:15.
10            (Recess.)
11            (The jury entered the courtroom.)
12            THE COURT:  All right.  The jury has returned.  Mr.
13   Kleam, you may begin your cross-examination.
14            MR. KLEAM:  Thank you, Your Honor.
15                      CROSS-EXAMINATION
16   BY MR. KLEAM:
17   Q.  Good afternoon, lieutenant.
18   A.  How you doing, sir?
19   Q.  Or former lieutenant.  How long has it been since you've
20   retired?
21   A.  Two years.
22   Q.  Now, I'd like you to turn to -- or tell you what.  I'll
23   publish this if that's all right.  It's been previously
24   admitted as Plaintiff's Exhibit 51.  Is that all right, Your
25   Honor?

1    THE COURT:  If it's been previously admitted, then

2    that's fine with the Court.  Yes.

3    BY MR. KLEAM:

4    Q.  This is the document that you reviewed with Ms. Price

5    before lunch; is that correct?  One of them.

6    A.  What exhibit was that, sir?

7    Q.  I'm sorry, if you just look at your screen right there.

8    It should be.

9    A.  Yes.

10   Q.  And is this the document that you reviewed before lunch

11   with Ms. Price?

12   A.  One of them, yes.

13   Q.  Now, the bottom email, that says it's from Richard Warren,

14   the labor relations analyst; is that correct?

15   A.  Yes.

16   Q.  And in the "to" line of the email, right -- I'm sorry.

17   THE COURT:  Okay.  Now, move the document up.

18   MR. KLEAM:  Okay.

19   THE COURT:  Do your line again.  You can adjust

20   the -- online and then adjust.

21   MR. KLEAM:  Excellent.  Thank you, judge.

22   THE COURT:  It's based upon personal experience.

23   There you go.

24   MR. KLEAM:  There we go.

25   Q.  In the "to" line, that is your former work email address;

1   correct?

2   A.   Yes.

3   Q.   And in the body of that line -- email is a line advising

4   you that Richard Warren has attached a supervisory cease and

5   desist letter order for your review; correct?  And I can

6   direct you to that.

7   A.   Can you, please?

8   Q.   Isn't that correct?  Do you see that?

9   A.   I see that, yes.  I'd have to see the cease and desist

10  order for me to refresh myself.

11  Q.   But the email itself does say -- advise you that he has

12  attached a cease and desist order; is that correct?

13  A.   Yes.

14  Q.   And in the following line, Richard Warren notifies you

15  that it may be used as a tool wherein a supervisor instructs

16  one to conduct themselves in a professional manner; is that

17  correct?

18  A.   Yes.  That's correct.

19  Q.   Now, in the email directly above in the "from" section is

20  your former email address again; is that correct?

21  A.   Yes.

22  Q.   And in the "to" section is email addresses for an Anthony

23  Baer and a Sergeant Lawton; is that correct?

24  A.   That's correct.

25  Q.   And those are the Lieutenant Baer and Sergeant Lawton that

1451

1    worked under you at the time; is that correct?

2    A.   They are the two supervisors that handled -- that worked

3    in facility C that were responsible for this issue.

4    Q.   Right.  And in the subject line, again, it says "Forward

5    C/O I. Sanchez."  Is that correct?

6    A.   Yes.

7    Q.   And then in the body of the email you wrote, "Hey guys,

8    this might be helpful in the issue with Sanchez."  Is that

9    correct?

10   A.   Yes.

11   Q.   And that is a direction to Lieutenant Baer and Sergeant

12   Lawton to use that in the situation with Officer Sanchez; is

13   that correct?

14   A.   No.

15   Q.   What was -- what did you mean by "hey guys, this might be

16   helpful in the issue with Sanchez."

17   A.   It may be a tool.  It may be a tool.  They have to make an

18   assessment whether this tool might be helpful in the issue

19   with Officer Sanchez.

20   Q.   So it was left up to them to decide if this was a tool to

21   be used with Officer Sanchez?

22   A.   Yes.

23   Q.   And sergeants are permitted to issue letters of

24   expectations; is that correct?

25   A.   That is correct.

1452

1   Q.  And letters of expectation are not discipline; correct?

2   A.  That's correct.

3   Q.  And you considered -- and the cease and desist order was

4   not a letter of expectation; is that correct?  I'm sorry.

5   Strike that question.

6          The cease and desist order is a letter of

7   expectation; is that correct?

8          MS. PRICE:  Objection.  Lacks foundation.  Calls for

9   speculation.  Also misstates the document.

10          THE COURT:  Overruled.

11          THE WITNESS:  Cease and desist -- cease and desist

12   order is a mandatory document compelling staff to do

13   something.  So that wouldn't be a disciplinary tool, nor would

14   it be a training tool.  That is an instructory type tool.  A

15   mandatory instructing device.

16   BY MR. KLEAM:

17   Q.  When you were captain, when you were acting captain, how

18   many officers did you supervise?

19   A.  Oh, goodness.

20   Q.  Approximately.

21   A.  150.

22   Q.  And you mentioned that you were acting captain over two

23   units at one point, I believe; is that correct?

24   A.  Two facilities, yes.  Yes.

25   Q.  And how many inmates were in those two facilities?

1453

1    A.   1,000 each, probably 2,000 total.

2    Q.   And safety is a concern at the prison for --

3    A.   Yes.

4    Q.   -- for inmates --

5    A.   Paramount concern for both staff and inmates, absolutely.

6    Q.   That is why many of the duties around inmates involve

7    officers working in tandem; is that correct?

8    A.   Absolutely.

9    Q.   And it is expected that officers act professionally

10   towards each other in their duties; is that correct?

11   A.   Absolutely.

12   Q.   Because they can't be worrying about whether or not

13   somebody would respond in an emergency; is that correct?

14   A.   Correct.

15   Q.   And a cease and desist order that tells someone to be

16   professional is just reinforcing what is already expected of

17   them; is that correct?

18   A.   Depends what's on the cease and desist order, sir.

19   Q.   So if the cease and desist order simply directed somebody

20   to be professional in their interactions with a co-worker,

21   then it would just be reinforcing what is already expected of

22   them; is that correct?

23   A.   That is correct.  If that's what was the -- if that's what

24   was inside the cease and desist order, yes.

25   Q.   Did you meet with Ms. Price in order to prepare for today?

1454

```
 1   A.   No.
 2   Q.   Did you review any documents in order to prepare for
 3   today?
 4   A.   Yes.
 5   Q.   Which documents did you review?
 6   A.   She -- Ms. Price handed me the Exhibit Number 21 document
 7   to refresh my -- for this case.
 8   Q.   Oh.  When did she hand that to you?
 9   A.   Yesterday.  Yesterday morning.  When I was waiting
10   outside.
11            THE COURT:  Exhibit 21?
12            THE WITNESS:  No, that's Exhibit 51.
13            THE COURT:  All right.  Let's make sure because --
14            THE WITNESS:  I'm sorry, it's on the tab.
15            THE COURT:  Can you flip up -- can you flip
16   the -- the tab there before?
17            THE WITNESS:  Is that Exhibit 50 -- am I
18   correct -- am I mistaken?
19            THE COURT:  The Court can see a different document
20   than what he first referred to.  So can you flip -- what is
21   that number that you have in your right hand right now?
22            THE WITNESS:  It is 50.
23            THE COURT:  50.  Okay.  And what's the document -- is
24   that the document that follows that --
25            THE WITNESS:  That's correct.
```

1455

1    THE COURT:  -- tab that you reviewed?

2    THE WITNESS:  Yes.

3    THE COURT:  So for the record, he was referring to

4    50.

5    BY MR. KLEAM:

6    Q.  I'm sorry to have to -- I'm sorry to have to bring this

7    back up, but I just realized I forgot to address something on

8    Exhibit 51.  I'm republishing that, Your Honor.

9    THE COURT:  Okay.

10   BY MR. KLEAM:

11   Q.  Just to be clear, you sent this to Lieutenant Baer and

12   Sergeant Lawton; is that correct?

13   A.  Yes.

14   Q.  And there is an attachment with cease and desist.doc on

15   it; is that correct?

16   MS. PRICE:  Objection.  Misstates the document.

17   THE COURT:  Overruled.

18   THE WITNESS:  There --

19   BY MR. KLEAM:

20   Q.  There is a -- I can rephrase.  That's fine.  There's an

21   attachment to the email that I've underlined saying "cease and

22   desist.doc."

23   A.  I think -- are you asking me was there an attachment?

24   Q.  I'm asking isn't it correct that there is an attachment

25   that says "cease and desist.doc"?

1456

1   A.   That's what it says on here.  I'd have to be refreshed to

2   see if the document was attached.  I just don't recall.

3   However, according to what you're saying here, it does say

4   "Attachment:  Cease and desist.doc."

5            MR. KLEAM:  All right.  Thank you.  One moment,

6   please.

7            THE COURT:  Yes.  I need to clarify the record

8   because he's looking at 50.

9            MR. KLEAM:  Ah.

10           THE COURT:  He was looking at Exhibit 50, but I think

11  that's what's been admitted into evidence as Exhibit QQ.  Can

12  the parties confirm that for me?

13           MS. PRICE:  That is true, Your Honor.

14           THE COURT:  Just so the record is clear as to -- so

15  he -- 50 equals QQ.

16           MR. KLEAM:  Yes, Your Honor.

17           THE COURT:  Correct?  So you -- just go with the

18  flow.  That's just me doing a record.

19           THE WITNESS:  All right, sir.

20           THE COURT:  You're all right.

21           MR. KLEAM:  Oh, I'm sorry.  This has been -- this is

22  Exhibit 29, Your Honor.  This has been previously admitted.

23           THE COURT:  Yes.

24           MR. KLEAM:  I'm going to publish this now to the

25  jury.

1    THE COURT:  Yes.

2    BY MR. KLEAM:

3    Q.  Lieutenant, this is Exhibit 29, a cease and desist order

4    to Irma B. Sanchez.  Do you recognize this document?

5    A.  I recall seeing it, yes.

6    Q.  And do you recall seeing the first line, first sentence

7    rather that says, "This memorandum is to inform you that you

8         are instructed to conduct yourself in a professional

9         manner during any contact you may have with

10        Correctional Officer Smyth and/or other staff

11        members/inmate population."

12   A.  What was the question, sir?

13   Q.  I'm sorry.  And do you remember the portion that says this

14   memorandum is to inform you that you are instructed to conduct

15   yourself in a professional manner?

16   A.  I don't remember it, but I -- I can see the memorandum.

17   Do I recall this memorandum verbatim?  No.  Because like I

18   mentioned before, this was an unauthorized document that I

19   think was retracted.

20   Q.  But you had said earlier that you had provided it to

21   Sergeant Lawton and Lieutenant Baer for them to -- so that

22   they may use this in their dealings with Officer Sanchez;

23   that's correct?

24   A.  That is it --

25        MS. PRICE:  Objection.  Argumentative, Your Honor.

1458

1    THE COURT:  Overruled.

2    THE WITNESS:  That is correct.  After the -- that

3  memorandum was forwarded to me by labor relations office, I

4  forwarded it to the sergeant and lieutenant.

5  BY MR. KLEAM:

6  Q.  And the content of this cease and desist order is

7  consistent with a letter of expectations; correct?

8  A.  Yes.

9  Q.  And you had testified earlier that sergeants and

10  lieutenants, I would assume, are able to issue letters of

11  expectations?

12  A.  That is correct.

13  Q.  And so Sergeant Lawton issuing a letter of expectation was

14  acceptable?

15  A.  If Sergeant Lawton gave her a letter of expectation, that

16  would be acceptable, yes.

17    MR. KLEAM:  Your Honor, I'd like to now publish

18  previously admitted Exhibit QQ.

19    THE COURT:  Yes.

20    MR. KLEAM:  One moment, Your Honor.

21    THE COURT:  Yes.

22  BY MR. KLEAM:

23  Q.  Lieutenant, if I could please direct your attention to the

24  third paragraph down that begins, "I told Officer Sanchez."

25  A.  Yes.

1    Q.  And could I -- I would like to confirm that Lieutenant

2    Baer, in this memorandum to you, informed you that there is no

3    documentation and/or pending investigation to corroborate her

4    allegations of any sort of harassment by Officer Smyth; is

5    that correct?

6    A.  Yes.

7    Q.  And he informed you of that with this memorandum; is that

8    correct?

9    A.  Yes, that's correct.

10            MR. KLEAM:  All right.  Thank you.  No further

11   questions at this time, Your Honor.

12            THE COURT:  Anything further for this witness?

13            MS. PRICE:  Yes, Your Honor.

14            THE COURT:  All right.

15                     REDIRECT EXAMINATION

16   BY MS. PRICE:

17   Q.  Hi Lieutenant Pacifico.

18   A.  Ma'am.

19   Q.  Did you ever see a letter of expectation issued by

20   Sergeant Lawton to Officer Sanchez?

21   A.  No.  Not to my recollection.

22   Q.  Did Sergeant Lawton ever ask your permission to issue a

23   letter of expectation to Officer Sanchez?

24   A.  Not to my recollection.

25   Q.  Did Sergeant Lawton ever ask your permission to issue a

Pacifico - RD

1460

1   letter of expectation to defendant Smyth?

2   A.   Not to my recollection.

3   Q.   If Sergeant Lawton had issued a letter of expectation to

4   Officer Sanchez in order to punish her for filing a complaint

5   of harassment, would that have been okay?

6   A.   No.

7   Q.   And Sergeant Lawton told you the day before you got this

8   memo that he knew that there was, in fact, a complaint pending

9   by Officer Sanchez; correct?

10  A.   That is correct.

11  Q.   All right.  And you wanted to take some action to

12  intervene in this situation; correct?

13  A.   Correct.

14          MR. KLEAM:  Objection.

15          MS. PRICE:  And why didn't you --

16          THE COURT:  I'm sorry, what?

17          MR. KLEAM:  Objection.  Leading, Your Honor.

18          THE COURT:  Sustained.

19  BY MS. PRICE:

20  Q.   Did you take some action to intervene in this situation,

21  Captain Pacifico?

22  A.   Yes.

23  Q.   What did you do?

24  A.   My action was two fold.  Number one, it was to interview

25  both of complainant and Officer Smyth, advise them that -- to

1  advise them that professionalism is of utmost importance and
2  they are to remain professional on duty.
3        Number two, this document that lieutenant -- acting
4  Lieutenant Baer wrote was forwarded to the associate warden
5  for his review.
6  Q.  All right.  And did the associate warden then direct you
7  to -- was the associate warden a man or a woman?
8  A.  A man.
9  Q.  Did that person direct you to do anything as a result of
10  the memorandum?
11  A.  Negative.
12  Q.  At any time in your communication with -- you actually sat
13  down and talked to defendant Smyth about this?
14  A.  No, I did not.
15  Q.  You wanted to; is that what you were telling us?
16  A.  No, I didn't tell you that.  However, it was a concern.  I
17  wanted this hostility or tension level to be over and done
18  with.  Again, it's my expectations and the department's
19  expectations to be professional, both on and off duty.
20  However, pending -- if there was an investigation pending, it
21  would -- it's critical that it's not impeded in any way, shape
22  or form.  By me intervening, it can jeopardize an
23  investigation.  So therefore, it was -- it was my
24  responsibility to at least address it with staff, if something
25  is happening, that's to stop.

1  Q.  Okay.

2  A.  But yes, I would have loved to sat them both down one on

3  one and make -- or maybe with the supervisors present and give

4  them my expectations.  But I didn't go that direction.  Based

5  on the fact that there was an investigation pending.

6  Q.  Did it come to your attention at any time that Officer

7  Sanchez wanted the administration or her supervisors to remove

8  defendant -- to protect her from having to work with defendant

9  Smyth?

10  A.  Yes.  She brought that to Sergeant Lawton's attention,

11  according to Sergeant Lawton.  And he advised me that he was

12  going to do his best to either avoid or minimize contact

13  between Sergeant Smyth and Officer -- Officer Smyth and

14  Officer Sanchez.

15  Q.  Do you know who Warden Connie Gipson is?

16  A.  Yes, I do.

17  Q.  And did you learn that in November of 2011, Warden Gipson

18  had moved Smyth to a different area?

19  A.  Negative.  I don't know that.

20       MS. PRICE:  May I have a moment, Your Honor?

21       THE COURT:  You may.

22  BY MS. PRICE:

23  Q.  If you could look in the white binders, Lieutenant

24  Pacifico, there's one that has three -- on that side there

25  beside you.  Volume one, I believe --

1463

1    THE COURT:  What's the exhibit number?

2    MS. PRICE:  Three Cs, CCC.

3    THE COURT:  Okay.

4    THE WITNESS:  Three Cs?

5  BY MS. PRICE:

6  Q.  Yes, sir.

7    THE WITNESS:  I've got five Cs, that's not it.

8    THE COURT:  See where it says three As, and then look

9  behind that.

10    THE WITNESS:  Okay.

11    THE COURT:  There you go.

12    THE WITNESS:  Yes, ma'am.

13  BY MS. PRICE:

14  Q.  Have you ever seen that before?

15  A.  No, I haven't.

16  Q.  Let me have you go back to the purple binder and look at

17  Exhibit 48.

18  A.  Okay.

19  Q.  I apologize, Your Honor, but may we approach?

20    THE COURT:  Yes.  Yes.

21    (The following proceedings were held at sidebar

22    between the Court and counsel:)

23    THE COURT:  So I see we're going to get into a

24  document issue because 48 is the same as CCC; am I right?

25    MS. PRICE:  That's right.  But 48 is in evidence

1464

1    already.  48 is in.

2              THE COURT:  Is 48 in evidence?

3              THE CLERK:  Yes.

4              THE COURT:  We just need to be better with our

5    exhibiting these, please.

6              MS. PRICE:  I can redact 48 if the Court is concerned

7    about the little number, because that's what I understood was

8    your concern was the little number.

9              THE COURT:  What I'm concerned about is that some of

10   the documents, at least I've only seen them in your documents,

11   although yours are the majority, are underlined or notations

12   are made.  And we're not going to have that, because it

13   doesn't appear that that's anybody else's issue.  So can you

14   give -- is that one underlined?

15             MS. PRICE:  No, Your Honor.  I can --

16             THE COURT:  It doesn't appear anything's wrong with

17   that one.  So what's the issue?

18             MS. PRICE:  My copy has the little exhibit number.

19   What I notice, Your Honor, I thought the Court was noticing

20   were my deposition exhibit notes.  If you look at the very

21   bottom of 48, it has a number 22 in the corner.

22             THE COURT:  Well, that's the least of our worries.

23             MS. PRICE:  Okay.  If you don't care about that.

24             THE COURT:  If you're just saying the numbers.  The

25   ones that I was concerned about where areas were underlined to

1 highlight, notations were made.  Whether it has a number, that

2 doesn't -- nobody can infer that -- somebody can infer from an

3 underlining what that means or a notation that says "this was

4 found on my desk."  So if the 22 doesn't seem to be any -- is

5 there any suggestion --

6             MR. KLEAM:  No objection.

7             THE COURT:  Sounds like you can show 48.

8             MR. KLEAM:  Just this one since it's not the

9 highlighting or underline.

10             MS. PRICE:  I didn't --

11             THE COURT:  Well, whatever the witness does is a

12 different analysis.  But the document itself seems fine.  So

13 go ahead and do that.

14             MS. PRICE:  Thank you.

15             (The following proceedings were held in open court:)

16 BY MS. PRICE:

17 Q.  All right.  Captain Pacifico, excuse me.  I know you as

18 "Captain," so I apologize.

19             Can you look at Exhibit 48, please?

20 A.  Yes, ma'am.

21 Q.  And have you -- does that -- had you ever seen that

22 before?

23 A.  Never.  I've never seen this document.  To the best of my

24 recollection.

25 Q.  Did it come to your attention in November of 2011 that

1    defendant Smyth had been reassigned from C yard?

2    A.  I want to say no, it didn't come to my attention.

3    Q.  Did it come to your attention, according to this

4    memorandum, that he was directed -- he was not permitted to

5    work on facility C until further notice?

6    A.  No.  It -- you can see the CC goes -- is the ERO, ISU

7    captain and assignment lieutenant, which was not my position.

8    Q.  Yes.

9    A.  So therefore, I just wasn't privileged to it.

10   Q.  Okay.

11   A.  So it wasn't even brought to my attention.

12   Q.  All right then.  Do you recall receiving a memorandum from

13   defendant Smyth himself in connection with this issue?

14   A.  I don't recall.

15   Q.  Let me have you take a look at Exhibit 47.

16          Your Honor, at this time I'd move Exhibit 47 into

17   evidence.

18          MR. KLEAM:  Just one moment, Your Honor.

19          THE COURT:  Sure.

20          MR. KLEAM:  I would object to foundation, Your Honor.

21          THE COURT:  Sustained.  There's been absolutely no

22   foundation laid, other than the request.  So you have to lay

23   the foundation.

24   BY MS. PRICE:

25   Q.  Lieutenant Pacifico, let us know when you finish reviewing

1    it.

2    A.   Yes.  I've completed.  I read it.

3    Q.   Yes, sir.  Did you receive a memorandum like this in

4    November of 2011?  Let me rephrase.

5         Did you receive this memorandum?

6    A.   You know, I don't recall.  I don't know if it was given to

7    the sergeant, lieutenant and it was just -- it's got my name

8    on it.  I don't recall seeing this.

9    Q.   All right then.  Thank you.

10        The cease and desist order that Sergeant Lawton

11   issued to Officer Sanchez, that's not a letter of expectation;

12   is it?

13   A.   No.

14   Q.   It's very different from a letter of expectation?

15   A.   A letter of expectation is titled "letter of expectation."

16   Q.   All right.  And in the course of your involvement in this

17   matter, did you have any concern about the manner in which

18   your supervisors were responding to Officer Sanchez?

19        MR. KLEAM:  Objection.  Calls for speculation.

20        THE COURT:  Sustained.

21   BY MS. PRICE:

22   Q.   Did you have some knowledge, based on your communications

23   with the supervisors, of what they were doing to respond to

24   Officer Sanchez?

25   A.   I've got to think about this one.  I had a concern.

1  Q.  And what was that?

2  A.  The concern would have been they were -- they may not have

3  been as sensitive as they could have been with this issue.

4  Sergeant Lawton just came from working investigative unit.

5  Lieutenant Baer was -- I think he was just barely there a

6  week.  And he came from a SHU, which is a high security, very

7  violent arena with the inmate population.

8       The concern was -- my concern would have been did

9  they -- the first thing that comes to my mind is if you have

10  an individual of extreme sensitivities, offer them some help.

11  Such as the employee assistance program.  Advise the employee

12  some of the alternatives that they can be referred to, such as

13  DFEH and -- did they let her know these things.  As well as

14  advising the individual in a very professional but soft manner

15  of their expectations.  Because it was -- it was apparent,

16  based on the memorandum that I received from Lieutenant Baer,

17  that Officer Sanchez was quite upset.

18  Q.  All right then.  Thank you.  Well, one more question, if I

19  may, Your Honor.

20       Did you have any information that Sergeant Lawton had

21  given her any advise on how to file with an outside agency?

22  A.  No.  I was -- no.  The answer is no.  However, I did

23  advise both the sergeant and lieutenant that I wanted her to

24  be made aware of some directions.

25  Q.  All right then.  Thank you, sir.

1469

1    THE COURT:  Any redirect?  Recross?

2    MR. KLEAM:  Yes, Your Honor.

3    THE COURT:  You may.

4              RECROSS-EXAMINATION

5  BY MR. KLEAM:

6  Q.  Lieutenant Pacifico, Sergeant Lawton and Lieutenant Baer

7  never did anything to -- that would give you the opinion they

8  had any ill will towards Officer Sanchez; is that correct?

9  A.  That's correct.

10   MR. KLEAM:  Thank you, Your Honor.

11   THE COURT:  All right.  May this witness be excused?

12   MS. PRICE:  Yes, Your Honor.

13   MR. KLEAM:  Yes, Your Honor.

14   THE COURT:  You're excused.

15   THE WITNESS:  Do you want me to fold this up?

16   THE COURT:  That would be fine, thank you.

17   THE WITNESS:  And that one too?

18   THE COURT:  No, no.  Call your next witness, please.

19   MS. PRICE:  Plaintiff calls Connie Gipson, Your

20  Honor.

21   THE COURT:  Are you getting Ms. Gipson, Ms. Price?

22   MS. PRICE:  Yes.

23   THE COURT:  I didn't know if you wanted me to yell.

24   Please come forward and be sworn.

25

1470

**CONNIE GIPSON**,

called as a witness on behalf of the Plaintiff, having been

first duly sworn, testified as follows:

1  
2  
3  
4      THE CLERK:  Please state your full name for the
5  record and spell your last name.
6      THE WITNESS:  Connie Gipson, G-I-P as in Paul S-O-N.
7      THE CLERK:  Have a seat, please.
8      THE COURT:  You may proceed, Ms. Price.
9      MS. PRICE:  Thank you, Your Honor.
10                      DIRECT EXAMINATION
11  BY MS. PRICE:
12  Q.  Good afternoon, Warden Gipson.
13  A.  Hi.
14      MS. PRICE:  Your Honor, I designate under 611(c).
15      MR. KLEAM:  Stipulated.
16      THE COURT:  All right.  So stipulated.
17      MS. PRICE:  Thank you.
18  Q.  You're familiar with defendant Sydney Smyth; correct?
19  A.  That's correct.
20  Q.  You're the warden at Corcoran State Prison?
21  A.  Not at this time, no.
22  Q.  What is your current position -- assignment?  Sorry.
23  A.  I am an associate director with the Department of
24  Corrections & Rehabilitation, Division of Adult Institutions.
25  Q.  And where are you assigned to work?

1   A.   In Sacramento.

2   Q.   And at some time you were the acting warden for -- at

3   Corcoran State Prison; is that correct?

4   A.   That's correct.

5   Q.   For how long did you hold that position?

6   A.   From June of 2011 to July of 2013.

7   Q.   And during that time, it came to your attention that

8   Officer Irma Sanchez had -- was alleging -- or asserting that

9   defendant Sydney Smyth was sexually harassing her; correct?

10   A.   That's correct.

11   Q.   I want to ask you to take a look at what's been marked

12   as -- in the purple binder there, Exhibit 74, please.

13           For the record, this is a memorandum dated November

14   17th, 2011.  This is a memorandum -- you knew who Sabrina

15   Johnson was; is that correct?

16   A.   That's correct.

17   Q.   She reported to you as the EEO Coordinator.

18   A.   That's correct.

19   Q.   In November of 2011, did she provide you with a copy of

20   this report that was made to her?

21   A.   I want to say yes.

22   Q.   So you became aware that Officer Sanchez was alleging that

23   she was -- that Officer Smyth was volunteering and swapping

24   with other officers so he could work in her building and

25   making comments to her that are listed there; correct?

                                                              1472

1   A.   That's correct.

2   Q.   And Officer Sanchez was at -- did you understand that

3   Officer Sanchez was asking for him to leave her alone and to

4   not have to work with him?

5   A.   Yes.

6   Q.   And did you understand that Officer Sanchez was saying

7   that she had been served with a cease and desist memo from

8   Sergeant Lawton?

9   A.   Yes, it's written here in the memo.

10  Q.   Okay.  And the remedy, again, that Officer Sanchez was

11  requesting was that she just didn't want to work alone with

12  him; correct?

13  A.   Correct.

14  Q.   And she wanted to work in a hostile free work environment;

15  correct?

16  A.   Correct.

17  Q.   And in 2011 at Corcoran State Prison, that was not an

18  unreasonable request; was it?

19  A.   No, it was not.

20  Q.   And Officer Sanchez indicated to the EEO Coordinator staff

21  that she was concerned that she was -- she was worried she was

22  going to be written up for not wanting to work with him;

23  correct?

24          MR. KLEAM:  Calls for speculation.

25          THE COURT:  Sustained.

1473

1  BY MS. PRICE:

2  Q.  Well, in the report from Regina Guzman, the EEO counselor,

3  didn't she indicate that Officer Sanchez was worried that she

4  was going to get written up for not wanting to work with

5  defendant Smyth?

6  A.  That's what's written in the memo.

7  Q.  All right.  And let me direct your attention as well to

8  Exhibit Number 34.  Did Ms. Johnson share with you a

9  handwritten note that she had received from Officer Sanchez on

10  or about November 17th, 2011?

11  A.  I don't --

12          MR. BESMER:  I'm going to object.  It's reading from

13  a document not in evidence.

14          THE COURT:  Sustained.  Remember the Court's

15  admonition to the parties as to laying the foundation of

16  documents.

17          MR. BESMER:  And ask that the --

18          THE COURT:  Warden, if you could shut the book,

19  please.

20          MS. PRICE:  He wants you to not look at it.  I'll ask

21  you a different -- can she just shut the page, Your Honor, so

22  I can -- we won't -- nevermind.

23          THE COURT:  Well, I would ask that --

24          MS. PRICE:  I'll withdraw.

25          THE COURT:  I would ask that you ask the question.

1474

1  If you're laying the foundation, then lay the foundation as

2  the Court has requested the parties to do for purposes of my

3  courtroom.

4  BY MS. PRICE:

5  Q.   In November of 2011, did you receive a hand -- did Sabrina

6  Johnson share with you a handwritten note that she had

7  received from Officer Sanchez?

8  A.   I don't remember.

9       MS. PRICE:  May she have leave, Your Honor, please to

10  look at Exhibit 34?

11       THE COURT:  Just a minute.  Lay the foundation

12  consistent with the Court's foundational requirements.

13       MS. PRICE:  I --

14       THE COURT:  That's -- not yet.  The question is not

15  yet.

16       MS. PRICE:  I'm sorry, the question is not yet?  I

17  don't --

18       THE COURT:  If we could have a sidebar.

19       MS. PRICE:  I'm confused, Your Honor.

20       THE COURT:  I understand.

21       (The following proceedings were held at sidebar

22       between the Court and counsel:)

23       THE COURT:  Here are the elements that the Court

24  understands for laying a recalled not recorded but -- if they

25  don't recall, would something refresh your recollection?  Yes.

1   What would that be?  Then we go into it.  You can't direct

2   them to something, because then if we get into the problem

3   where they start reading from the document.  So the -- and you

4   can't have them turn to a document and then ask a question

5   about the document.  Because that's where the objection -- it

6   suggests there's something out there.

7            So you have to ask the first question that you asked.

8   "Did you receive a handwritten note from Ms. Johnson?"  Don't

9   have her go to the exhibit immediately because that suggests

10  that the exhibit exists.  And that somehow the defense is

11  trying to keep that from the jury and that's just not the

12  proper foundation to be laid.

13           So you will need to -- all parties will need to

14  follow -- if you disagree with the laying of the foundation

15  for refreshing recollection, then you all can brief it.  But

16  that's the way the Court wants to proceed so that we can avoid

17  this unnecessary reading of a document by the witness so that

18  the witness can testify as a percipient witness based upon

19  what they hear, saw and observed.  Okay?  So --

20           MS. PRICE:  Yes, Your Honor.

21           THE COURT:  Go ahead.

22           MS. PRICE:  So the witness has been asked, "Did you

23  receive a memo?"  She says, "I don't remember."  I want -- is

24  it the Court's direction you want me to ask her to identify

25  something that would refresh her recollection?  Would I --

1476

```
1        THE COURT:  Yes.  Would something refresh your

2   recollection as to whether or not you received this memo?

3        MS. PRICE:  Okay.

4        THE COURT:  What does she say?  She says what?

5        MS. PRICE:  I don't know what she says.

6        THE COURT:  I don't see anything on that memo that

7   suggests -- no, I don't see anything on that memo that

8   suggests that she received it.  That's why I looked at the

9   memo.

10        MS. PRICE:  Your Honor, there's nothing on the other

11   document that suggests that she received it.  My information

12   is that Sabrina Johnson, as the EEO Coordinator, went to the

13   warden and provided her with information about this situation,

14   which then prompted the warden to take particular action.  So

15   I make that offer of proof.

16        THE COURT:  All right.  Let me ask you:  Why didn't

17   you ask Sabrina Johnson about the document since she is --

18        MS. PRICE:  I did, Your Honor.  I did.

19        THE COURT:  And it didn't come in.

20        MS. PRICE:  That's right.  It did not come in because

21   Ms. Johnson said "I don't remember."

22        THE COURT:  That's right.

23        MR. BESMER:  It goes to foundation --

24        MS. PRICE:  That does not preclude me from asking

25   another person who received information about the information.
```

1477

1    If the Court is saying that in order to refresh her

2    recollection, I can only use something that she remembers --

3            THE COURT:  No, that's not what the Court is saying.

4            MS. PRICE:  So I'm asking then, may I please have

5    leave to ask this witness to review a document to see if it

6    refreshes her recollection whether or not she received the

7    document.  That's all I'm trying -- that's all I would like to

8    do.  And we don't -- I don't need -- we don't have to -- may I

9    please ask the witness if I --

10           THE COURT:  I got what you just asked me.

11           MS. PRICE:  Yes, sir.

12           THE COURT:  I got what you just asked me.  I will

13   allow you to ask that one question.  But that doesn't mean

14   that you get to do that in the future.  You have got to stop

15   going to the exhibit and then asking the question pertinent

16   because it suggests to the jury that there is a document

17   there.  And when it doesn't come into evidence, it is -- it is

18   prejudicial because you are not laying the foundation.

19           If you are saying, "I'd like you to turn" -- if

20   you're trying to lay a foundation for the business record

21   exception or some other exception, other than refreshing,

22   that's different.  You have to look -- "I'm showing you what's

23   been marked as this.  Do you recognize that document?"  Yes or

24   no.  "How do you recognize it?  Is that maintained in the

25   ordinary course of business?  Is that created by somebody that

1    has the knowledge?  Is that a true and correct copy?"  Which

2    is something that you keep forgetting to do.  "Is that a true

3    and correct copy?"

4         MS. PRICE:  I'm not doing --

5         THE COURT:  I'm making the record for other issues.

6    So that you do not get confused as to what I am talking about.

7    You want to mix the Court's words and say exactly what the

8    Court is not saying and the Court has said on numerous

9    occasions that refreshing recollection does not require that

10   that witness create that record at all.  It's just whether it

11   refreshes their recollection.  But in the interest of time, I

12   will allow you to ask that one question.

13        But we are not going to be going through this

14   exercise.  The parties will follow my foundational

15   requirements as to how a document is admitted.  If you

16   disagree, then you all can brief for me the foundational

17   requirements -- the foundational requirements that are

18   necessary on all of the admission of the documents.

19        So any other questions?

20        MS. PRICE:  No, Your Honor.

21        MR. BESMER:  No, Your Honor.

22        THE COURT:  All right.  Thank you.

23        (The following proceedings were held in open court:)

24   BY MS. PRICE:

25   Q.  Looking at Exhibit 34, does that refresh your recollection

1479

1     that you received this document?

2     A.   I don't recall seeing it at the time.

3     Q.   Thank you.  Based on information from Ms. Johnson, did you

4     direct the reassignment of defendant Sydney Smyth from C yard?

5     From -- yeah, from C yard.

6     A.   Yes, I did.

7     Q.   To the best of your knowledge, were you the first warden

8     to redirect -- well, withdraw that.

9          At the time you did that, was there some restriction

10    on your -- that you were aware of, any restriction on your

11    ability to make that temporary reassignment order?

12    A.   No.

13    Q.   Did the union file a grievance because you did that?  To

14    the best of your knowledge.

15    A.   Not that I recall.

16    Q.   Did defendant Smyth have any right to appeal your order to

17    reassign him?

18    A.   He could have filed an employee grievance and I would have

19    responded to it.

20    Q.   And I want to direct your attention to Exhibit

21    Number -- in the white binders there, there's a letter -- I'm

22    sorry.  In the white binders, if you could look at Exhibit

23    DDD.

24    A.   So is that the first binder?

25    Q.   Yes.

                                                                      1480

1            THE COURT:  Volume one.

2            THE WITNESS:  Thank you.  And I'm sorry, you want me

3   to look where?

4   BY MS. PRICE:

5   Q.   DDD.  Did you direct Ms. Johnson to send that letter to

6   defendant Smyth?

7   A.   As part of the EEO process, yes.

8   Q.   And in connection with issuance of this letter, do you

9   know if any member -- did you direct -- do you know if Ms.

10  Johnson -- withdraw that.

11          As part of the issuance of this letter, was it your

12  understanding that anyone was going to actually have a

13  conversation with defendant Smyth about the allegations

14  against him at that time?

15  A.   The expectation of the policy is that a supervisor/manager

16  sit down with the employee and go over the letter.

17  Q.   Okay.  And do you know who defendant Smyth's supervisor

18  was at that time?

19  A.   I believe it may have been Sergeant Lawton.

20  Q.   And did you direct -- was it in your -- withdraw that.

21          Who was supposed to tell -- was anybody assigned to

22  tell Sergeant Lawton that that's what he was supposed to do?

23  A.   Well, it was a delegated responsibility of the EEO

24  Coordinator Ms. Johnson to assign this to a supervisor or

25  manager to sit down and have a conversation with Mr. Smyth.

1481

1    Q.  All right.  And then if you could look at Exhibit Number

2    48.  I'm sorry, it's in the purple binder.  That is the

3    memorandum that you issued; correct?

4    A.  That's correct.

5    Q.  And do you recall that you, at some point, received a

6    letter from defendant Smyth asking that you rescind this

7    directive, this temporary reassignment?

8    A.  I do, I believe.

9    Q.  And he did ask you to do that; correct?

10   A.  That's correct.

11   Q.  And did you do it?

12   A.  I believe it was upon closure of the investigation, he

13   requested that the letter be rescinded.

14   Q.  All right.  If you could take a look at Exhibit

15   Number -- in the -- back in the white binder, Exhibit Number

16   NNNN.

17          Did you receive -- is that the request you received

18   from defendant Smyth to rescind your order of temporary

19   reassignment?

20   A.  Yes.

21          MS. PRICE:  Your Honor, I move Defendants' Exhibit

22   NNNN into evidence.

23          THE COURT:  Any objection?

24          MR. BESMER:  No objection, Your Honor.

25          THE COURT:  NNNN is received in evidence.

1482

```
 1              (Defendants' Exhibit NNNN was received.)

 2              MS. PRICE:  Thank you, Your Honor.

 3    Q.  Now, this memorandum dated November 26th, 2012 is

 4    addressed to the warden CSP-Corcoran.  Do you see that?

 5    A.  I do.

 6    Q.  And that was you at the time?

 7    A.  Yes, it was.

 8    Q.  Were you still in an acting position?  Or had you been

 9    confirmed?

10    A.  I was still acting.

11    Q.  Okay.  But all the employees knew that you were the acting

12    warden; correct?

13    A.  That's correct.

14    Q.  And in the memorandum that you sent to defendant Smyth,

15    you signed it; correct?

16    A.  That's correct.

17    Q.  All right.  So you then sent this letter back to you

18    saying that he had received the letter restricting him from

19    working on 3C facility and it appears -- he said on July

20    30 -- on 30 July, 2012 all allegations were unfounded and to

21    be in no violation.  Do you see that?

22    A.  Yes, I do.

23    Q.  And did you underline that or did he do that?

24    A.  I didn't alter that.

25              MR. BESMER:  Calls for speculation.
```

1483

1    THE COURT:  Sustained.

2    BY MS. PRICE:

3    Q.  Was it underlined in that fashion when you received it?

4    A.  I don't recall.

5    Q.  Okay.  And it indicates, "Per the MOU, the investigation

6    should be completed within one year."  Then it says, item

7    number C, do you see that referencing "the staff member filing

8    allegations towards me"?

9    A.  Yes, I do.

10   Q.  And did you understand that defendant Smyth was now

11   making -- accusing Officer Sanchez of making false claims

12   towards him?

13   A.  I didn't take it that way.

14   Q.  Well, it says, "The staff member filing allegations

15       towards me, I feel has wasted many state man hours in

16       investigating false claims towards me since this is

17       the fourth allegation."

18       How did you take that?

19   A.  That in the prior complaints, the allegation must have

20   been unfounded and not substantiated.

21   Q.  And then he signed it with his name there.  Correct?

22   A.  That's correct.

23   Q.  Did you respond to this -- this is November 26th.  Isn't

24   it true on November 29th, three days later, you lifted the

25   restriction for him to work at 3C facility?

1484

1  A.  If I could see the memo.

2  Q.  Sure.  If you look at OOOO, OOOO.  Should be the next one

3  over.

4  A.  That's correct.

5  Q.  That's your memo; correct?

6  A.  This is my memo.

7          MR. BESMER:  Stipulated.

8          THE COURT:  All right.  Exhibit -- are you moving

9  Exhibit OOOO into evidence?

10          MS. PRICE:  I was about to, Your Honor.  I hadn't --

11          THE COURT:  All right.  So I will move and -- at the

12  stipulation of the parties, Defendants' Exhibit OOOO is

13  admitted into evidence.  Four Os is admitted into evidence.

14          MS. PRICE:  Okay.

15          THE COURT:  Did I get the zeros wrong?

16          MS. PRICE:  You said four zero zero, it's not --

17          THE COURT:  That's why I decided to go four zero.

18          Again, ladies and gentlemen, this is the Court's

19  order as to how the exhibits should be done.  Rethinking its

20  policy on that.

21  BY MS. PRICE:

22  Q.  All right.  So it indicates on November 29th, three days

23  after you received the request from defendant Smyth, you

24  granted the request; is that correct?

25  A.  That's correct.

1485

1    Q.  You rescinded the memorandum dated November 17th, 2011;

2    correct?

3    A.  That's correct.

4    Q.  And based on your memorandum, it was official notification

5    that defendant Smyth was not precluded from working any post

6    at CSP Corcoran; correct?

7    A.  That's correct.

8    Q.  So based on your memorandum, he could go to any post -- he

9    could ask to be reassigned to the same -- a floor officer

10   position with Officer Sanchez; correct?

11   A.  That is correct.

12   Q.  And this memorandum was cc'd to the watch office; do you

13   see that?

14   A.  That's correct.

15   Q.  The watch office is where assignments are actually made;

16   correct?

17   A.  Correct.

18   Q.  Officers go to the watch office to request if they want to

19   go to a particular location to work; correct?

20   A.  I'm not understanding your question.

21   Q.  Their assignments -- if you're in a relief position or if

22   you're on overtime, you go to the watch office -- isn't it

23   true that through the watch office is where you can find out

24   where you're going to be assigned; correct?

25   A.  The watch office deals with overtime assignments.

1486

1   Q.  Yes, ma'am.

2   A.  Regular job assignments are done through personnel

3   assignments.

4   Q.  So what does the watch office do with respect to overtime

5   assignments?

6   A.  They will look at who has signed up for voluntary overtime

7   and then look to fill vacant positions.  And then if there's

8   not enough staff signed up on voluntary overtime, they may go

9   over into an involuntary process and order staff over.

10  Q.  So if you sign up for voluntary overtime and the watch

11  office knows that, then they'll communicate with you about

12  where you want to go, correct?

13  A.  They'll contact you on what positions are available,

14  correct.

15  Q.  And you get to pick one; correct?  If you have seniority.

16  A.  If you have seniority, it's by seniority.

17  Q.  So if you have as much seniority as defendant Smyth had in

18  2012 and you were signed up for voluntary overtime and there

19  was an opening, you could pretty much pick where you wanted to

20  go; correct?

21  A.  It would have to be on the respective watch that he was

22  requesting to work and it had to be available at the time they

23  made contact with him.

24  Q.  Yes.

25  A.  If someone with more seniority hadn't already assumed the

1487

1    post.

2    Q.   Okay.   In 2012, did you know how much seniority he had?

3    A.   No, I do not.

4    Q.   All right.   And were you aware at the time that you issued

5    this memorandum that there was a lawsuit filed against him for

6    sexual harassment?

7    A.   I did not, no.

8    Q.   Were you aware at the time you issued this memorandum that

9    there was an EEOC complaint process still pending against him?

10   A.   I was not aware of that.

11   Q.   Was it someone's responsibility in the -- you have

12   basically three days before this memo got issued.   Did you

13   direct the issuance of the memorandum?

14   A.   Well, by my signature, yes.

15   Q.   So in the three days between the time you got the request

16   and the time you granted the request, was there someone

17   assigned to investigate the situation before you granted the

18   request?

19   A.   Well, before I had the memorandum drafted, I had verified

20   that the investigation had been closed.

21   Q.   Which investigation was that?

22   A.   The one with the Office of Civil Rights.

23   Q.   And how did you do that?

24   A.   There was a closure memo that was sent to me from the

25   Office of Civil Rights.

1488

1    Q.  Did you actually -- and did you look at anything, other

2    than the closure memo?

3    A.  I'm sorry.  I don't understand the question.

4    Q.  Did you look at -- you had a closure memo from the Office

5    of Civil Rights, did you look at any investigation reports or

6    documents associated with the investigation?

7    A.  I did not.

8    Q.  Did you contact anyone at the Office of Civil Rights to

9    determine whether some other action might be appropriate or

10   warranted?  Based on the investigation.

11   A.  I did not.  The investigation, I believe, was either

12   unfounded or no violation of the EEO sexual harassment policy.

13   And that was what I used to base my decision upon.

14   Q.  And is it the department's position -- well, withdraw

15   that.

16          During the time that the investigation was pending,

17   was it your understanding that you, as the warden, were

18   responsible for ensuring that there was no retaliation by

19   defendant Smyth against Officer Sanchez?

20   A.  Yes.  If issues were brought to my attention, yes.

21   Q.  So when the issues -- issues like him calling her a bitch

22   or a cunt, that would be something you would want to know

23   about; correct?

24   A.  That's correct.

25   Q.  Okay.  And that, in fact, that information came to your

1489

1   attention in November of 2011; correct?

2   A.   Via the EEO complaint, yes.

3   Q.   Yes, ma'am.  And the memorandum from Regina Guzman to

4   Sabrina Johnson specifically said that; correct?

5   A.   That's correct.

6   Q.   And based on that memorandum, you directed -- you did a

7   temporary reassignment; correct?

8   A.   That's correct.

9   Q.   Did you assign anyone to monitor defendant Smyth's actions

10  to ensure, for, I suppose -- up until -- for the next year,

11  whether or not he was complying with the policy?

12  A.   I did not.

13  Q.   Did you assign anyone to speak with Officer Sanchez on a

14  regular -- or on any basis to determine if she was continuing

15  to experience any problems with defendant Smyth?

16  A.   I thought I read in Ms. Guzman's memo where she took the

17  EEO complaint, that she went over Ms. Sanchez' rights under

18  EEO and advised her that if she was having any problems, to

19  please report it up.  I believe that was in the bottom of the

20  memo.

21  Q.   Yes, ma'am.  So was it Ms. Guzman's responsibility, while

22  the complaint was pending, to keep in touch with Officer

23  Sanchez to find out if anything else was going on?

24  A.   Well, one of the things the EEO counselor --

25  Q.   I'm sorry.  That's either a yes or a no.

1490

1    THE COURT:  Ask it with a yes or no.

2    BY MS. PRICE:

3    Q.  I'm sorry.  Yes or no, was it Ms. Guzman's

4    assignment -- withdraw that.

5         Yes or no, was it Ms. Guzman's responsibility to

6    check in with Officer Sanchez during -- while that

7    investigation -- the internal investigation was pending to see

8    if there were any further issues with defendant Smyth?

9    A.  No.

10   Q.  You were aware -- did it come to your attention that

11   Officer Sanchez filed an EEOC complaint in January of 2012?

12   A.  I don't recall being made aware of that.

13   Q.  Okay.  You're familiar with the EEOC; correct?

14   A.  That's correct.

15   Q.  And you also know that the department has an obligation to

16   respond to the EEOC when an employee goes to that agency and

17   makes a complaint; correct?

18   A.  That's correct.

19   Q.  Did you or your staff -- were you or your staff involved

20   in the response, the preparation of the response to EEOC?

21   A.  I was not involved.  I don't know if the EEO Coordinator

22   was in concert with the Office of Civil Rights.  They're the

23   responsible entity and responded to outside complaints.

24   Q.  Right.  The Office of Civil Rights prepares the paperwork

25   to respond; correct?

1491

1   A.   That's correct.

2   Q.   Does the Office of Civil Rights have any jurisdiction at

3   the institution to ensure that a complainant is being

4   protected from retaliation at the institution?

5   A.   They do not.

6           MS. PRICE:  Okay.  Let me check my notes, Your Honor.

7   I think I have nothing further.

8           THE COURT:  All right.  You may.

9           Ms. Price, are you looking at your notes or are you

10  putting your exhibits away?

11          MS. PRICE:  I'm sorry, Your Honor.

12          THE COURT:  That's all right, I just need to know so

13  that --

14          MS. PRICE:  I'm looking at the exhibits that are in

15  my notes, Your Honor.

16          THE COURT:  All right.  So that means you have more

17  questions?

18          MS. PRICE:  I think so, Your Honor.  There is a

19  document that I believe the witness has referred to.

20          THE COURT:  All right.  What I'm going to do is I'll

21  allow cross-examination, Ms. Price.  If you can collect -- and

22  then if you have any other questions, I'll allow you to ask

23  that.

24          MS. PRICE:  That's fine, Your Honor.  I think

25  we're -- we're dealing with the same document.  So it should

1   be fine.  Yes, Your Honor.  Thank you.  What number is this?

2              MR. BESMER:  Oh, are you still going?

3              THE COURT:  No.  I'd like you to go next so Ms. Price

4   can look that up while you're doing your examination in the

5   interest of time and case management.

6              MS. PRICE:  Oh, dear.  Wait.

7                          CROSS-EXAMINATION

8   BY MR. BESMER:

9   Q.  Good afternoon, Ms. Gipson.

10  A.  Hello.

11  Q.  Ms. Gipson, do you consider yourself a leader?

12  A.  I do.

13  Q.  And what -- how would you describe for the jury your

14  leadership style?

15  A.  I'm very much about insuring the staff have the tools and

16  the resources to do their job.  That I have an open door

17  policy, meaning staff can come in and talk to me and walk with

18  me when I was the warden.

19             Additionally, I tour the institutions and I walk and

20  I talk to staff and to inmates.  Because, one, I want the

21  staff to know from me what my expectations are, but, two, I

22  like to verify.  Are we doing the practices we say we're

23  doing, but also get a sense of what the facilities feel like,

24  what staff are doing.  Are there any issues or concerns out

25  there?

1493

1    Additionally, I reached out to staff weekly and on

2  post training and met with employees because I wanted

3  employees to understand that they had an avenue and that I

4  wanted to hear their concerns on how could we make Corcoran

5  run better.

6    Additionally, I met with supervisors, sergeants and

7  lieutenants on a quarterly basis and talked about expectations

8  and touring with a purpose when they're walking the

9  facilities.  There's an expectation of supervisor tours.

10  Sergeants touring daily, lieutenants touring.  The

11  expectations that managers are touring weekly as well as

12  myself.

13  Q.  That's a very detailed answer.  Thank you.  I was going to

14  ask do you consider yourself a micro manager, but you may have

15  already answered that question.

16  A.  I do not.  I do not.

17  Q.  When you were the warden, did you delegate responsibility

18  to other folks?

19  A.  Yes, I did.

20  Q.  And did you delegate responsibility to the EEO

21  Coordinator?

22  A.  Yes, I did.

23  Q.  When the EEO Coordinator -- withdraw that.

24    Did you micromanage the way that the EEO Coordinator

25  ran the EEO process at Corcoran State Prison?

1494

1  A.  I did not.

2  Q.  Did you rely on the EEO Coordinator to enforce the

3  policies and processes of the EEO system?

4  A.  Yes, I did.

5  Q.  Why did you redirect Officer Smyth in November 2011?

6  A.  Because based upon the complaint and my discussions with

7  Ms. Johnson, it felt that there was an issue on the facility.

8  And I wanted to ensure that, one, that we were able to do an

9  investigation and look at the process.  And so I wanted to

10 separate the employees for the overall benefit of that

11 facility and insuring that staff can work together and the

12 institution is safe.

13 Q.  And we were looking at the memo a few minutes ago.  But

14 that memo redirected Officer Smyth off the 3C facility all

15 together; correct?

16 A.  That was correct.

17 Q.  And based on that memo, what was your understanding of the

18 type of contact that Officer Smyth might have with Officer

19 Sanchez while at work?

20 A.  It would be incidental.  Meaning he may pass her, they may

21 have to respond to emergencies because there's times in a

22 prison where you have large scale events that happen and every

23 staff person has to respond who are peace officers.  So it's

24 that kind of contact.  And there's the expectation that

25 they're professional and courteous with each other when they

Gipson - X

1495

1    are interacting.

2    Q.  And was there anything preventing Officer Sanchez from

3    volunteering for overtime positions anywhere she wanted in the

4    prison?

5    A.  Not that I'm aware of, no.

6    Q.  Was there anything that prevented Officer

7    Sanchez -- withdraw that.

8             Did your memo redirect Officer Smyth to the hospital?

9    A.  My memo, no.

10   Q.  Let's go back and look at that briefly.

11            MR. BESMER:  Your Honor, I'm publishing what's

12   previously been admitted into evidence, Exhibit 48.

13   Q.  Ms. Gipson, do you see right there where it says --

14            THE COURT:  You can use the screen, warden.

15   BY MR. BESMER:

16   Q.  "And reassigned to Post" -- gives a unit -- "ACH-Unit A,

17   Floor 2."  Do you see that?

18   A.  I do.

19   Q.  What do you recognize "ACH" to mean?

20   A.  That would be our hospital at Corcoran State Prison.

21   Q.  Where do you understand you directed Officer Smyth when

22   you issued this memo?

23   A.  It would be inside the hospital.

24   Q.  Was there anything that prevented Officer Sanchez from

25   volunteering for overtime hours in the hospital while this

1496

1   memo was in effect?

2   A.   No.

3   Q.   We went through and you eventually rescinded that memo; is

4   that correct?

5   A.   That is correct.

6   Q.   When you rescinded the memo, did Officer Smyth have free

7   reign of where he could pick and choose his positions at the

8   prison?

9   A.   Yes.   In accordance with his post and bid.

10  Q.   So with his -- when he showed up at work each day, could

11  he choose and pick wherever he wanted to work?

12  A.   Okay.   I'm sorry.   I misunderstood your question.   You

13  talking about when he was on the redirect, could he pick where

14  he wanted to go?

15  Q.   After you rescinded Officer Smyth's redirection memo,

16  could he show up at work each day and pick wherever he wanted

17  to work?

18  A.   No.   He had an assigned post.

19  Q.   And unless he received -- withdraw that.

20         Did he need permission to leave his assigned post

21  from a supervisor?

22  A.   Yes, he did.

23  Q.   You were eventually notified that the investigations into

24  Officer Sanchez' complaints had been closed; isn't that right?

25  A.   That's correct.

1497

1    Q.  And do you recall how you were notified?

2    A.  I believe I received a closure letter from the Office of

3    Civil Rights addressed to, I believe, Mr. Smyth.

4    Q.  Would you please turn to Exhibit FFFF.

5    A.  In which binder?  I'm sorry.

6    Q.  Yes, ma'am, it's the white binder.  It should be volume

7    one right next to you there.  White binder, volume one.

8            Your Honor, actually, Ms. Gipson, I think we may make

9    things easier for you here.  Your Honor, counsel and I have

10   stipulated that Exhibit FFFF may be moved into evidence.

11           THE COURT:  Agreed, Ms. Price?

12           MS. PRICE:  Yes, Your Honor.

13           THE COURT:  All right.  Defendants' Exhibit FFFF,

14   F-F-F-F, is received into evidence.

15           (Defendants' Exhibit FFFF was received.)

16   BY MR. BESMER:

17   Q.  Is this memo -- well, I'll just go through it with you

18   here, ma'am.  This memo is addressed to Sydney Smyth; correct?

19   A.  That's correct.

20   Q.  And up here in the right-hand corner, there's a stamp that

21   says "noted" with "warden" written underneath it; correct?

22   A.  That's correct.

23   Q.  Are those your initials on that?

24   A.  They are.

25   Q.  And the memo itself or the letter itself is dated July

1498

1    31st, 2012; do you see that there?

2    A.  Yes, I do.

3    Q.  And your handwriting there, it looks like, what is that,

4    8-23-2012?

5    A.  Yes.

6    Q.  What would that indicate?

7    A.  That indicates the date that I saw the memo.

8    Q.  And you say here, "Do memo to return EE to previous

9    position."  Is that right?

10   A.  That's correct.

11   Q.  And "EE," that stands for employee?

12   A.  Yes.

13   Q.  And here, it refers to "CRO."  Do you understand that to

14   be civil rights office?

15   A.  That's correct.

16   Q.  And civil rights office, though, is the internal

17   agency -- or I should say the internal section of the

18   Department of Corrections & Rehabilitation that investigated

19   complaints; is that correct?

20   A.  That's correct.

21   Q.  Now, ma'am, why did -- why do local institutions send

22   their EEO complaints to the Office of Civil Rights or CRO, as

23   it's referenced there, for investigation?

24        MS. PRICE:  Objection, Your Honor.  It's beyond the

25   scope.  Also plaintiff's in limine number four perhaps.

1       THE COURT:  Well, perhaps -- is it perhaps or is it?

2       MS. PRICE:  Well, it's just the number I'm not sure

3   of.  It is.  There is such an order.

4       THE COURT:  All right.  I -- is it 4 or is it

5   somewhere else?  Maybe we could just sidebar.

6       (The following proceedings were held at sidebar

7       between the Court and counsel:)

8       THE COURT:  I suspect that what he is asking are the

9   questions related to what you were asking about, the process

10  of the EEO.  You asked questions about the EEO and there is a

11  suggestion out there that somehow it was some sort of sham.

12  So one could infer that from the record.

13      So I suspect that where the proffer is going here is

14  related to why the department uses this an independent.

15      MR. BESMER:  That's exactly right, Your Honor.  In

16  the opening statement -- recognize the opening statement is

17  not evidence -- she said, "Look, they only conducted 8 minute

18  interviews."

19      THE COURT:  Right.

20      MR. BESMER:  That sort of thing.  They really didn't

21  do much.  They kind of brushed it under the rug type of thing.

22  So --

23      THE COURT:  I get where the proffer is going.

24  That's -- I mean, seems relevant to me.  And --

25      MR. BESMER:  I can ask her about this investigation,

1  not investigations in general because this is the one that she

2  had percipient knowledge of.

3          THE COURT:  Well, I think -- I mean, I think you have

4  to -- the suggestion is that this is a sham.  And so he's

5  perfectly appropriate in addressing that issue with the

6  warden, who would have -- and I'm -- I'm totally at a loss for

7  the motion in limine, so can you give me what you were

8  referring to there?

9          MS. PRICE:  Yes, Your Honor.  Thank you.  If you'd

10  allow me to be heard on my objection.

11          THE COURT:  I always allow you to be heard.  I just

12  need you to be, all parties, quicker in the thing.  That's all

13  it is.

14          MS. PRICE:  It's in limine number five.  Yes, we

15  moved to exclude this -- precisely this kind of testimony

16  before trial.  The motion was granted.  Yes.  This case is

17  about a sham investigation and the department's failure to

18  take prompt effective remedial action.  That is our burden.

19  We certainly have introduced evidence to meet that burden.

20          If the defendants wanted to introduce evidence about

21  the policies and the procedures for OCR and why CDCR does what

22  it does, they should have designated an expert.  And we

23  specifically identified this witness in --

24          THE COURT:  Let me see.

25          MS. PRICE:  -- in limine number 5.  This is the

1    Court's ruling on the motion.  But that's Connie Gipson,

2    that's her name.

3              THE COURT:  No, I --

4              MR. BESMER:  We agree with the --

5              MS. PRICE:  That's pointed -- may I --

6              MR. BESMER:  I apologize.

7              MS. PRICE:  I just -- I made an objection.  I hope I

8    would get a chance to state the basis for the objection.  I

9    appreciate --

10             THE COURT:  You keep saying that, Ms. Price, but I'm

11   really -- the Court is really bending over backwards.  And you

12   are given that opportunity.  You keep saying that, but you're

13   always being given the opportunity.  Maybe not at the length

14   that you wish to have it, but again, we are in the middle of

15   trial.  A trial judge needs to make quick determinations.  I

16   asked that -- your objection is that it is in violation of the

17   motion in limine.  Is there anything else as to the basis of

18   the objection that the Court needs to consider for purposes of

19   the trial right now?

20             MS. PRICE:  My initial objection, Your Honor, is that

21   it was beyond the scope.  And my concern is that before I ever

22   get to state my position or give the Court even the basic

23   information to support my objection, the Court has already

24   made a tentative ruling and stated a position, has allowed Mr.

25   Besmer to state his position and then I end up being the last

1   person to speak on my objection.

2           So it's not the length, it's the procedure that the

3   Court has chosen to follow consistently, not just this time,

4   but on repeated occasions the Court has come to sidebar and

5   articulated a position before I ever get to say anything.  And

6   at various times, my position has been misstated and

7   misrepresented and not intentionally, but perhaps

8   misunderstood.  My position on this witness is very clear.

9           THE COURT:  Okay.  Have you made that position

10  already?  Or are you just repeating it now?

11          MS. PRICE:  I hope I've made it already, Your Honor.

12          THE COURT:  All right.  And I disagree with your

13  assessment of how this Court is -- the record will speak for

14  itself.  And you can take that to a higher court as to how

15  this Court has acted towards you.

16          MS. PRICE:  Yes, Your Honor.

17          THE COURT:  This Court has been more than fair to

18  both parties in this case.  Also this Court is the trial

19  judge, it is assessing based upon how it is receiving and

20  perceiving the aspects of the trial and will make its ruling

21  based upon its discretion.

22          I am now going to present my ruling on this since the

23  record is now closed with regard to this objection.  Is that

24  correct?

25          MR. BESMER:  Yes, Your Honor.

1    THE COURT:  All right.  The objection has been

2    considered and is overruled.  It is relevant.  It's an issue

3    that you have raised and it's perfectly appropriate for this

4    witness to testify in that arena.  It is also not outside the

5    scope of the examination.  So that is my ruling.  Thank you.

6    MS. PRICE:  And I'm hoping I don't have to continue

7    to object to every question.  Can the record reflect that I

8    have a continuing objection to any question that does not rely

9    upon this person's percipient knowledge of Officer Sanchez'

10   complaint and that it's phrased in the form of why the CDCR

11   does anything.

12   THE COURT:  Well, that will be noted.

13   MS. PRICE:  Thank you, Your Honor.

14   THE COURT:  I will also note that she is a warden.

15   And if you wish to lay the foundation and elaborate further

16   for the record as to the veracity and her basis of knowledge

17   as being in the position that she is, as a warden in CDCR,

18   which I would assume is a very high position based upon the

19   Court's understanding of the structure of CDCR.  If you wish

20   to lay that for the record, noting the objection and it's a

21   continuing objection, you may also do so.

22   So anything further?

23   MS. PRICE:  Will he be required to lay that

24   foundation before he starts soliciting opinions from this -- I

25   would ask that he be required to lay the foundation so that

1504

1 the record is clear before he is allowed to solicit opinions

2 from this witness.

3          THE COURT:  If that's what -- if that's what you want

4 the jury to hear about her -- more about herself and where

5 she's come from and how she's acquired this position, I guess.

6          MS. PRICE:  No, I've objected to the entire line of

7 questioning.

8          THE COURT:  Do you want that?

9          MS. PRICE:  No, I don't.  I object.

10          THE COURT:  So what was your objection then?

11          MS. PRICE:  I'd ask that that information be

12 excluded.  This witness has not been disclosed --

13          THE COURT:  I've got that.  I've got that.  You made

14 your objection.  My point is if you want Mr. Besmer to go into

15 that.

16          MS. PRICE:  I don't.

17          THE COURT:  He'd be happy to do that in front of the

18 jury if you'd like to.

19          MS. PRICE:  Can we have a 402 hearing then?  If the

20 Court is going to allow the witness to express --

21          MR. BESMER:  I don't think is --

22          THE COURT:  No.

23          MS. PRICE:  -- opinions without having her disclosed

24 as an expert and the Court is --

25          THE COURT:  She's not an expert.

1505

1    MS. PRICE:  -- suggesting and advising Mr. Besmer how

2    to lay a foundation and what he should ask her, I'd ask that

3    that take place outside the presence of the jury.

4    THE COURT:  And that request has been considered and

5    is denied.

6    MS. PRICE:  All right.  Thank you, Your Honor.

7    THE COURT:  And I am not telling Mr. Besmer how to

8    lay a foundation.  I have told everybody how to lay a

9    foundation.  Whether or not people take -- heed my warnings as

10   to any foundation, that is your discretion.

11   As a trial advocate, if you wish to think that that

12   is the way you all wish to proceed, that is the ruling of the

13   Court.

14   So the Court has considered it.  We are done with the

15   sidebar.  Let us proceed.  Thank you.

16   MS. PRICE:  Thank you.

17   (The following proceedings were held in open court:)

18   BY MR. BESMER:

19   Q.  You testified that you were the acting warden at

20   CDCR -- excuse me, at CSP Corcoran from June 2011 to July

21   2013; is that correct?

22   A.  Yes.

23   Q.  And as acting warden, you have responsibility

24   to -- indirect responsibility to oversee the EEO operations at

25   CSP Corcoran; is that correct?

1506

1    A.   That's correct.

2    Q.   Did you all -- I'll withdraw that.

3         As the warden, did you become familiar with how EEO

4    complaints were processed at Corcoran and within CDCR?

5    A.   I'm not sure of your question.

6    Q.   As the warden, did you have an opportunity to become

7    familiar with the EEO complaint process?

8    A.   Prior to my being a warden, I knew the EEO complaint

9    process.

10   Q.   And did you carry that knowledge forward with you to your

11   position as the warden?

12   A.   I did.

13   Q.   And as the EEO Coordinator at one point, and then as the

14   warden, did you understand how EEO complaints were

15   investigated?

16   A.   Through the referral over to OIA and the Office of Civil

17   Rights.

18   Q.   Do you know why CDCR has set up a system where EEO

19   complaints are referred from the institution to the Office of

20   Civil Rights for investigation?

21   A.   Because you want an independent review oversight.

22   Q.   As the warden, did you have any influence over the results

23   of any EEO investigations?

24   A.   I did not.

25   Q.   When Sanchez filed her complaint in November of 2011, do

1507

1    you know whether there were other -- I'll withdraw that.

2            When I use the word "respondent" in the EEO context,

3    do you know what I'm referring to?

4    A.  Yes.

5    Q.  And what is a respondent?

6    A.  It's the individual who the complaint is against.

7    Q.  When Sanchez filed her complaint against Officer Smyth,

8    were you aware of whether there were any other respondents?

9            MS. PRICE:  Objection.  Vague as to which complaint.

10           MR. BESMER:  I will rephrase, Your Honor.

11           THE COURT:  All right.  The objection is sustained

12   subject to rephrasing.

13   BY MR. BESMER:

14   Q.  When Sanchez filed her November 2011 EEO complaint, were

15   you aware of any other respondents?

16   A.  I was not.

17   Q.  Were you aware that Sanchez filed an EEOC charge at one

18   point?

19   A.  As I prepared for my deposition.

20   Q.  Other than that, were you aware?

21   A.  No.

22   Q.  I'm going to ask that you turn to Exhibit GGGG, that's

23   GGGG.

24           Do you recognize this document, ma'am?

25   A.  Yes, I do.

1508

1    Q.   And is that your handwriting on the document?

2    A.   It is.

3    Q.   Does your handwriting indicate that at some point in time

4    you received this document?

5    A.   Yes, it does.

6    Q.   Is this document the type of document that is generated in

7    the ordinary course of business within the California

8    Department of Corrections & Rehabilitation?

9    A.   This appears to be a closure memo in regards to a --

10   Q.   So without --

11        THE COURT:  Without saying what it is, just listen to

12   the question.

13        THE WITNESS:  Yes.

14        THE COURT:  Thank you.

15   BY MR. BESMER:

16   Q.   That this document was prepared in the ordinary course of

17   business within CDCR; correct?

18   A.   That's correct.

19        MS. PRICE:  Objection, Your Honor.  Lacks foundation.

20   Assumes facts.

21        THE COURT:  That's what he's trying to do.  That's

22   the foundation that he's trying to lay, as you know, and as

23   I've allowed both parties, a foundation is laid by a series of

24   leading questions.

25        MS. PRICE:  Your Honor, the -- there's --

1509

1       THE COURT:  You can test the veracity, if you wish,

2    on redirect.  I'll allow you to do that.

3       All right.  So your objection is overruled.

4       MS. PRICE:  Thank you, Your Honor.

5       THE COURT:  You're welcome.

6    BY MR. BESMER:

7    Q.  So ma'am, Exhibit GGGG, is that document a document that's

8    prepared in the ordinary course of business at CDCR?

9    A.  Yes.

10   Q.  And this document is a document that you received at some

11   point in time; is that correct?

12   A.  That's correct.

13   Q.  And is this document a document that's maintained within

14   CDCR's files?

15   A.  I don't know.  I would say yes.

16   Q.  So --

17   A.  I don't know.  I don't have knowledge where it's

18   maintained.

19   Q.  Did you have a file where you kept these type of

20   documents?

21   A.  I do not know.

22   Q.  Where did you send these type of documents after you

23   received them?

24   A.  To the EEO Coordinator.

25   Q.  And did the EEO Coordinator have a file that the EEO

1510

1  Coordinator kept?

2          MS. PRICE:  Objection.  Lacks foundation.  Calls for

3  speculation.

4          MR. BESMER:  I'll withdraw that.  I was --

5          THE COURT:  I was going to overrule it, but you

6  withdrew it.  So what do you want?

7  BY MR. BESMER:

8  Q.  Do you know whether the EEO Coordinator maintained a file

9  in the EEO Coordinator's office that kept documents like

10  these?

11  A.  I do not.

12  Q.  Do you recall -- I'll withdraw that last question.

13          If you could go ahead and just turn over tab GGGG to

14  cover that document, ma'am.  The other -- the other way.  So

15  you're not looking at any document.  Just the blank tab.

16          Were you ever informed that investigations into

17  Sanchez' complaints resulted in unsubstantiated allegations

18  against other individuals?

19          MS. PRICE:  Objection.  Asked and answered.

20          THE COURT:  Overruled.

21          THE WITNESS:  I want to say yes, I received closure

22  memos.

23  BY MR. BESMER:

24  Q.  And do you know for whom you received -- I'll withdraw

25  that.

1511

1    Do you know who the respondents were for those

2  closure memos?

3  A.   I want to say Sergeant Lawton and Lieutenant Baer.

4  Q.   Anybody else?

5  A.   And correctional Officer Smyth.

6  Q.   Anybody else?

7  A.   I don't recall anyone else.

8  Q.   Is there any document that would refresh your memory as to

9  whether you received closure memos for other employees of

10 CDCR?

11 A.   I don't know of any document.

12 Q.   Would you turn and look at Exhibit IIII, please.  Don't

13 say what it is.  Just take a look at it.  Go ahead and take a

14 quick look at it.  Go ahead and cover the document.

15    Does that document refresh your recollection as to

16 whether you received closure memos for anybody else other than

17 Smyth, Lawton and Baer?

18 A.   Yes, it does.

19 Q.   And who else did you receive closure memos for?

20 A.   Lieutenant Fresquez.

21 Q.   Do you know why Lawton, Baer, Fresquez were being

22 investigated?

23 A.   I do not.

24 Q.   Is there any document that would refresh your

25 recollection?

1512

1     A.  I'm not aware of one.  I don't know.

2     Q.  Go ahead and turn to tab GGGG, please.  Read that silently

3     to yourself, please.

4     A.  I read it.

5     Q.  Go ahead and flip the tab over so you're not looking at

6     the document.  Does that document refresh your recollection as

7     to why Baer, Lawton and Fresquez were being investigated?

8     A.  It was the allegation of discrimination and --

9     Q.  So just -- did it refresh your recollection?

10    A.  Yes, it did.

11    Q.  And what do you remember now that Baer, Lawton and

12    Fresquez were being investigated for?

13              MS. PRICE:  Objection.  Relevancy, Your Honor.

14              THE COURT:  Overruled.

15              THE WITNESS:  Retaliation.

16    BY MR. BESMER:

17    Q.  And do you know what the results of that investigation

18    were?

19              MS. PRICE:  Objection.  Calls for hearsay.

20              THE COURT:  Is the next question going to call for

21    hearsay?

22              MR. BESMER:  I will -- I will preface it with this.

23    Q.  Did you take any corrective or disciplinary action against

24    Lieutenant Baer, Fresquez or Lawton?

25    A.  I did not.

1513

1   Q.  And why did you not take any disciplinary corrective

2   action against Lawton, Baer or Fresquez?

3           MS. PRICE:  Objection.  Lacks foundation and calls

4   for hearsay.

5           THE COURT:  It does not.  The problem is if you want

6   foundation, you might get hearsay.  So go ahead, Ms. Price.

7           MS. PRICE:  Relevancy as well, Your Honor.

8           THE COURT:  Considering that, that objection is

9   overruled.

10  BY MR. BESMER:

11  Q.  Why didn't you take any action?

12          MS. PRICE:  I'm sorry.  So did my objection get

13  sustained or --

14          THE COURT:  Well, I was asking an answer -- if you

15  want foundation --

16          MS. PRICE:  Are you asking me or Mr. Besmer?

17          THE COURT:  I'm looking at you, Ms. Price.

18          MS. PRICE:  I know.  But I'm not the --

19          THE COURT:  You objected.

20          MS. PRICE:  You're asking me --

21          THE COURT:  You objected on foundation.  In order for

22  him to lay the foundation, it may require additional

23  information that you may subsequently object to is all I'm

24  saying.

25          MS. PRICE:  I'm objecting to both grounds.  He should

1514

1   not be allowed to elicit -- to lay a foundation using hearsay

2   or elicit hearsay in order to lay a foundation.

3           THE COURT:  All right.  That's a different objection.

4   All right.  Is that your -- is that your objection now?  So

5   that I can rule on it.

6           MS. PRICE:  Yes, Your Honor.

7           THE COURT:  That objection has been considered and is

8   overruled.

9   BY MR. BESMER:

10  Q.  You may answer the question, ma'am.

11  A.  Could you repeat the question?

12  Q.  Sure.  You took no action against Lawton, Baer or

13  Fresquez; is that correct?

14  A.  That's correct.

15  Q.  Why not?

16          MS. PRICE:  Same objection.

17          THE WITNESS:  The allegation was not sustained.

18          THE COURT:  All right.  Ladies and gentlemen of the

19  jury, you're not to consider that last statement for the truth

20  of the matter asserted.

21          MS. PRICE:  Objection.  Relevancy.

22          THE COURT:  Overruled on that basis.  Just as to why

23  this -- why the warden acted in the way she did, that's what

24  it's being offered for.  Correct?

25          MR. BESMER:  That's absolutely correct, Your Honor.

1515

1     THE COURT:  All right.

2     MS. PRICE:  That -- okay.

3     BY MR. BESMER:

4     Q.  And do you recall what the results -- I'll withdraw that.

5     Did you take any corrective or disciplinary action

6     against Officer Smyth?

7     A.  I did not.

8     Q.  Why not?

9     A.  The --

10    MS. PRICE:  Same objection.

11    BY MR. BESMER:

12    Q.  You can answer, ma'am.

13    A.  The allegation was either unsubstantiated or unfounded.

14    THE COURT:  Ladies and gentlemen, you shall not

15    consider that for the truth of the matter asserted.  It's

16    ultimately the jury's determination, based upon the jury

17    instructions that I give you, as to the facts in this case.

18    BY MR. BESMER:

19    Q.  Ma'am, do you recall whether the OCR investigation and

20    closeout memos you received related to Officer Sanchez'

21    internal complaints, the EEOC complaints or both?

22    A.  The internal complaint.

23    Q.  Do you know whether you received any close out memos

24    relating to any of her EEOC complaints?

25    A.  I don't recall.

1516

1    Q.  Would you take a look at Exhibit JJJJ, please.  Read that

2    silently to yourself.

3              MS. PRICE:  Objection to the form of the question,

4    Your Honor.

5              THE COURT:  Overruled.

6              Natural break, when you're ready.

7              MR. BESMER:  Right after this one, Your Honor?

8              THE COURT:  Yes.

9    BY MR. BESMER:

10   Q.  Now, go ahead and close that up.  And I'm only asking

11   whether that refreshed your recollection regarding closeout

12   letters for any EEOC charges or complaints Officer Sanchez had

13   made.  Is your memory refreshed?

14   A.  Could I read it one more time?  Because, no, my memory is

15   not.

16   Q.  Is that because you didn't read it slow enough or --

17             MS. PRICE:  Objection.

18             THE COURT:  Just a minute.

19             MS. PRICE:  Objection, Your Honor.  Coaching the

20   witness.

21             THE WITNESS:  I would --

22             THE COURT:  Do you need more time to read the

23   document?

24             THE WITNESS:  I do.

25             THE COURT:  She was not completed.  Tell us when

1517

1   you're ready.

2   BY MR. BESMER:

3   Q.  Does that refresh your recollection, ma'am?

4   A.  Yes.

5   Q.  Did you receive any -- did you receive any notifications

6   regarding the investigation of Officer Sanchez' EEOC

7   complaints?

8   A.  Yes.

9   Q.  What did you understand the results of the investigation

10  into her EEOC complaints to be?

11  A.  Not --

12          MS. PRICE:  Objection.  Calls for hearsay.

13          THE COURT:  Again -- go ahead.

14          MR. BESMER:  I'll go back to the first question and

15  then answer the second one.

16  Q.  Based on her EEOC complaints, did you take any action

17  against Officer Smyth or any of her supervisors?

18  A.  I did not.

19  Q.  Why not?

20  A.  The allegations were not -- were not supported to be a

21  violation or shown to be a violation of the policy.  They were

22  unsubstantiated or unfounded.

23          MS. PRICE:  Same objection, Your Honor.  I'd ask for

24  the same limiting instruction.

25          THE COURT:  Ladies and gentlemen of the jury, you're

1518

1    not to consider that for the truth of the matter asserted, but

2    for the effect on what the warden did.

3         MR. BESMER:  I'm ready to break, Your Honor.

4         THE COURT:  All right.  Ladies and gentlemen of the

5    jury, we're going to take our afternoon break.  We will

6    promptly return at 3:15.  Have a good break.  Please do not

7    form an opinion, do not discuss this case with anybody and

8    we'll see you back at 3:15.

9         (The jury left the courtroom.)

10        THE COURT:  All right.  We're outside the presence of

11   the jury.  Remind the parties to confer with Ms. Hernandez on

12   the exhibits admitted to date as well as to provide the Court

13   with any objections they may have on the Court's provided

14   yellow piece of paper regarding the jury instructions and the

15   verdict form.

16        And lastly, the Court has had an opportunity to

17   review the request by the defense to quash the subpoena.  The

18   Court's tentative ruling on that is not to quash the subpoena.

19   That while the practice is not prudent that a witness in a

20   trial should be served mid trial, I don't see the prejudice to

21   the defense in producing that witness.

22        MR. BESMER:  Your Honor, we're in the process of

23   trying to coordinate the production of that witness.  I've

24   already talked with the folks at his local prison and they've

25   informed me that he's on FMLA leave for tomorrow and Friday.

1519

1          And what I understood to be that he may be available

2    Monday, but I'm getting some conflicting information.  So

3    we're going to check that.  And I certainly have no objection

4    to Ms. Price calling Officer Ortega during our case --

5          THE COURT:  Right.

6          MR. BESMER:  -- given the Court's ruling.

7          THE COURT:  Yes.  And that would be the intent is to

8    get the witness.  And if the plaintiff rests, which it's been

9    represented the plaintiff is either going to rest today or

10   tomorrow, that the plaintiff would be -- have the opportunity

11   to call him and that would be noted that she is reserving that

12   right to call that person in her case in chief.

13         Ms. Price, anything further?

14         MS. PRICE:  Not at this time, Your Honor.

15         THE COURT:  All right.  Thank you.  We'll take our

16   break and we'll see you at 3:15.

17         MR. BESMER:  Thank you, Your Honor.

18         (Recess.)

19         MS. PRICE:  I do have a question about the --

20         THE COURT:  Go ahead.

21         MS. PRICE:  About the stickers, Your Honor.  Is

22   it -- do I need to put them on one set or two?

23         THE COURT:  Ultimately, whatever goes to the jury is

24   really what I want now at this time.

25         MS. PRICE:  Yes, sir.

1520

1    THE COURT:  It's nice to have them on all of them.

2    MS. PRICE:  Yes, sir.

3    THE COURT:  But we'll just deal with it.

4    MS. PRICE:  So which one should I put them on?

5    THE COURT:  The ones to the jury.

6    MS. PRICE:  The witness binders?  Which ones are

7    going to send to the jury?  I gave the Court two binders.

8    THE COURT:  I --

9    MS. PRICE:  Maybe I --

10    THE COURT:  No.  This is -- I got to ask this

11    premise.  How do you -- the binders don't have anything to do

12    with what the original is that goes to the jury.  How -- my

13    understanding, trial practice, is that you would have an

14    exhibit which is the original exhibit, which would then go to

15    the jury.  The binders don't have anything to do with it.

16    Were you relying upon the binders?

17    MS. PRICE:  My understanding was I lodged the binders

18    with the clerk of the Court.

19    THE COURT:  But the binders are only for purposes of

20    the Court, for the witness, not what actually the jury sees.

21    Do you not -- how are you doing it?

22    MS. PRICE:  I don't know.

23    THE COURT:  Mr. Besmer?  What were you going to use?

24    MR. BESMER:  Your Honor, we're going to use the

25    binders.  But I think Ms. Price and I can probably work

1521

1    something out.

2              THE COURT:  If you were going to use your own

3    binders --

4              MS. PRICE:  No.  I would not use my own binder.

5              THE COURT:  Okay.  All right.  Well, we can work

6    this -- we don't need to deal with it now.  What you need to

7    do is you come up with one set, whatever -- but don't touch

8    the witness binder and don't touch my binder is all.

9              MS. PRICE:  Okay.

10             THE COURT:  So you'll have to touch your binder.

11             MS. PRICE:  Okay.  And just give my copy to the

12   clerk?

13             THE COURT:  Yes.

14             MS. PRICE:  That would be the Court's expectation?

15             THE COURT:  Yes.  I always had a separate -- I had

16   the originals.  And then I had binders.

17             MS. PRICE:  I always give the original to the clerk.

18             THE COURT:  That's right.  It is the original.  I

19   mean, that's the whole purpose of the evidence.

20             MS. PRICE:  Before the trial.  Sorry.

21             THE COURT:  Where is the original though?

22             MS. PRICE:  I thought I gave it to her.

23             THE COURT:  In what format?

24             MS. PRICE:  In a binder.

25             THE COURT:  Which would have gone where?

1522

1    MS. PRICE:  Which would have gone to the clerk.

2    THE COURT:  The binders are just for me and the

3 witness.  They have nothing to do with what goes into

4 evidence.  That's just --

5    MS. PRICE:  Well, that -- obviously I'm just finding

6 that out.  I didn't read your order like that.  I thought you

7 directed us to provide the exhibits to the clerk prior to

8 trial.  So we did that.

9    MR. BESMER:  Your Honor, if this is helpful to Ms.

10 Price, we'll take the lead on compiling all the exhibits into

11 one binder that have been admitted.  And if that's something

12 the Court's amenable to, Ms. Price is amenable to and then we

13 have a compiled set that goes to the jury.

14    MS. PRICE:  I have an order --

15    THE COURT:  They go in a red well because we

16 don't --

17    MR. BESMER:  I apologize.

18    THE COURT:  Make sure they're all stapled.  Just put

19 them all in a red well.

20    MR. BESMER:  I apologize.

21    THE COURT:  So you all deal with your exhibits.

22 These are mine.  Don't touch them.  You guys deal with your

23 exhibits.

24    MS. PRICE:  Okay.  So you ordered me to do that by

25 the time I rest.

1523

1    THE COURT:  Yes.

2    MS. PRICE:  So that was --

3    THE COURT:  What I care about now, they all should

4  have had an exhibit sticker on pursuant to my order.  They

5  were all required to be indexed pursuant to my order.  The

6  defense has done that.

7    I have ordered you to do that by resting.  So by

8  tomorrow.  If you happen to rest today, if you get it tomorrow

9  is fine with the Court.  I just want to get it done so that we

10  don't do this while the jury is waiting to deliberate.  That's

11  the only issue that I'm trying to avoid.  So you all work it

12  out, maybe between 4:30 and five today if we have any issues.

13    So also, I need to make on the record that my

14  tentative ruling with regard to the subpoena is now my final

15  ruling that the defendants' motion to quash is denied.

16    MR. BESMER:  And I've communicated with Ms. Price and

17  we've arranged for Officer Ortega to appear at 8:30 a.m. on

18  Monday, Your Honor.

19    THE COURT:  Okay.

20    MS. PRICE:  Yes, Your Honor.

21    THE COURT:  We will note that then.  Thank you.

22    All right.  Call the jury.

23    (The jury entered the courtroom.)

24    THE COURT:  All right.  Ladies and gentlemen of the

25  jury, we are back and we are ready to proceed.  Mr. Besmer.

1524

1   BY MR. BESMER:

2   Q.  Ms. Gipson, earlier we reviewed Exhibit FFFF that I'm

3   going to publish again, which has previously been admitted

4   into evidence.  This is the closeout memorandum that you

5   received for Officer Smyth; correct?

6   A.  That's correct.

7   Q.  And it's dated July 31st, 2012; is that correct?

8   A.  Yes, it is.

9   Q.  And the date up here you previously testified indicated

10  that you received it on 8-23-2012; correct?

11  A.  That's correct.

12  Q.  And what has previously been admitted as Exhibit NNNN --

13  I'm publishing, Your Honor -- is the temporary reassignment

14  from current post position.  You see there where it says the

15  date is 11-26-2012?

16  A.  I do.

17  Q.  Was 11-26-2012 the first time you learned that Officer

18  Smyth was requesting to have the reassignment lifted?

19  A.  Yes.

20  Q.  And the memo here says that he was notified on July -- on

21  30 July 2012 that all allegations were unfounded; is that

22  correct?

23  A.  That's correct.

24  Q.  Between July 30th, 2012 and the date you received this

25  memorandum here, in those intervening months, did Officer

1525

1    Smyth do or say anything to you that indicated he was trying

2    to work with Officer Sanchez?

3    A.   No.

4    Q.   Do captains, lieutenants and sergeants have the authority

5    to redirect people from one facility to another?

6    A.   Yes, they do.

7    Q.   Do they have the authority to redirect folks from one

8    facility to another for, say, a year?

9    A.   No, they do not.

10   Q.   What is the limitation that captains, lieutenants or

11   sergeants have on redirecting officers from their post and bid

12   positions?

13   A.   Is when we are in an emergency situation or we do a mass

14   searching of the housing units.  And so we may redirect staff

15   from one facility to assist with another facility.  Or if we

16   were running staff shortages and there was a procedure that

17   they would follow on which positions would be redirected to

18   where.

19   Q.   So outside those situations that you just testified to, do

20   sergeants, lieutenants or captains have authority to redirect

21   an officer from his or her post and bid position on one

22   facility to another facility?

23   A.   They do not.

24   Q.   What is the EEO training requirement for officers?  I'll

25   withdraw that.

1526

1       While you were at CSP Corcoran between 2010 and 2011,

2    did you know what the EEO training requirement was for

3    correctional officers?

4    A.   They received it annually at all posts.

5    Q.   And what were the -- what was the contents of that

6    training?

7    A.   It spoke about the -- what EEO meant, what sexual

8    harassment meant and how an employee could file and who the

9    EEO Coordinator was for the facility so they would know.  And

10   then it talked about what the expectation of the behavior was

11   from our employees.

12   Q.   Did that training cover retaliation?

13   A.   Yes, it did.

14   Q.   Did that training cover the avenues that the employees had

15   to file complaints?

16   A.   Yes.  It explained it.

17   Q.   And what avenues did that training cover?

18   A.   It spoke about filing with the institution and resolving

19   issues through the local intervention process, complaints

20   could be filed with the Office of Civil Rights, EEOC, DFEH.

21       MR. BESMER:  No further questions, Your Honor.

22       THE COURT:  Any redirect?

23       MS. PRICE:  Yes, Your Honor.

24   ///

25   ///

Gipson - RD

1527

1    REDIRECT EXAMINATION

2    BY MS. PRICE:

3    Q.  Ms. Gipson, when is the last time that you attended EEO

4    training at Corcoran State Prison?

5    A.  I can't recall the exact time, but it was when I was a

6    warden.

7    Q.  Were you -- you mean when you were the acting warden?

8    A.  Yes, I was the acting warden.

9    Q.  Okay.  And do you have any personal knowledge as to

10   whether or not defendant Smyth was in that to receive that

11   training at that time?

12   A.  I do not.

13   Q.  Do you have any personal knowledge as to whether or not

14   Officer Sanchez received the training at that time?

15   A.  I do not.

16   Q.  Do you have any personal knowledge as to what information

17   was provided to Officer Sanchez in -- assuming she even had

18   the training?

19   A.  I cannot.  I know what should be taught, but I can't

20   verify that's what she received.  No.

21   Q.  Okay.  I'm sorry, Your Honor.  Just a moment.

22           THE COURT:  Sorry?

23           MS. PRICE:  I said okay.  I'm apologizing for saying

24   okay, Your Honor.  Not supposed to.

25   Q.  As the warden at CSP Corcoran, did you have any

1528

1  understanding as to how long -- what the average length of

2  time it took for OCR to investigate complaints coming -- EEO

3  complaints from your institution?

4  A.  I did not, no.

5  Q.  Do you have any -- in your capacity as an acting warden at

6  Corcoran, did you have any information as to the number of

7  complaints, EEO complaints that were coming from your

8  institution to Corcoran?  I'm sorry.

9         Did you have any -- in your capacity as the acting

10 warden at Corcoran, did you have any information as to the

11 number of EEO complaints that your institution was referring

12 to OCR at any given period of time?

13 A.  No, I do not.

14 Q.  As the acting warden at Corcoran, did you have any

15 responsibility to review the EEO complaints that were being

16 referred to OCR before they went there?

17 A.  Yes, I did.

18 Q.  And in this case, with Officer Sanchez, did you review her

19 EEO complaint before it went to OCR?

20 A.  I know I reviewed, in all likelihood, the 989 because I

21 would have had to sign it for investigation.  And I reviewed

22 the memo by Ms. Guzman.

23 Q.  Did you review any documentation from Officer Sanchez?

24 A.  I don't recall.

25 Q.  Now, you were asked a series of questions about closure

1  memos about these other -- the supervisors.  Do you have

2  any -- you didn't read the investigation report for

3  Officer -- for -- from OCR; did you?

4  A.  No.  I did not.

5  Q.  So do you have any idea what was actually investigated by

6  OCR with respect to those individuals?

7  A.  I do not.

8  Q.  Other than reading Officer -- I'm sorry, Ms. Guzman's

9  memorandum, did you have any information as to what was

10 actually investigated with respect to defendant Smyth?

11 A.  I do not.

12 Q.  Was it -- in your capacity as an acting warden, did you

13 have any -- were you aware of any mechanism in place

14 to -- once a matter was referred to OCR for the institution to

15 track that matter?

16 A.  Well, all investigations are tracked.  Because there's a

17 statute of limitations in which if we are going to take

18 action, it has to be closed within.

19 Q.  So you're saying you track -- at Corcoran, there was a

20 mechanism in place to track the period of time that an

21 investigation was lasting?

22 A.  Not for EEO, no.

23 Q.  So my question is about the --

24 A.  No.

25 Q.  -- EEO complaint?

1530

1   A.  Not that I'm aware of.

2   Q.  So once it got referred to OCR, the institution was

3   essentially left in the dark; is that factual?

4   A.  Until the investigation was completed, yes.

5   Q.  All right.  And do you know how long it took OCR to issue

6   a closure letter in -- for Officer Sanchez' case?

7   A.  I don't know.  I believe it came in in July.

8   Q.  And isn't it true that she filed the complaint in

9   November?

10  A.  That's true.

11  Q.  So about eight months.  Correct?

12  A.  That's correct.

13  Q.  And during that time, did Corcoran state -- anybody at

14  Corcoran State Prison, to the best of your knowledge, contact

15  OCR and ask what's taking so long?

16  A.  I'm not aware if that occurred or not.

17  Q.  Did anyone at Corcoran State Prison contact Officer

18  Sanchez and say, we know it's -- give her some kind of status

19  report as to during that eight-month period?

20  A.  I'm not aware that occurred.

21  Q.  Was that a policy in place at Corcoran in 2012?

22  A.  No.

23  Q.  Was there any policy in place at Corcoran in 2012 to alert

24  OCR if the institution had additional concerns about an

25  employee?

1531

1   A.   I'm not sure about the question.

2   Q.   If another -- say, for instance, investigation is pending,

3   another employee comes forward and says "He got me too," did

4   Corcoran have a policy in place to let OCR know about that?

5   A.   If the complaint came up through the EEO Coordinator,

6   then, yes, she would have referred it over to OCR.

7   Q.   Okay.  And you prepared -- you were the most -- I took

8   your deposition as the person most knowledgeable on behalf of

9   the Department of Corrections.  Do you remember that?

10  A.   Yes, you did.

11  Q.   And in connection with that deposition, did you produce

12  any correspondence from Corcoran to OCR that pertained -- that

13  showed the transmission of the report pertaining to Isabel

14  Ramirez?

15       MR. BESMER:  I object that it lacks foundation at

16  this point.  It's outside the scope of the 30(b)(6)

17  designation.

18       THE COURT:  Sustained as to the first part.

19  BY MS. PRICE:

20  Q.   You reviewed the documents that you reviewed to prepare

21  for your deposition to prepare for court; is that correct?

22  A.   That's correct.

23  Q.   Did you see any documentation from Corcoran State Prison

24  to OCR while Officer Sanchez' complaint was pending that

25  related to the transmission of information about defendant

1    Smyth's conduct towards Isabel Ramirez?

2    A.  I'm not aware of such document.

3         MS. PRICE:  Thank you.

4         THE COURT:  Anything further?

5         All right.  May this witness be excused?

6         MR. BESMER:  Yes, Your Honor.

7         MS. PRICE:  Yes, Your Honor.

8         THE COURT:  Thank you, warden.  You're excused.

9         THE WITNESS:  Thank you.

10        THE COURT:  Call your next witness, please.

11        MS. PRICE:  May we approach, Your Honor?

12        THE COURT:  Yes.

13        (The following proceedings were held at sidebar

14        between the Court and counsel:)

15        THE COURT:  Yes.

16        MS. PRICE:  It was my -- it's my intention to read

17   Sergeant Baer at this time.

18        THE COURT:  Uh-huh.

19        MS. PRICE:  However, I lack a person, a third party

20   person to read the document.

21        THE COURT:  I'm not doing it.

22        MS. PRICE:  So my -- my alternative, I had a person

23   who has not responded to me.  So I can only propose to use

24   Officer Sanchez.  And I don't know if you want me to do that.

25        THE COURT:  Do you have an objection to that?

1    MR. BESMER:  No.  That's fine.

2    THE COURT:  All right.

3    MS. PRICE:  I need a moment.  I haven't prepared her

4  to do it.

5    THE COURT:  Why don't you -- -- any other witnesses

6  that you have?

7    MS. PRICE:  No.

8    THE COURT:  Okay.  I said that I'm not going to do

9  it, that was a facetious joke on behalf of the Court for the

10 record.

11    So, yeah, why don't you have an opportunity just to

12 talk with her, Ms. Price.  I'll give you a couple of minutes

13 so that you can obviously put her in -- make her understand

14 what she's going to do.

15    MS. PRICE:  Okay.  Can I have more than a couple?  I

16 need to make sure that I have gotten -- translated all of what

17 Mr. Besmer sent you into what I had actually marked.  And I

18 guess at the time you were ruling on the objections, I think I

19 realized that the Court had not seen our Exhibit Number 77 and

20 78, or there was some misunderstanding.  Those were the

21 excerpts that were submitted.  So I have to take what he has

22 in his red ink and make sure that I have --

23    THE COURT:  Well, that's more than a five-minute

24 exercise.  And that's why I gave it to you yesterday so that

25 you could prepare for that over the evening to do that.  I'm

1534

1    not taking precious jury time for you to do that.  You're

2    going to have to -- we're not going to take that time.

3            Can you call a witness or do you have any more

4    witnesses or are you done other than Officer Ortega?

5            MS. PRICE:  I'm done.

6            THE COURT:  You're done.  Do you have any witnesses

7    you could call now?  I realize you're kind of put in the

8    blind.

9            MR. BESMER:  No.  We're not.  We're prepared for

10   tomorrow to put on whoever we need to go.  And if we run out,

11   to call our client tomorrow.  But we're not --

12           THE COURT:  I understand that.  I understand that.

13   I'm not -- you were not prepared to go today.  So -- because

14   I'm not going to take up the jury's time.  I was going to try

15   to get some defense witnesses done because Ms. Price does have

16   time.

17           MR. BESMER:  Your Honor, can we have a moment to

18   confer with counsel?  Because I think that our case at this

19   point might be shorter than we think.  And in terms of its

20   management of the calendar and when it wants to let the jury

21   go today and when Ms. Price does the reading.

22           THE COURT:  Here's the deal.  Tomorrow I'm going to

23   have an issue with my criminal calendar.  So I hate to take

24   up -- I hate to take up their time.  I don't want to be all of

25   a sudden rushing again.

1535

1     MR. BESMER:  Uh-huh.

2     THE COURT:  We have time.  I should have had my

3  criminal calendar right now.  But I can't get the defendants

4  here.  So --

5     MS. PRICE:  I have -- I don't think it would take me

6  very long, Your Honor.  I did start the --

7     THE COURT:  Well, I guess my suggestion --

8     MS. PRICE:  -- process, I've got my notes --

9     THE COURT:  You're just going to have to read -- I'm

10  not going -- I assume that people would have raised

11  my -- that's why I did what I did.  I went through it so that

12  I could give everybody as much notice.  And the Court has

13  tried to turn this stuff around because of the interest of the

14  trial.  So that should have been done last evening.  How much

15  time do you need, Ms. Price?

16     MS. PRICE:  Probably about 10 minutes, Your Honor.

17  And I -- again, I started it, but I cannot make sure that --

18     THE COURT:  All right.

19     MS. PRICE:  -- I'm dealing with my document versus

20  apparently what you were dealing with.

21     THE COURT:  I'm going to give you ten minutes.  I'm

22  going to excuse the jury.  And then we're going to start up.

23  And if there's any issues, I'm not going to decide the issues,

24  you're just going to have to read what is a non-disputed

25  testimony and then we'll have to deal with the other issues

1536

1    later since you're now putting me in a bind if I -- if you

2    agree with what I have already said, it sounds like.  I am not

3    hearing anything from the defense.

4         MR. BESMER:  Well, we've made our objections and I

5    understand the Court's sustained some and overruled others.

6         THE COURT:  Okay.

7         MR. BESMER:  So our objections stand.

8         THE COURT:  If you just read what I noted, then it is

9    what it is.  So --

10        MS. PRICE:  Right.  But I may -- as you may

11   understand --

12        THE COURT:  I'm not having an argument in ten

13   minutes.  You should have done that earlier.  That's why I

14   gave that stuff yesterday so that we could raise these issues

15   before they were read so that we do not waste their time.

16        MS. PRICE:  And when -- yes, Your Honor.

17        THE COURT:  It sounds like you are not prepared to do

18   that.

19        MS. PRICE:  I'm not prepared to read at this moment,

20   Your Honor, that's true.

21        THE COURT:  All right.

22        MS. PRICE:  That's why I asked for a sidebar.

23        THE COURT:  I will give you -- I understand that.

24   And that's perfectly appropriate.

25        All right.  You can have ten minutes.  And you can

1537

1    read what is -- without having any argument, you can read what

2    you need to read and if you need to come back and deal with

3    the other issues, you can do so.

4            MS. PRICE:  Thank you, Your Honor.

5            THE COURT:  The non-objectionable stuff.  At least we

6    can do that and come back.

7            MS. PRICE:  Yes, sir.

8            THE COURT:  All right.  So ten minutes.  I'm going to

9    excuse -- well, I'm going to excuse the jury until 3:51.

10           MR. BESMER:  Thank you, Your Honor.

11           MS. PRICE:  Yes, Your Honor.  Thank you.

12           (The following proceedings were held in open court:)

13           THE COURT:  All right.  Ladies and gentlemen of the

14   jury, we are going to take a ten-minute recess and only ten

15   minutes.  We're just dealing with some housekeeping measures.

16   And in the Court's interest of maintaining the case management

17   in the case, the Court feels that taking a ten-minute recess

18   is in the best interest of everybody.

19           And I just want to remind you tomorrow I do have my

20   criminal calendar that starts at ten o'clock and we should be

21   done by 10:30.  I just want to advise you of that.

22           Again, the Court tries to avoid having these issues

23   and taking your precious time because I like to maintain the

24   times that I committed to you at the beginning as to how we

25   are doing.  And I will tell you that it appears that we are on

1   track ultimately with the ultimate discussion that I had with

2   you at the very beginning.  The Court is keeping with that

3   commitment.  And so are the parties.

4          So we're going to take a very quick ten-minute

5   recess.  And we'll see you again.  Do not form an opinion.  Do

6   not discuss this case with anybody.  Thank you.

7          (Recess.)

8          THE COURT:  All right.  The record will reflect that

9   the jury has returned.

10         MS. PRICE:  May we approach, Your Honor?

11         THE COURT:  Yes.

12         (The following proceedings were held at sidebar

13         between the Court and counsel:)

14         MS. PRICE:  I don't have the defendant's counter

15   designations.

16         MR. BESMER:  We filed --

17         THE COURT:  Again, this is a preparation issue.  Are

18   you ready to read the -- I don't think we'll get to the

19   counter designation today.  Will we?

20         MR. BESMER:  It depends on how long this takes, Your

21   Honor.  We filed our counter designations by line and page

22   number pursuant to the pretrial order.  I didn't see a

23   requirement that we also include as exhibits the counter

24   designations in the pretrial order so we did not.  That may

25   have been an error on our part, but we designated by line and

1   page number, Your Honor.  And if we don't get to it today, I'm

2   happy to provide Ms. Price with the actual pages --

3          THE COURT:  All right.  Why don't you do that.  It

4   sounds like we're not going to get to that today anyway in

5   light of the time.  Since we only have 35 more minutes.  So I

6   suspect that -- so you're going to -- are you prepared to read

7   your part?

8          MS. PRICE:  Right.  My part is -- is -- was submitted

9   as a separate excerpt.  So my part doesn't have -- if they

10  have other pages, I don't have them in what I'm about to give

11  her.

12         MR. BESMER:  And.

13         MR. KLEAM:  And Your Honor, when I did is prepare

14  counter designations to Ms. Price's designation.  What I did

15  was I extended what she was designating so to speak.  Like I

16  included the sections before and after to put in better

17  context.  So I'm not sure if without our counter

18  designations --

19         THE COURT:  Well, but this is a preparation issue.

20  This is a preparation issue --

21         MS. PRICE:  I am prepared to read.

22         THE COURT:  No, you're not.  Are you prepared to

23  read?

24         MS. PRICE:  Yes.  I will read the portions that I

25  designated and subject -- with the Court's objections.  But I

1540

1    don't have a document, a single document that has all of what

2    they designated because I don't have their -- apparently it

3    doesn't -- I don't -- I don't have it.  It wasn't provided to

4    me.  So my understanding is that I -- we were required to

5    identify --

6              THE COURT:  Okay.  Let me stop there.  Does she not

7    know what the counter designations are?

8              MR. BESMER:  We filed our counter designations by the

9    timeline required by the Court by page and line number on the

10   ECF system, Your Honor.

11             THE COURT:  Okay.

12             MR. BESMER:  We didn't take pages out and include it

13   with that because we didn't think it was required.

14             THE COURT:  Which is not the requirement.  The

15   designation -- as the Court has required, that's consistent

16   with its preparation issue that you did not compare the

17   desig -- you designate, they designate, the fact that they put

18   it in a different format or a medium is not -- that's the

19   problem.  It's a preparation issue.

20             MS. PRICE:  Your Honor, your order requires a party

21   who designates to mark them as an exhibit and submit them as a

22   separate exhibit.  We did that.  That is in your order.  And I

23   did that.  And that's what I have.  I don't have the part that

24   they designated because it wasn't -- I submitted my exhibit

25   presumably before they designated.

1541

1    THE COURT:  Again.  I don't understand why we're

2    doing this right now when we're sitting -- why wasn't this

3    raised beforehand?  You knew this was an issue.  The Court

4    talked about this on Friday.  I went over it.  I told you what

5    to do on this.  Mr. Besmer gave us the information Thursday

6    afternoon.

7         The Court got it on the morning because the Court

8    doesn't get things until the morning.  Got it, went through

9    it, gave its finding on Monday afternoon.  And now we're here

10   on Wednesday with 31 minutes left and this is being raised as

11   an issue, which is a procedural problem.  It should have been

12   raised earlier to say to me, you know what, judge, I can't do

13   it or I can't read it and now I got the witness on the stand.

14        MS. PRICE:  I did raise it as a procedural

15   problem --

16        THE COURT:  When?

17        MS. PRICE:  -- at the time -- when you started

18   reading, you started saying, 8, 9 -- if you recall, I was

19   saying wait, you are presenting this in a different format

20   from the way that it is organized -- that I have it organized.

21   And you cut me off and said you are going to -- this was how

22   you were going to do it.

23        THE COURT:  Because, again, you were not

24   prepared -- I said I'm taking the exhibit as filed by Mr.

25   Besmer and you were saying, "Wait a minute, Your Honor, I'm

1542

1  trying to find everything."  And I said, "Write down the

2  deposition, here's the section, here's the ruling."  And I

3  take it you wrote that down.  Are you telling me you didn't

4  write that down?

5         MS. PRICE:  No, I wrote it down.  Where is the

6  exhibits filed by Mr. Besmer?  If you give me that, then we're

7  good.  But I don't have such a thing.

8         THE COURT:  Mr. Besmer sent you, on Sunday afternoon,

9  the information and Mr. Besmer or whoever did it for the

10  defendant color coded it and put it in pursuant to what the

11  Court had asked to do, did that.

12         And I went through that and said here is -- here's

13  the objections as to the red part, which was the disputed

14  part.  Which was the disputed part.  I cut to the chase.  And

15  I said overruled.  Sustained.  Overruled.

16         That was provided to you.  You were cc'd.  It was the

17  afternoon of Sunday.  Whether or not you looked at it that day

18  didn't matter because I gave it to you Monday afternoon, my

19  ruling on it, and said if there's any issue, then you need to

20  raise it.

21         Now we're about ready to read testimony and I'm

22  concerned either you're not prepared to go forward with the

23  testimony.  Yes or no?  Are you prepared to go forward?

24         MS. PRICE:  I will go forward with what I have

25  designated.  I do not have the defendant's counter

1543

1   designations.

2          THE COURT:  Okay.  Can we go forward?

3          MR. BESMER:  We have no objection, Your Honor, we'll

4   just read our counter designations at a later time.

5          THE COURT:  Okay.  All right.

6          MS. PRICE:  All right.  Thank you.

7          (The following proceedings were held in open court:)

8          MS. PRICE:  Is the Court going to explain the process

9   or shall I?

10         THE COURT:  Yes.  Ladies and gentlemen of the jury,

11  due to the unavailability of a witness and, again, in the

12  interest of time, what the parties have agreed to do is read

13  the deposition testimony of this individual.  So all it is is

14  reading information.  All right?

15         And in a way to explain it to you and to put it in a

16  better context to you, Ms. Sanchez -- Officer Sanchez is just

17  going to read the role of the individual that Ms. Price -- so

18  she will be asking the answer, question, and then the defense

19  will have an opportunity then to put in additional aspects.

20  Because depositions are treated differently than trials.  So

21  the Court has dealt with issues related to that, so that's how

22  we're going to go.

23         So, Ms. Price, if you would now state -- and I will

24  give you a further instruction as to the deposition.  Ms.

25  Price, for the record, if you would state who you're calling.

1544

1        MS. PRICE:  Yes, Your Honor.  Plaintiff calls

2   Lieutenant Baer.

3                        **ANTHONY BAER**,

4   called as a witness on behalf of the Plaintiff, having been

5   first duly sworn, testified by reading of deposition as

6   follows:

7        THE COURT:  And mindful of the part -- the Court is

8   not following.  So any issues related to objections need to be

9   raised by the parties.  Okay?

10       MS. PRICE:  Yes, sir.

11       THE COURT:  Based upon the Court's previous ruling.

12       MR. BESMER:  Yes, Your Honor.

13       THE COURT:  Thank you.

14       MS. PRICE:  May I approach, Your Honor?

15       THE COURT:  You may.

16       All right.  Ladies and gentlemen, I'm just going to

17  read the instruction.  A deposition is sworn testimony of a

18  witness taken before trial.  Witness is placed under oath to

19  tell the truth and lawyers for each party may ask questions.

20  The question and answers are recorded.  When a person is

21  unavailable to testify at trial, the deposition of that person

22  may be used at trial.

23       The deposition of Anthony Baer was taken on September

24  25th, 2014 and October 27th, 2014.  You should consider

25  deposition testimony presented to you in court in lieu of live

1   testimony insofar as possible in the same way as if the

2   witness had been present to testify.

3          All right.  Ms. Price.

4          MS. PRICE:  Yes, Your Honor.

5          MS. SANCHEZ:  Your Honor, am I reading this?

6          THE COURT:  I thought the purpose of the break was to

7   discuss --

8          MS. PRICE:  We did, Your Honor, but it wasn't really

9   long enough.

10         THE COURT:  To say "I'm going to ask questions and

11  you answer"?

12         MS. PRICE:  It's a little more complicated than that,

13  Your Honor.

14         THE COURT:  All right.  And the Court has advised the

15  parties to be prepared to present their witnesses as any other

16  witness.

17         MS. SANCHEZ:  The deposition of Anthony Baer was

18  taken in the above entitled matter pursuant to the provisions

19  of law pertaining to the taking and use of deposition and

20  pursuant to notice at --

21         THE COURT:  Is she reading the answer?

22         MS. PRICE:  No.  She's reading the counter

23  designation from the defense, Your Honor.

24         MR. BESMER:  I -- Your Honor, I thought that we were

25  going to read the defendant's counter designation at a --

1546

1       THE COURT:  I did too.

2       MR. BESMER:  -- later date and time.

3       THE COURT:  I did.

4       MS. PRICE:  That's the introductory page, they

5  counter designated it.  So we have that one.  If you don't

6  want her to read it, that's fine.

7       MR. BESMER:  We have no objection to the fact that

8  she just read it, Your Honor.

9       THE COURT:  Fine.  Then pose your objection when you

10  want -- you pose your objection when you want and I'll decide.

11  You may go ahead.

12       MS. SANCHEZ:  I'm sorry.

13       THE COURT:  I'm just going to sit here.

14       MS. SANCHEZ:  Huseby Court Reporters, 7185 North Palm

15  Avenue, Suite 120, Fresno, California.

16       Appearances for the plaintiff:  Law Offices of Pamela

17  Y. Price by Pamela Y. Price, Attorney at Law, 901 Clay Street,

18  Oakland, California 94607.  510-452-0292.  Pamela.price at --

19       MR. BESMER:  Your Honor, if it's okay with Ms. Price,

20  we'll stipulate to skipping the detail of our addresses, phone

21  numbers and email addresses.

22       THE COURT:  Otherwise the Court was going to

23  interject to 403.  So let's -- let's get to the testimony.

24       MS. PRICE:  Okay.

25       THE COURT:  Since I've already read the instruction.

1    MS. PRICE:  All right.  So go to page four.  I will

2    read the question.

3                    DIRECT EXAMINATION

4    BY MS. PRICE:

5    Q.  Will you state your full name for the record, please.

6    A.  Anthony Baer.

7    Q.  And what is your current occupation?

8    A.  I'm currently correctional lieutenant at Corcoran State

9    Prison.

10   Q.  Okay.  And how long have you been there?

11   A.  I've been at Corcoran 17 years.  Prior to that I was at

12   Wasco State Prison for two years.

13   Q.  What is your current assignment?

14   A.  I'm currently the administrative assistant to the warden

15   and the public information officer for the prison.

16   Q.  And how long have you held that position?

17   A.  It will be two years in October.

18   Q.  In your capacity as public information officer, do you

19   issue press releases?

20   A.  Yes, ma'am.

21   Q.  Do you participate in press conferences?

22   A.  Yes, ma'am.

23   Q.  Do you give interviews?

24   A.  Yes.

25   Q.  And have you been trained by the department on how to

Brent Deposition read

1548

1    address -- provide public information to the public?

2    A.  Yes, ma'am.

3    Q.  Okay.  Do they give you any training about how to speak on

4    camera?

5    A.  Correct.  Yes.

6            MS. PRICE:  "We" -- continue reading line 15 and 16.

7            MS. SANCHEZ:  Oh, sorry.

8            THE WITNESS:  Correct, yes.  We were also tested

9    every day on camera on how to speak.

10   BY MS. PRICE:

11   Q.  Have you received any training on how to testify in court?

12   A.  Yes, ma'am.

13   Q.  Was that before you became the public information officer?

14   A.  Yes.

15   Q.  Okay.

16   A.  Once a year, just as an officer, it's part of our block

17   training.  Court demeanor.

18   Q.  So how many years have you received block training on

19   court demeanor?

20   A.  Going on about 19 years.

21   Q.  It's very --

22           MS. PRICE:  Okay.  Go to page 8, please.

23   Q.  It's very important that if I ask you a question --

24           MR. BESMER:  Objection.

25           MS. PRICE:  Oh, I'm sorry.

1549

1    MR. BESMER:  The Court's ruled on this.

2    THE COURT:  Thank you.

3    MS. PRICE:  I'm looking at the wrong -- sorry, Your

4    Honor.  I'm trying to --

5    Go to page 12, Officer Sanchez.  Lieutenant Baer.

6    Q.  Have you done anything to prepare for today's deposition?

7    A.  Yes, ma'am.

8    Q.  What did you do?

9    A.  I received -- I reviewed my reports -- the report dated

10   October 20th, November 1st -- both authored by myself.  Also a

11   report on November 2nd authored by Lieutenant Dicks.  And then

12   the transcript of recorded interview that was dated June 19th,

13   2012.

14   Q.  How much time did you spend preparing for the deposition?

15   A.  About two days.

16   Q.  Okay.  Without telling me about your conversations with

17   any lawyer, Mr. Besmer or anybody else at his office, can you

18   tell me how you spent the two days preparing for the

19   deposition?

20   A.  Reviewing my reports.  I read my reports that I wrote as

21   well as the transcripts that was done in June.

22   Q.  Okay.  Did you talk to anyone other than Mr. Besmer about

23   the deposition?

24   A.  No.

25   Q.  Okay.  Before I want to take you back to -- let's go back

1550

1    to your -- what we marked as Exhibit 23.  It's a memorandum

2    dated October 20th, 2011 to Captain Pacifico.  You prepared

3    this memorandum?

4    A.   Yes.

5    Q.   And the memorandum, at the end of the first paragraph, it

6    says that you are aware that Officer Sanchez had met with

7    Sergeant Lawton and Correctional Counselor A. Pineda regarding

8    her continued allegations against Correctional Officer Smyth.

9    Do you see that?

10   A.   Yes.

11        MS. PRICE:  Go to page 18.  Just lines 2 through 6,

12   please.

13        THE WITNESS:  On the question on how much time I

14   spent reviewing the documents and preparing for this, I should

15   have been -- it should have been over the course of two days I

16   spent about an hour each day reviewing the documents.

17        MS. PRICE:  Go to page 20.

18   Q.   So when you say "continued allegations against

19   correctional Officer Smyth by Officer Sanchez," what

20   allegations were you referring to?

21   A.   That was based off of Sergeant Lawton informing me that

22   it's been an ongoing problem with Sanchez stating that she

23   wasn't able to work with Smyth.  That there was complaints

24   filled out there -- filed out there.  And then also on the day

25   that she came to my office and stated to me that he looks at

1   her and smiles and has made comments about her ass.

2   Q.   So what was your understanding of how these allegations

3   related to her prior complaints of sexual harassment by

4   defendant Smyth, if any?  That's if you had such an

5   understanding.

6            Don't read -- go to line 10.

7            THE WITNESS:   None.  Just based off of Sergeant

8   Lawton reporting to me that she continuously refuses to work

9   based on problems in the past that she filed complaints on.

10  BY MS. PRICE:

11  Q.   Did Sergeant Lawton tell you the specifics of the

12  complaints that Officer Sanchez had filed against Officer

13  Smyth?

14  A.   I don't remember.

15           MS. PRICE:   Go to the top of 24.

16  Q.   Okay.  And what was the -- was there some restriction on

17  assigning her to a different post?

18  A.   No, ma'am.

19  Q.   Why did you rule out reassigning her to a different post?

20  A.   Because of the fact that there was nothing pending on

21  Officer Smyth.  All facilities and all staff are expected to

22  work together professionally.

23  Q.   Any other reason?

24  A.   No.

25  Q.   Was there any reason you could not reassign Officer Smyth?

1          Go to line 18.

2    A.  By doing I felt -- by redirecting Officer Smyth, it would

3    be discriminating against him.

4    Q.  And what did you base that on?

5    A.  As far as the training I received in the department,

6    retaliation against staff for something that isn't -- that he

7    hasn't done.  I felt that they were retaliating against Smyth

8    by moving him and redirecting him.

9    Q.  Who was retaliating against him?

10   A.  Just by the sergeant, by him -- me hearing that they've

11   been moving staff around and redirecting staff to keep them

12   apart.

13   Q.  Uh-huh.

14   A.  Then the sergeant is -- if we were to continue to do that

15   and he was doing it, then that could be looked at as

16   retaliation to him.

17   Q.  Sure.  Did they train you -- did they train you -- when

18   they trained you on retaliation, were you told that in order

19   for there to be retaliation, there has to be something that

20   the person did and then the department takes action against

21   the person like it's a cause and effect kind of thing?  Did

22   they train you about that?

23   A.  Correct.  It doesn't have to be sexual in nature, just

24   anything that the employee does.  You cannot retaliate or if

25   you're taking action on an employee, you know, for something

1553

1    retaliation is illegal and not tolerated by the department.

2    Q.  Okay.  So when you formed this view that moving Officer

3    Smyth was retaliating against him, what was it that you

4    thought Officer Smyth had done that would have triggered the

5    retaliation?

6    A.  Well, that's just it.  I thought there was nothing pending

7    against Officer Smyth that was confirmed in our ERO office,

8    that he had done anything to be moved around.

9    Q.  Okay.

10   A.  So by moving him, then we would be retaliating against him

11   for something he didn't do.

12   Q.  Okay.  So you thought that the department was retaliating

13   against him even though he hadn't done anything; is that your

14   understanding?

15   A.  Well, I felt that he could construe it as being retaliated

16   against if we kept moving him around.

17   Q.  Okay.  And you thought that based on your training?

18   A.  Yes, ma'am.

19   Q.  And did you talk to any supervisor about that

20   understanding that you had in your head?

21   A.  No.

22   Q.  Okay.  Why not?

23   A.  At that point, just from the training I've received, that

24   was my understanding of what we're possibly doing to him.

25   Q.  Did you ever talk to Captain Pacifico about this idea that

1  by moving Officer Smyth, you were -- the department would be

2  retaliating against him for something?

3  A.  I spoke with Officer -- with Officer Pacifico, but not in

4  regards to retaliating against Officer Smyth.

5  Q.  Now, you also used the term "discriminate against him."

6  Is that -- in your view, when you say "discriminating" and

7  "retaliating," are you talking about the same thing?

8  A.  Yes, ma'am.

9  Q.  Okay.  All right then.  Did you talk to Sergeant Lawton

10  about this idea that moving Officer Smyth was some type

11  of -- could be construed as a form of retaliation?

12  A.  I recall informing him about that, yes.

13  Q.  Okay.  Did he agree with you about that?

14  A.  I don't recall.

15  Q.  Did Officer -- I'm sorry.

16        Did Sergeant Lawton tell you in that conversation

17  about retaliation that he was moving Officer Smyth in order to

18  punish him?

19  A.  No.

20  Q.  Did Sergeant Lawton ever tell you, in the conversation you

21  had with him about moving Officer Smyth, that he was

22  doing -- that Sergeant Lawton was moving Smyth because Smyth

23  had done something at work?

24  A.  No.

25  Q.  Other than yourself, was there anyone else involved in

1  this decision to stop redirecting either Sanchez or Smyth?

2  A.  I went to Captain Pacifico and I informed him about what I

3  was observing, what's happening on the facility.  I told him

4  it was a problem.  I don't recall what he said, you know, as

5  far as redirecting him.

6  Q.  When did you tell him was the problem?

7  A.  Again, that I was learning that Sanchez was calling and

8  complaining of working around Smyth.

9  Q.  Okay.  Anything else that was the problem that you

10  expressed to Captain Pacifico?

11  A.  The fact -- the fact that we had already heard from ERO

12  that there was no pending investigations.  And I was trying to

13  get direction from him on what other steps were to take.

14  Q.  Did Officer Sanchez complaining -- continuing to complain

15  that Smyth was sexually harassing her get to be a problem?

16  A.  Yes.

17  Q.  Okay.  Why did you consider that to be a problem?

18  A.  Based on the fact that there wasn't anything current

19  pending and by her not reporting to her assigned duties, it

20  was causing a safety and security issue in the prison.

21  Q.  But my question is about her complaining that he was

22  sexually harassing her.  Why did you consider that to be a

23  problem?

24  A.  Complaining to who?  I'm sorry.

25  Q.  Sergeant Lawton.

1556

1          MR. BESMER:  Your Honor, at this point, I think it

2    would be prudent to read the next answer for sake of context.

3          THE COURT:  All right.

4          MR. BESMER:  That's on page 30, lines 5 and 6.

5          THE COURT:  All right.  Ms. Price.

6          MS. PRICE:  I would ask to read from page 30, line 5

7    through 10, Your Honor.  It looks like --

8          MR. BESMER:  Yeah, that's fine.

9          THE COURT:  That's fine.  Just -- why don't you ask

10   the question, Ms. Price.

11         MS. PRICE:  Yes, Your Honor.

12         THE COURT:  So we have continuity.  Thank you.

13         MS. PRICE:  Can I re-read the question?

14         THE COURT:  Yes, please.  Thank you.

15   BY MS. PRICE:

16   Q.  Why did you consider that -- the question is on page 29,

17   starting on line 20.

18         But my question is about her complaining that he was

19   sexually harassing her.  Why did you consider that to be a

20   problem?

21   A.  Complaining to who?  I'm sorry.

22   Q.  Sergeant Lawton.

23         And then the answer is at line 5.

24   A.  The problem I felt was the movement around based on what

25   she was telling Sergeant Lawton.

1  Q.  Okay.  And why was the movement around a problem?

2  A.  Again based on nothing pending currently on Officer Smyth

3  and possible discriminating against Officer Smyth for

4  something that wasn't there.

5      MS. PRICE:  You have page 33 there?

6      MS. SANCHEZ:  Oh, do I go all the way to 33?

7      MS. PRICE:  Just go -- no, to the next page, I think.

8  Skip the -- go to page 33, line 11.

9  Q.  Can you identify by name or post any officer who

10  complained that they were unhappy about the reassignment of

11  Sanchez or Smyth?

12  A.  No.

13  Q.  Did any -- okay.

14      THE COURT:  Advise me when you're at a natural break.

15      MS. PRICE:  All right.  This next section will be

16  fine, Your Honor.

17      THE COURT:  Thank you.

18  BY MS. PRICE:

19  Q.  Okay.  Did any union representative contact you and

20  indicate to you, as the supervisor, that he intended to file a

21  grievance because Smyth or Sanchez was being redirected?

22  A.  No.

23  Q.  So the decision to require -- to deny Sanchez' request to

24  be separated from Smyth was a management decision; correct?

25  A.  Correct.  And based off of, again, the contract, the MOUs

1558

1  as far as staff's post and bid rights.

2         MS. PRICE:  Yes, Your Honor.

3         THE COURT:  All right.  Ladies and gentlemen of the

4  jury, we're going to take our evening recess at this time.

5  And we will begin promptly at 8:30 tomorrow morning.

6  Everybody have a wonderful evening.  Do not form an opinion.

7  Do not discuss this case with anybody.  And we will see you

8  tomorrow.  Thank you.

9         (The jury left the courtroom.)

10        THE COURT:  All right.  We're outside the presence of

11 the jury.  The parties will meet with me at five in my

12 chambers and we will spend the time necessary to hear the

13 arguments related to the Court's proposed jury instructions.

14        Again, it will be off the record.  And then the Court

15 will listen to any objections or comments the parties may

16 have.  We will then file it and then I will set a requirement

17 where you will then object in writing to it and the Court will

18 make its ruling based upon those objections.

19        So -- and also, after the conclusion or between now

20 and five o'clock, let's work out any issues related to

21 this -- to the reading of the transcripts here.  Again, these

22 are issues that should have been raised.

23        If somebody is at fault one way or the other, that

24 should have been raised earlier than right before the

25 testimony being read.  We've been talking about this since

1  Friday afternoon and the Court has strived to get this done
2  for everybody.
3        If there is no issue, then the Court need not hear
4  about the issue.  But if somebody is not following the Court's
5  order, that should have been raised earlier so we could have
6  addressed it and not take up the time.
7        So let's do that.  And if there's no issue tomorrow,
8  then we'll begin with the resumption.  Are you going to have
9  Officer Sanchez continue to read?
10       MS. PRICE:  I don't know, Your Honor.  I have not
11  been able to turn my phone on all day long.  So I take that
12  back.  I turned it on, but I --
13       THE COURT:  It's okay about the phone.  I just want
14  to ask the question about whether -- because it changes up the
15  scenery if you have somebody else read.
16       MS. PRICE:  I have to communicate with people outside
17  of this courtroom to know the answer to that question.
18       THE COURT:  Okay.  All right.
19       MS. PRICE:  And I would like to have an opportunity
20  to be heard on the defendant's objections to my designations,
21  Your Honor.  So when will that take place?
22       THE COURT:  Well, Ms. Price, I would have thought, as
23  an experienced litigator, you would have raised that with me
24  before we began this exercise.  I'm at a loss to understand
25  why you did not raise that since the Court gave this

1   information two days ago as to its objection.  And now it's

2   somehow the Court's fault or that you're not being given an

3   opportunity to be heard on the issue.

4           So how much time do you need to present your argument

5   so the Court can factor it in without wasting the jury's time?

6           MS. PRICE:  I'm sorry, Your Honor, I don't -- I want

7   to make sure you understand.  I'm not saying anything is the

8   Court's fault.  That is not my position.  So I'm not sure --

9           THE COURT:  Okay.

10          MS. PRICE:  I certainly have not articulated that as

11  a --

12          THE COURT:  All right.

13          MS. PRICE:  So I'm not sure why you made that

14  comment.  But I want the record to reflect, I -- you haven't

15  had that conversation with me.  And I'm asking for an

16  opportunity to make my record now because this is the first

17  opportunity I've had to make that request.

18          THE COURT:  Because you have made that request.

19  You've never made that request since the timing.  And I told

20  you all about -- to deal with any issues related to the

21  transcript before it's read.  So how much time do you need?

22          MS. PRICE:  To make my objections?  I don't know.

23          THE COURT:  Whether there's even objections --

24          MS. PRICE:  15 minutes.

25          THE COURT:  And I don't know whether -- I'm going to

1   order to the parties meet and confer and that the parties be

2   prepared to meet and confer.  Whether that is after the five

3   o'clock conference or in between now and five o'clock.

4        The parties can meet and confer.  And if there are

5   any issues, then those can be addressed and you can advise me

6   accordingly.  And I'll state for the record now, it's 15

7   minutes.  And I'm going to give 15 minutes total for it.

8        So you'll have to make your argument in approximately

9   less than five minutes or five minutes and I'll hear argument

10  on the other side because the Court has to have time to make

11  its ruling.

12       MS. PRICE:  Well, can I just put it in writing?

13  Would that be easier for the Court?

14       THE COURT:  Well, I still have to read it and make

15  the decision.  So however you wish to make your -- I'm not

16  going to deny you that ability.  So however you wish to do it.

17  I would ask that you meet and confer because maybe there isn't

18  an issue and I don't want to take unnecessary time with Mr.

19  Besmer, Mr. Kleam decides to -- there's not an issue.  So you

20  can talk and you're ordered to meet and confer.

21       All right.  So I'll see you at five.

22       MR. BESMER:  Thank you, Your Honor.

23       MS. PRICE:  Thank you.

24       (The proceedings were concluded at 4:29 p.m.)

25

1562

1    I, KAREN HOOVEN, Official Reporter, do hereby certify

2  that the foregoing transcript as true and correct.

3

4  DATED:  10th of September, 2015    /s/  Karen Hooven
                                       KAREN HOOVEN, RMR-CRR
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25